# 12-4689-cv

# United States Court of Appeals
*for the*
# Second Circuit

DRUG MART PHARMACY CORPORATION, PIPTONE ETHICAL PHARMACY, INC., JOST PHARMACY, INC., R-R DRUGS, INC., THIS WAY PHARMACY, PHAR-MOR PLAINTIFFS, 1:95-CV-01261-ILG,

*Plaintiffs,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX
FOR PLAINTIFF-APPELLANT**


DURETTECRUMP PLC
WYATT B. DURRETTE, JR.
KENNETH D. MCARTHUR
1111 E. Main Street, 20th Floor
Richmond, VA 23219
(804) 775-6900

BOIES, SCHILLER & FLEXNER LLP
NICHOLAS A. GRAVANTE, JR.
STEVEN I. FROOT
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

MICHAEL I. ENDLER
ROBERT C. TIETJEN
BENJAMIN D. BATTLES
30 South Pearl Street
Albany, NY 12207
(518) 434-0600

*Attorneys for Plaintiff-Appellant*

BOIES/GRAVANTE PLAINTIFFS,

*Plaintiff-Appellant*,

v.

JOHNSON AND JOHNSON, a New Jersey Corporation,
THRIFT DRUG INC., CAREMARK INC.,

*Defendants-Appellees*,

AMERICAN HOME PRODUCTS CORPORATION, GLAXO, INC., SCHERING-PLOUGH CORPORATION, SMITHKLINE BEECHAM PHARMACEUTICAL CO., MEDCO CONTAINMENT SERVICES, KNOLL PHARMACEUTICAL COMPANY, SANDOZ INC., HOFFMANN-LA ROCHE, INC., HOECHST MARION ROUSSEL, INC., FKA Marion Merrell Dow Inc., RHONE-POULENC RORER, INC., ABBOTT LABORATORIES, INC.,

*Defendants.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

No Plaintiff-Appellant has any parent corporation, and no publicly held corporation owns ten percent or more of any Plaintiff-Appellant's stock.

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ................................................................ 2

ISSUES PRESENTED FOR REVIEW ......................................................... 2

STATEMENT OF THE CASE ...................................................................... 3

BACKGROUND ............................................................................ 3

PROCEDURAL HISTORY ............................................................ 5

*Plaintiffs Agree to Streamline their Cases In Order to Advance the Litigation toward Trial* ........................................ 6

*The Matching Process* ................................................................ 8

*The August 8, 2011 Stipulation* .................................................. 9

*The Decision Below* .................................................................... 11

ARGUMENT ............................................................................................... 12

I. THE HISTORY OF THE ROBINSON-PATMAN ACT ....................... 13

A. Congress Enacted the Robinson-Patman Act to Protect Small Business from Being Discriminated against in Favor of Large-Volume Buyers ........................................................................ 13

B. The Act Has Not Been Repealed .................................................. 15

C. The Supreme Court's Decision in *Volvo* Confirms the Continuing Vitality of the Robinson-Patman Act ........................ 16

II. PLAINTIFFS' EVIDENCE OF COMPETITIVE INJURY CREATES AN ISSUE OF FACT FOR THE JURY ................................................ 21

A. The Competitive Injury Requirement .......................................... 21

B. Plaintiffs Are Entitled to an Inference of Competitive Injury under *Morton Salt* ....24

C. The District Court Erred by Concluding that Defendants Rebutted the *Morton Salt* Inference ....24

D. Plaintiffs Never Agreed to Restrict their Proof of Competitive Injury to the Results of the Matching Process ....28

E. The District Court Erred by Concluding that a Robinson-Patman Plaintiff Must Show Substantial Diverted Sales to Establish Competitive Injury on Summary Judgment ....32

III. PLAINTIFFS' EVIDENCE OF ANTITRUST INJURY CREATES AN ISSUE OF FACT FOR THE JURY ....43

A. The Antitrust Injury Requirement ....43

B. The Plain Language of the Clayton Act Has No Substantiality Requirement ....45

C. A Plaintiff with only Nominal Damages Can Satisfy the Clayton Act's Antitrust Injury Requirement ....46

D. The Case Law Cited by the District Court Requires Substantial *Evidence* of an Injury, Not a Substantial *Amount* of Injury ....48

IV. THE DISTRICT COURT IMPROPERLY REJECTED EVIDENCE FROM PLAINTIFF PHARMA-CARD ....52

V. PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF SHOULD SURVIVE SUMMARY JUDGMENT ....55

VI. PLAINTIFFS' 2(D) AND 2(F) CLAIMS SHOULD SURVIVE SUMMARY JUDGMENT ....56

CONCLUSION ....57

CERTIFICATE OF COMPLIANCE ....58

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Allen Pen Co. v. Springfield Photo Mount Co.*,
653 F.2d 17 (1st Cir. 1981) .......... 49-50

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) .......... 44, 46

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982) .......... 45-46

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels and Resorts Worldwide, Inc.*,369 F.3d 212 (2d Cir. 2004) .......... 33, 44, 46

*Boise Cascade Corp. v. FTC*,
837 F.2d 1127 (D.C. Cir. 1988) .......... 27-28, 39

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .......... 22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .......... 45

*Chrysler Credit Corp. v. J. Truett Payne Co.*,
670 F.2d 575 (5th Cir. 1982) .......... 37-38

*Coastal Fuels of Puerto Rico v. Caribbean Petroleum Corp.*,
79 F.3d 182, (1st Cir. 1996) .......... 26

*Corn Products Refining Co. v. FTC*,
324 U.S. 726 (1945) .......... 22, 34

*De Modena v. Kaiser Foundation Health Plan, Inc.*,
743 F.2d 1388 (9th Cir. 1984) .......... 41-42

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
288 F. Supp. 2d. 325 (E.D.N.Y. 2003) .......... 4

*Drug Mart Pharmacy Corp. v. Am. Home Prods Corp.*,
378 F. Supp. 2d 134 (E.D.N.Y. 2005) .......... 33

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
472 F. Supp. 2d 385 (E.D.N.Y. 2007) (SPA-1-83) ................................ 6, 43, 48

*Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*,
841 F. Supp. 212 (E.D. Mich. 1993) ..................................................................47

*Duncan v. Walker*,
533 U.S. 167 (2001)...........................................................................................45

*Erickson's Flooring & Supply Co. v. Basic Coatings, Inc.*,
No. 04-74990, 2007 WL 3036747 (E.D. Mich. Oct. 15, 2007) .........................42

*Falls City Indus., Inc. v. Vanco Beverage, Inc.*,
460 U.S. 428 (1983)...................................................................................... *passim*

*FLM Collision Parts, Inc. v. Ford Motor Co.*,
543 F.2d 1019 (2d Cir. 1976) ............................................................................16

*FTC v. Fred Meyer, Inc.*,
390 U.S. 341 (1968)...........................................................................................16

*FTC v. Morton Salt Co.*,
334 U.S. 37 (1948)........................................................................................ *passim*

*Geneva Pharmaceuticals Tech. Corp. v. Barr Laboratories, Inc.*,
386 F.3d 485(2d Cir. 2004) ..............................................................................13

*George Haug Co. v. Rolls Royce Motor Cars Inc.*,
148 F.3d 136 (2d Cir. 1998) ......................................................................... *passim*

*Great Atlantic & Pacific Tea Co. v. FTC*,
440 U.S. 69 (1979).............................................................................................13

*Hygrade Milk & Cream Co. v. Tropicana Prods.*,
No. 88 Civ. 2861, 1996 WL 257581 (S.D.N.Y. May 16, 1997) ........... 25, 50-52

*In re Blackwood Assocs., L.P.*,
153 F.3d 61 (2d Cir. 1998) ................................................................................29

*In re Boise Cascade Corp.*,
113 F.T.C. 956 (1990) ............................................................................... 26, 28

*In re Brand Name Prescription Drugs Antitrust Litig.*,
123 F.3d 599 (7th Cir. 1997) ........................................................................5

*In re Brand Name Prescription Drugs Antitrust Litig.*,
186 F.3d 781 (7th Cir. 1999) ......................................................................24

*Interstate Cigar Co. v. Sterling Drug Inc.*,
655 F.2d 29 (2d Cir. 1981) ...................................................................... 36-37

*Interstate Cigar Co. v. Sterling Drug Inc.*,
No. 79 Civ. 3547, 1980 WL 1862 (S.D.N.Y. July 3, 1980)......................... 36-37

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981)......................................................................... 22, 34, 44

*Lupia v. Stella D'oro Biscuit Co.*,
586 F.2d 1163 (7th Cir. 1978) .................................................................. 39-41

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
132 S. Ct. 2566 (2012)....................................................................................1

*Pinto v. Allstate Insurance Co.*,
221 F.3d 394 (2d Cir. 2000) .......................................................................55

*Precision Printing Co. v. Unisource Worldwide, Inc.*,
993 F. Supp. 338 (W.D. Pa. 1998)............................................................ 43, 55

*Sciambra v. Graham News*,
892 F.2d 411 (5th Cir.1990) .......................................................................47

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001).........................................................................................45

*United Magazine Co. v. Curtis Circulation Co.*,
279 F. App'x 14 (2d Cir. 2008)......................................................................36

*United States Football League v. Nat'l Football League*,
842 F.2d 1335 (2d Cir. 1988) .................................................................... 46-48

*United States Football League v. Nat'l Football League*,
887 F.2d 408 (2d Cir. 1989) ...................................................................... 47-48

*United States v. Anderson*,
15 F.3d 278 (1994) .....45

*United States v. Kozeny*,
541 F.3d 166 (2d Cir. 2008) .....45

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
546 U.S. 164 (2006) ..... *passim*

*Wilson v. Nw. Mut. Ins. Co.*,
625 F.3d 54 (2d Cir. 2010) .....13

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) .....44

**Statutes**

15 U.S.C. § 13 ..... *passim*

15 U.S.C. § 13c .....41

15 U.S.C. § 15 ..... 11, 45

15 U.S.C. § 26 .....55

28 U.S.C. § 1291 .....2

28 U.S.C. §§ 1331 .....2

28 U.S.C. § 1337 .....2

**Rules**

Fed. R. Civ. P. 54 .....2

Fed. R. Civ. P. 56 .....12

**Other Authorities**

H.R. Rep. No. 2287 (1936) ..... 14

S. Rep. No. 1502 (1936) .....14

80 Cong. Rec. 9417 .....14

Antitrust Modernization Commission,
Report and Recommendations (2007) .......................................................... 14, 15

Robert H. Bork, ANTITRUST PARADOX (1978)................................................. 14, 15

Henry J. Friendly, *The Gap in Lawmaking-Judges Who Can't and Legislators Who Won't*, 63 Colum. L. Rev. 787 (1963) ....................................15

John B. Kirkwood, *The Robinson-Patman Act and Consumer Welfare: Has* Volvo *Reconciled Them?*, 30 Seattle U. L. Rev. 349 (2007) .............................20

Pierre N. Leval, *Judging under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. Rev. 1249 (2006) .........................................................................20

J. Manly Parks et al., *Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.: When Do Competitive Bidding Assistance Programs Violate the Robinson-Patman Act?*, 19 Antitrust 62 (2005) ...........................................20

Richard Posner, THE ROBINSON-PATMAN ACT: FEDERAL REGULATION OF PRICE DIFFERENCES (1976) ........................................................................... 13, 15

Jeremy M. Suhr, Note, *Reading Too Much into Reeder-Simco?*, 106 Mich. L. Rev. 169 (2007) ..................................................................... 20, 35

## INTRODUCTION

Congress enacted the Robinson-Patman Act in 1936 to help small businesses compete with chain stores and other large purchasers by prohibiting manufacturers from offering quantity discounts to similarly-situated customers. For close to a century, the Act has helped protect small businesses' vital role in the national economy, and while the Act has been criticized, it remains the law of the land. In its decision below, however, the District Court (Gold, M.J.)[1] crippled the Act by requiring Robinson-Patman plaintiffs to satisfy stringent requirements found neither in the statute nor in any binding precedent. The District Court had no authority to amend or effectively repeal a statute Congress has chosen to leave unchanged. As the Supreme Court recently observed, courts "are vested with the authority to interpret the law; [they] possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them. It is not [the courts'] job to protect the people from the consequences of their political choices." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012).

Specifically, the District Court held that a Robinson-Patman plaintiff cannot survive a preliminary summary judgment motion unless it proves that the amount

[1] The parties below consented to have the motion decided by a magistrate judge. (A-1466.)

of sales it lost to the favored purchasers meets an undefined "substantiality" threshold. The District Court found that Plaintiffs could not satisfy that requirement—absent from the statute or any existing precedent—notwithstanding undisputed existence of Defendants' decades-long pattern of price discrimination resulting in a concomitant shift of market share to favored competitors as a result of that discrimination, and that Plaintiffs identified specific sales lost to favored competitors. That is not the law, and this Court should reverse the District Court's decision granting summary judgment against Plaintiffs' claims.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and Rule 54(b) of the Federal Rules of Civil Procedure. The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

## ISSUES PRESENTED FOR REVIEW

1. Did the District Court err by finding that a stipulation entered into by the parties restricted the evidence Plaintiffs could use to establish competitive injury?

2. Did the District Court err by holding that Plaintiffs could not establish competitive injury under *FTC v. Morton Salt Co.*, 334 U.S. 37 (1948), even though it is undisputed that Defendants, for decades, gave substantial discounts and rebates to entities that directly compete with Plaintiffs?

3. Did the District Court err by holding that a plaintiff must show substantial diverted sales in order to survive summary judgment on the issue of competitive injury?

4. Did the District Court err by holding that Plaintiffs' evidence failed to create a factual dispute as to whether Defendants' conduct caused competitive injury?

5. Did the District Court err by holding that the Clayton Act requires a plaintiff to show substantial diverted sales in order to survive summary judgment on the issue of antitrust injury?

6. Did the District Court err by holding that Plaintiffs' evidence failed to create a factual dispute as to whether Plaintiffs suffered an antitrust injury?

7. Did the District Court err by holding that Plaintiffs' claims for equitable relief failed as a matter of law?

8. Did the District Court err by holding that Plaintiffs' claims under Sections 2(d) and 2(f) failed as a matter of law?

## STATEMENT OF THE CASE

### BACKGROUND

This lawsuit alleges that brand-name prescription drug (BNPD) manufacturers violated the Robinson-Patman Act by engaging in a decades-long

pattern of price discrimination against independent retail pharmacies.[2] The parties here are twenty-eight independent retail pharmacy plaintiffs-appellants ("Plaintiffs"); defendant-appellee Johnson & Johnson ("J&J"), a BNPD manufacturer; and defendant-appellee Caremark, LLC, a pharmacy benefit manager ("PBM"), which owns and operates a mail-order pharmacy ("Caremark," and together with J&J, "Defendants").[3]

Since at least the early 1990s, J&J and other BNPD manufacturers have utilized a two-tiered pricing policy where purchasers in the arbitrarily-defined "retail" class of trade—which includes all Plaintiffs—pay full list price for BNPDs, and a variety of other purchasers ("Favored Purchasers")—including mail-order pharmacies owned by Caremark and other PBMs—pay substantially discounted prices for the same BNPDs.

That undisputed price discrimination allowed the Favored Purchasers to charge their customers less for BNPDs and thereby gain a significant competitive advantage over Plaintiffs. Unsurprisingly, as the two-tiered pricing practices grew

---

[2] The procedural history of this case is described in greater detail in *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 288 F. Supp. 2d. 325, 326-28 (E.D.N.Y. 2003).

[3] Following the notice of appeal in this case being filed, Plaintiffs agreed to settle their claims against a number of the defendants-appellees in this action that had manufactured BNPDs: Abbot Laboratories; Ciba-Geigy Corporation and Sandoz Pharmaceuticals Corporation (both now merged into Novartis Pharmaceuticals Corporation); Hoechst Marion Roussel, Inc. and Rhone-Poulenc Rorer, Inc. (both now part of the Sanofi group); and Pfizer Inc. and its subsidiaries G.D. Searle & Co. and Pharmacia & Upjohn Co. Together with J&J, these entities are at times collectively referred to herein as the "Manufacturer Defendants."

during the 1990s, retail pharmacies lost a substantial share of the BPND market to Favored Purchasers, in particular mail order pharmacies. From 1990 to 2005, for example, mail-order pharmacy's market share doubled while independent retail's market share was cut in half. (A-1679-93.) Further, Manufacturer Defendants' pricing practices significantly impacted the ability of retail pharmacies to do business in the United States. In 1991, there were approximately 31,000 independent retail pharmacies nationwide; by 1997 that number had fallen to approximately 22,000. The experience of the plaintiff group involved in this litigation is illustrative: at the start of this case, the total number of the plaintiffs' open locations was approximately 4,000; today, over 50% of those locations are no longer in business.

## PROCEDURAL HISTORY

This case began as part of a massive litigation involving claims brought by retail pharmacies under both the Sherman Act and the Robinson-Patman Act against manufacturers and wholesalers of BNPDs. Those cases were consolidated for pre-trial purposes in the Northern District of Illinois. *See generally In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 602 (7th Cir. 1997) (describing procedural history). Plaintiffs herein opted out of the plaintiff class in order to pursue their claims individually. After transfer back to the Eastern District of New York, Plaintiffs settled their Sherman Act claims. The Robinson-Patman

claims of certain “designated” plaintiffs and defendants went forward, but discovery was stayed for all of the non-designated parties pursuant to a stipulation and pre-trial order (“Pre-Trial Order Number 5” (A-62-88)) that had been entered in the MDL proceedings.[4]

### *Plaintiffs Agree to Streamline their Cases In Order to Advance the Litigation toward Trial*

On January 25, 2007, the District Court (Glasser, J.) granted a summary judgment motion on damages that the designated defendants had filed against the designated plaintiffs. (SPA-1-83.) The court held that the designated plaintiffs: (i) failed to show antitrust injury because their expert report on damages was deficient (SPA-59-81); and (ii) were precluded from relying on any evidence outside the expert report on the basis of interrogatory responses the designated plaintiffs had served in 1995 (SPA-75-76).

Even following that ruling, however, the Robinson-Patman Act claims of

[4] As explained by the District Court:

> While this litigation was pending before Judge Charles P. Kocoras of the United States District Court for the Northern District of Illinois, the Court entered Pretrial Order Number 5, which, among other things, bifurcated discovery of the two claims and ‘contemplate[d] that . . . plaintiffs’ claims may be tried in two separate trials.’ . . . Pretrial Order Number 5 stayed the Robinson-Patman Act claims asserted against all non-designated defendants until the first Robinson-Patman Act trial involving designated parties is completed. Pursuant to the pretrial order, the parties designated seventeen plaintiffs to proceed against five defendants.

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 378 F. Supp. 2d 134, 136 (E.D.N.Y. 2005).

approximately 3,700 "non-designated" individual retail pharmacy plaintiffs remained to be resolved.[5] In an effort to find an efficient path forward for those cases, Plaintiffs made a number of proposals—including offering to agree to binding arbitration (A-1571-72)—each of which was rejected by the Defendants, who argued repeatedly that they should not be subjected to any discovery until each Plaintiff established antitrust injury in the manner set forth in Judge Glasser's January 25, 2007 summary judgment ruling and identified specific customers lost as a result of the two-tiered pricing scheme. (*E.g.*, A-410.)

The District Court ultimately adopted a phased discovery process and instructed Plaintiffs to answer Defendants' interrogatories relating to the identification of customers lost as a result of price discrimination, but stayed all other discovery. (A-1597, 1604.) Accordingly, Plaintiffs answered interrogatories and produced over 500,000 pages of documents. By necessity, however, most Plaintiffs' answers were incomplete in that they showed that particular customers had stopped purchasing certain BNPDs from their pharmacies, but could not definitively determine what became of any particular customer thereafter. Plaintiffs' responses noted that discovery was required—from Defendants and third-party Favored Purchasers—in order to identify which customers were lost to

[5] Pre-trial Order Number 5 limited the effect of those summary judgment motions to the designated parties. (A-68-69.)

Favored Purchasers. (*E.g.*, A-1736-37.) Nonetheless, and even without that information, more than 550 plaintiffs identified specific customers lost as a result of Defendants' discriminatory pricing scheme.[6] (*E.g.*, A-1735, 1740-50.)

***The Matching Process***

In recognition of the inherent limitations of Plaintiffs' customer data, the District Court permitted Plaintiffs to serve discovery requests on certain Favored Purchasers in order to help identify specific lost customers. (A-1622-25.) Following some negotiation on the scope of discovery,[7] the District Court allowed Plaintiffs to compile electronic lists of customers they had a basis to believe may have been lost to a Favored Purchaser, and then try to match those lists with customer lists from the files of five Favored Purchasers. (A-1663-64.) That plan, which became known as the "Matching Process," was intended to make a threshold showing of damages by tracing specific customers from Plaintiffs to the Favored Purchasers. (*See* A-1528-30, 2676.) Importantly, there was never a suggestion that the Matching Process would restrict the proof Plaintiffs could use to establish *prima facie* Robinson-Patman violations.

---

[6] In a further effort to streamline the litigation, the parties randomly selected the twenty-eight Plaintiffs involved in this appeal from the hundreds of plaintiffs remaining in the case.

[7] Plaintiffs initially proposed a comprehensive approach where they would obtain discovery from third-party Favored Purchasers consisting of all patients within particular zip codes (corresponding to the location of the Plaintiff pharmacies). The District Court rejected that approach, citing burden and privacy concerns. (A-1612-16, 2577.)

The Matching Process itself was the subject of extended negotiations between Plaintiffs and the Favored Purchasers, all of which had different data systems with different technological capabilities and different periods of available data. In January 2011, the Favored Purchasers provided their matching results to Plaintiffs' counsel. Plaintiffs then worked with data professionals to consolidate the data for each party and remove anomalous data that did not appear to indicate a "match." The results of that work were provided to Defendants' counsel. While the parties continue to dispute the proper interpretation of those results, it is undisputed that the process identified thousands of individual customers who once purchased BNPDs from Plaintiffs and then transferred their business to a Favored Purchaser. (A-1419, 1450.)

***The August 8, 2011 Stipulation***

On August 8, 2011, the Manufacturer Defendants, Caremark, and Plaintiffs jointly wrote to Magistrate Judge Gold to state that the Matching Process had been completed and to submit a stipulation that described aspects of the Matching Process and provided briefing dates for a summary judgment motion. (A-308-16.) The stipulation explained that the Matching Process was intended to demonstrate that Plaintiffs had lost specific customers to the Favored Purchasers, but limited:

(i) the universe of Favored Purchasers to four specifically identified PBMs[8] and Omnicare, a long-term care pharmacy; (ii) the universe of drugs to the Manufacturer Defendants' top-selling maintenance drugs (*i.e.*, medications prescribed for chronic, long-term conditions that are taken on a regular, recurring basis); and (iii) the relevant time period to that for which the PBMs and Plaintiffs currently maintained data. (A-312-13.)

The stipulation also contained express language contemplating that Plaintiffs would rely on evidence *in addition to* the matching results to prove their case and to oppose summary judgment:

> Notwithstanding the Parties' disagreement about the legal significance of the matching results *and any other data Plaintiffs may seek to use*, the Parties agree that, prior to engaging in further discovery, this threshold question [of whether Plaintiffs' claims can survive summary judgment] should be resolved …

(A-314 (emphasis added).)

That understanding was reiterated in a conference call the parties had before Magistrate Judge Gold on August 11, 2011, when Plaintiffs' counsel stated that, for "*damage purposes*," Plaintiffs would be limited to the specific customers identified through the matching process, but noted the existence of "*other evidence that is relevant to the determination of injury to competition and antitrust injury*

---

[8] The PBMs identified in the stipulation were Caremark, AdvancePCS, Express Scripts, and Medco. (A-312.)

*that goes beyond the identity of specific lost customers*." (A-341 (emphasis added).) Counsel further stated that Plaintiffs "never contemplated . . . that the lost customers that were identified through this abbreviated process narrowed as much as we did would be the universe—the entire universe of evidence of lost customers that would be relevant to the determination of competitive injury and antitrust injury." (A-346.) Importantly, neither Defendants nor the Court advanced the position that Plaintiffs would be restricted to the matching results for liability purposes.

### *The Decision Below*

On October 20, 2011, Defendants moved for summary judgment, claiming for the first time in this lengthy litigation that Plaintiffs could not establish that they lost "substantial" sales or profits as a result of price discrimination and therefore could not establish the purported requisite harm to competition or antitrust injury.

In response, Plaintiffs argued, *inter alia*, that (i) Defendants' undisputed decades-long practice of price discrimination entitled Plaintiffs to an inference of competitive harm under *FTC v. Morton Salt Co.*, 334 U.S. 37 (1948); and (ii) there is no quantum of damage necessary to establish antitrust injury under Section 4 of the Clayton Act, 15 U.S.C. § 15(a), which provides that a plaintiff may bring an antitrust claim "without regard to the amount in controversy."

On August 16, 2012, the District Court granted Defendants' summary judgment motion. (SPA-118-46.) Specifically, the District Court limited Plaintiffs' proof to the results of the Matching Process and held that, based solely on those results, Plaintiffs could not establish that Defendants' discriminatory pricing practices had caused either a harm to competition ("competitive injury") or an injury to plaintiffs of the kind that the antitrust laws were designed to prevent ("antitrust injury"). According to the District Court, the relevant case law—most notably the Supreme Court's decision in *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006)—requires that summary judgment be entered against a Robinson-Patman plaintiff on the issues of competitive injury and antitrust injury unless the plaintiff can definitively show that it lost a "substantial" number of lost sales to a favored purchaser. The Clerk of the District Court thereafter entered final judgment in favor of Defendants on Plaintiffs' claims, and Plaintiffs timely appealed to this Court.

## ARGUMENT

This Court should reverse the District Court's order granting summary judgment against Plaintiffs. Defendants are entitled to summary judgment only if they can demonstrate "that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). "The role of the court in deciding a motion for summary judgment is not to resolve

disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010) (quotation omitted). On appeal, this Court "review[s] a grant of summary judgment *de novo* to ensure the district court applied substantive antitrust law correctly." *Geneva Pharmaceuticals Tech. Corp. v. Barr Laboratories, Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (reversing grant of summary judgment where district court inappropriately resolved factual dispute in defendants' favor).

# I. THE HISTORY OF THE ROBINSON-PATMAN ACT

## A. Congress Enacted the Robinson-Patman Act to Protect Small Businesses from Being Discriminated against in Favor of Large-Volume Buyers

Congress enacted the Robinson-Patman Act in 1936, as an amendment to the Clatyon Act, to combat what was perceived as "the increased market power and coercive practices of chainstores and other big buyers that threatened the existence of small independent retailers." *Great Atlantic & Pacific Tea Co. v. FTC,* 440 U.S. 69, 75-76 (1979). The original Clayton Act was widely interpreted as permitting a seller to offer quantity discounts to large buyers, such as chain stores, that were not based on the seller's costs. *Morton Salt,* 334 U.S. at 43; Richard Posner, THE ROBINSON-PATMAN ACT: FEDERAL REGULATION OF PRICE DIFFERENCES 25 (1976). During the Great Depression, those quantity discounts became extremely

unpopular and Congress began to view large chain stores as a threat to small 'mom and pop' competitors. Antitrust Modernization Commission, Report and Recommendations 313 (2007) ("AMC Report").[9] Consequently, "the cry went up that the chains were prospering unfairly as recipients of discriminatorily low prices; anti-chain store legislation in various forms was adopted in many states, and at the national level the result was a statute drafted by counsel for a wholesale grocers association, the Robinson-Patman Act." Robert H. Bork, The ANTITRUST PARADOX 383 (1978); *see Morton Salt*, 334 U.S. at 43-44 ("The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability.") (citing H.R. Rep. No. 2287, at 7 (1936); S. Rep. No. 1502, at 4-6 (1936); 80 Cong. Rec. 9417).

As amended by the Robinson-Patman Act, Section 2(a) of the Clayton Act provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . .

[9] http://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf (last visited Jan. 11, 2014).

15 U.S.C.A. § 13(a). Both the Supreme Court and this Court have explained that Congress was "especially concerned with protecting small businesses," and revised Section 2 in order "'to justify a finding of injury to competition by a showing of 'injury to the competitor victimized by the discrimination.'" *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 142 (2d Cir. 1998) (quoting *Morton Salt*, 334 U.S. at 49); *see also* Posner, *supra*, at 26-27 (The Robinson-Patman amendment "closed the quantity-discount loophole" and "added a new test of anticompetitive effect, designed to attenuate still further the statutory requirement of proving competitive injury.").

### B. The Act Has Not Been Repealed

While the Robinson-Patman Act has been criticized,[10] the Supreme Court has made clear that, until Congress modifies or repeals the statute, it must be enforced as written. *See Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 436 (1983) ("The determination whether to alter the scope of the Act must be made by Congress, not this Court."). Despite repeated calls for modification or repeal, *e.g.*, AMC Report 312 (calling for the repeal of Robinson-Patman and noting that other groups in 1955, 1969, and 1977 had all called for the Act's repeal

---

[10] *E.g.*, Bork, *supra*, at 382; *Volvo*, 546 U.S. at 187 (Stevens, J., dissenting); *see also* Henry J. Friendly, *The Gap in Lawmaking-Judges Who Can't and Legislators Who Won't*, 63 Colum. L. Rev. 787, 793-94 (1963) (noting that "not a word has been altered" in the Robinson-Patman Act despite criticism of the Act "[f]rom the outset").

or substantial modification), Congress has left the 1936 text unchanged and it remains the law of the land.

Moreover, the Act must be interpreted consistently with its purpose of protecting small retailers from the coercive practices of large buyers. *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1026 (2d Cir. 1976) ("[T]he Robinson-Patman Act should not be construed 'in a manner which runs counter to the broad goals which Congress intended it to effectuate.'") (quoting *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349 (1968)); *see also Volvo*, 546 U.S. at 178 (competitive injury may be inferred in "chainstore paradigm" but not where "there is no discrete 'favored' dealer comparable to a chainstore or a large independent department store").

### C. The Supreme Court's Decision in *Volvo* Confirms the Continuing Vitality of the Robinson-Patman Act

The District Court's analysis rests on the mistaken premise that the Supreme Court narrowed the scope of the Robinson-Patman Act in *Volvo*, and the District Court's irrelevant belief that the Act itself rests on "mistaken economic theory" and has "come into disfavor" in recent years. (SPA-131 & n.15, 141.) *Volvo*, however, actually confirms the vitality of the Robinson-Patman Act, and public criticism of the policy behind a law does not authorize a federal court to substitute its own wisdom for that of Congress.

Initially, nothing in *Volvo* even addresses the Robinson-Patman Act's application to the clear and undisputed price discrimination between competing purchasers that exists here. Instead, the question at issue in *Volvo* was "whether a manufacturer [may] be held liable for secondary-line price discrimination under the Robinson-Patman Act *in the absence of a showing that the manufacturer discriminated between dealers competing to resell its product to the same retail customer*." *Id.* at 175 (emphasis added). In other words, *Volvo* focused on whether price discrimination was even present, an issue not disputed in this case.

In *Volvo*, an authorized dealer ("Reeder") that sold Volvo trucks through a competitive bidding process alleged that Volvo violated the Robinson-Patman Act by offering other authorized dealers larger discounts. At trial, the evidence showed that Volvo had (i) on several occasions offered larger discounts to other dealers bidding for *different* contracts; (ii) on one occasion initially offered a larger discount to a dealer that was directly competing with Reeder for the same contract (which neither dealer won), but ultimately offered Reeder the same discount; and (iii) on one occasion offered the same discount to another dealer that was directly competing with Reeder for the same contract, but then increased that dealer's discount after that dealer's bid was accepted. *Id.* at 177-80. The jury found a reasonable possibility that Volvo's discriminatory pricing may have harmed competition between Reeder and other Volvo dealers, and that Volvo's

discriminatory pricing had in fact injured Reeder. The Court of Appeals affirmed that finding. The Supreme Court, however, ultimately reversed and found that Reeder had failed to show an injury to competition.

The Supreme Court explained that a plaintiff may prove the requisite threat to competition by showing "the diversion of sales or profits from a disfavored purchaser to a favored purchaser"; or pursuant to what is known as "the *Morton Salt* inference," by presenting "evidence that a favored competitor received a significant price reduction over a substantial period of time," *id.* at 177 (citing *Morton Salt*, 334 U.S. at 49-51). *See* Section II *below*.

The Supreme Court found that Reeder could not show competitive injury under either method because it had not proven the existence of any favored purchaser with which it competed at any point in time. *Id.* at 180. Specifically, the Court found that Reeder did not compete with other dealers when it bid on different contracts, and that with respect to the two incidents where Reeder *did* compete for particular contracts, Reeder "could not establish that it was *disfavored* vis-à-vis the other Volvo dealers" because the amount of the alleged price discrimination—if it existed at all—was not "substantial."[11] *Id.* (emphasis in original). In other words, Reeder could not establish competitive injury under

[11] The Court thus required a showing of substantial price differential, not a substantial number of lost sales. *See* Section II.E *below*.

*Morton Salt* or by any other means because it could not show that Volvo ever sold at a lower price to Reeder's competitors. *Id.* at 179-80. *Volvo* thus did nothing to diminish Robinson-Patman's application to the type of conduct that "the Act centrally addresses," *i.e.*, "price discrimination . . . involving competition between different purchasers for the resale of the purchased product." *Id.* at 169-70.

Nonetheless, some courts and commentators have incorrectly interpreted *Volvo* as significantly narrowing the scope of the Robinson-Patman Act or casting doubt on the continued viability of the *Morton Salt* inference. Those interpretations are based primarily on Part IV of the *Volvo* decision where the Court—after concluding that Reeder's evidence failed to show an injury to competition (including under *Morton Salt*)—offered the following observations:

> Interbrand competition, our opinions affirm, is the primary concern of antitrust law. The Robinson–Patman Act signals no large departure from that main concern. Even if the Act's text could be construed in the manner urged by Reeder . . . , we would resist interpretation geared more to the protection of existing *competitors* than to the stimulation of *competition*. In the case before us, there is no evidence that any favored purchaser possesses market power, the allegedly favored purchasers are dealers with little resemblance to large independent department stores or chain operations, and the supplier's selective price discounting fosters competition among suppliers of different brands. By declining to extend Robinson–Patman's governance to such cases, we continue to construe the Act consistently with broader policies of the antitrust laws.

*Id.* at 180-81 (emphasis in original, quotations and citations omitted). At most, this passage clarifies that the Robinson-Patman Act should not apply where—unlike

here—the favored purchasers lack market power and the challenged pricing practices promote competition.[12]

Moreover, the Supreme Court decided *Volvo* with the benefit of a full trial record. In fact, the Court closely scrutinized the trial evidence, and analysis of that evidence occupies a substantial portion of both *Volvo*'s majority and dissenting opinions. *E.g.*, *id.* at 177-78 (analyzing the three categories of evidence that plaintiff offered at trial). Here, the District Court ruled on a limited discovery record that has not seen the production of Manufacturer Defendant information since *1995*. Thus, despite the District Court's apparent belief to the contrary (*see*

[12] In any event, the Court's statement in Part IV of its *Volvo* opinion is dictum. As one commentator has observed, this language "appeared only after the Court had already reexamined the evidence presented at trial" and "concluded that the plaintiff had failed to show that Volvo sold at a lower price to Reeder's 'competitors' given the customer-specific competitive-bidding situation at issue." Jeremy M. Suhr, Note, *Reading Too Much into Reeder-Simco?*, 106 Mich. L. Rev. 169, 174 (2007); *see also* Pierre N. Leval, *Judging under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. Rev. 1249, 1267-68 (2006) (identifying the "gratuitous statement of standards" as a "pernicious stimulus for making law through dictum"). Accordingly, it would be improper to read this passage as changing decades of Robinson-Patman law and foreclosing the Plaintiffs here from presenting their claim to a jury. *See* Suhr, *supra*, at 174 ("[O]ne would not expect the Court to reject in dicta a doctrine central to the RPA, first adopted in 1948 and affirmed repeatedly since then."). Moreover, many commentators expected the Court to use *Volvo* as an opportunity to disavow or diminish the *Morton Salt* inference. *E.g.*, *id.* at 173; J. Manly Parks et al., Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*: When Do Competitive Bidding Assistance Programs Violate the Robinson-Patman Act?*, 19 Antitrust 62, 67 (2005) (opining that "reversal on the grounds that Reeder failed to prove competitive injury could, depending on the Court's approach, represent a significant narrowing of the *Morton Salt* presumption of competitive injury—an outcome that would have ramifications for all secondary-line RP Act claims"). That the Court instead expressly endorsed *Morton Salt* eliminates any possibility that the Court intended to bar future Robinson-Patman plaintiffs from establishing competitive injury through proof of substantial price discrimination over a significant period of time. *See* John B. Kirkwood, *The Robinson-Patman Act and Consumer Welfare: Has* Volvo *Reconciled Them?*, 30 Seattle U. L. Rev. 349, 373 (2007) (*Volvo* "endorsed the *Morton Salt* inference").

SPA-131-32), nothing in *Volvo* suggests that a court considering a Robinson-Patman claim should be predisposed to summary dismissal.

## II. PLAINTIFFS' EVIDENCE OF COMPETITIVE INJURY CREATES AN ISSUE OF FACT FOR THE JURY

### A. The Competitive Injury Requirement

A plaintiff may bring three types of claims under Section 2(a) of the Robinson-Patman Act—primary line, secondary line, and tertiary line. *Volvo*, 546 U.S. at 176. Plaintiffs here claim a secondary-line injury, *i.e.*, they allege "price discrimination that injures competition among the discriminating seller's customers." *Id.* To make out a *prima facie* case for a secondary-line price discrimination violation under Section 2(a), a plaintiff must show that (i) the relevant product sales were made in interstate commerce; (ii) the products were of "like grade and quality"; (iii) defendants "discriminate[d] in price between" plaintiffs and other purchasers; and (iv) "the effect of such discrimination may be . . . to injure, destroy, or prevent competition" to the advantage of a favored purchaser. *Volvo*, 546 U.S. at 176-77 (quoting 15 U.S.C.A. § 13(a)); *George Haug*, 148 F.3d at 141. The fourth factor, based on the statutory text, has been described as "competitive injury." *See Falls City*, 460 U.S. at 434-35. "Unless rebutted by one of the Robinson-Patman Act's affirmative defenses,[13] a showing of

[13] *See* 15 U.S.C. § 13(a) (providing that Section 2(a) shall not prohibit differential pricing based on cost, prevent merchants from selecting their own customers in bona fide transactions not made in restraint of trade, or prevent price changes based on market conditions); § 13(b)

competitive injury as part of a *prima facie* case is sufficient to support injunctive relief, and to authorize further inquiry by the courts into whether the plaintiff is entitled to treble damages under § 4 of the Clayton Act." *Id.* at 435. Here, Defendants do not dispute that they sold BNPDs of like grade and quality in interstate commerce, and that they discriminated in price between Plaintiffs and the Favored Purchasers. Therefore, the only element of plaintiffs' *prima facie* case disputed on Defendants' motion is whether Defendants' price discrimination "threatens to injure competition." *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993).

To establish competitive injury, a plaintiff need not show actual, quantifiable harm to competition. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561 (1981) ("By its terms §2(a) is a prophylactic statute which is violated merely upon a showing that the effect of such discrimination *may be* substantially to lessen competition.") (emphasis in original, citation omitted); *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 742 (1945) ("[T]he statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they 'may' have such an effect."). Instead, the requisite threat to competition may be shown through evidence of diverted sales or profits,

---

(defendant can rebut *prima facie* case of price discrimination by showing that discounts were made to meet price or services offered by competitor).

or under the *Morton Salt* inference. *Volvo*, 546 U.S. at 177.[14] The *Morton Salt* inference derives its name from the Supreme Court's decision in *FTC v. Morton Salt*, 334 U.S. 37 (1948). As this Court has explained, "*Morton Salt* permits an inference of injury to competition from evidence of a substantial price difference over time, because such a price difference may harm the competitive opportunities of purchasers, and thus create a 'reasonable possibility' that competition itself may be harmed." *George Haug*, 148 F.3d at 142.[15]

The District Court erred when it concluded that Plaintiffs' could not, as a matter of law, show an injury to competition. *First*, Plaintiffs are entitled to an inference of competitive injury under *Morton Salt*. *Second*, Defendants' evidence does not rebut that inference. *Third*, Plaintiffs' reliance on evidence outside of the matching results to establish competitive injury is absolutely appropriate. And *finally*, identification of a "substantial" amount of specific lost sales is not required to show competitive injury.

[14] In April 2009, Plaintiffs notified the Court and the Defendants that they intended to prove competitive injury through evidence supporting a *Morton Salt* inference. (A-469-70.)

[15] Although the *Morton Salt* inference was first applied in a case brought by the FTC, both the Supreme Court and this Court have granted private plaintiffs the benefit of the inference in actions for treble damages under § 4 of the Clayton Act. *See, e.g., Falls City*, 460 U.S. at 435-38; *George Haug*, 148 F.3d at 144.

### B. Plaintiffs Are Entitled to an Inference of Competitive Injury under *Morton Salt*

Plaintiffs here are entitled to an inference of competitive injury under *Morton Salt* because there is no dispute that Defendants, since at least 1993, have provided substantial discounts and rebates to favored purchasers with whom Plaintiffs directly compete. In fact, the evidence of that price discrimination is so strong that Judge Posner, writing for the Seventh Circuit during an earlier phase of this litigation, suggested that the issue be stipulated. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 186 (7th Cir. 1999) ("[T]he existence of price discrimination should have been removed as an issue at trial by a stipulation of the parties."); *see also id.* ("[T]he manufacturers of [BNPDs] engage in price discrimination . . . . Everyone knows this.").

### C. The District Court Erred by Concluding that Defendants Rebutted the *Morton Salt* Inference

The District Court did not dispute that Plaintiffs were entitled to an inference of competitive injury under *Morton Salt*. Instead it ruled that Defendants had rebutted that inference. (SPA-139-40.) That conclusion was wrong. *First*, based on the very case law relied upon by the District Court, a defendant cannot rebut *Morton Salt* where, as here, the plaintiffs offer direct evidence of lost sales. *Second*, even if the inference could be overcome in this case (and it cannot), Defendants have not put forth enough evidence to break the chain of causation

between their undisputed price discrimination and the competitive injury. Indeed, Defendants submitted no affirmative evidence whatsoever.[16]

In *Falls City Indus. v. Vanco Beverage, Inc.*, 460 U.S. 428 (1983), the Supreme Court stated that the *Morton Salt* inference could be overcome "by evidence breaking the causal connection between a price differential and lost sales or profits," but *only* "[i]n the absence of direct evidence of displaced sales." *Falls City*, 460 U.S. at 435; *see also Hygrade Milk & Cream Co. v. Tropicana Prods.*, No. 88 Civ. 2861, 1996 WL 257581, at *3 (S.D.N.Y. May 16, 1997) (Where competitive injury is inferred from a substantial price difference over time *and plaintiffs cannot show evidence of displaced sales*, this inference may be overcome. . . .") (emphasis added).

Here, it is indisputable that the results of the Matching Process constitute "direct evidence of displaced sales." Specifically, Plaintiffs initially identified over 5,000 customers who purchased BNPDs from plaintiff retail pharmacies at one time, but subsequently switched those purchases to one of the identified Favored Purchasers. (A-1419.) And Plaintiffs have additional evidence of lost sales that the District Court inappropriately refused to even consider: In response to Defendants' interrogatories, eighteen of the twenty-eight Plaintiffs at issue

---

[16] The District Court's rebuttal analysis was particularly misguided given that the court severely restricted the evidence of competitive injury on which Plaintiffs could rely by improperly interpreting a stipulation between the parties regarding the scope and procedure of Defendants' summary judgment motion. *See* Section II.D *below*.

identified specific customers and groups of customers who were lost as a result of the differential pricing offered to Favored Purchasers. (A-1694-1782, 1829-2546); *see also* Section IV *below*. Accordingly, because Plaintiffs have submitted "direct evidence of displaced sales," the *Morton Salt* inference cannot be rebutted. *Falls City*, 460 U.S. at 435.

Furthermore, Plaintiffs submitted market evidence demonstrating that Defendants' discriminatory pricing negatively affected the retail pharmacy market as a whole. For example, Plaintiffs showed that, from 1990-2005, independent retail pharmacy's market share was cut in half, while the market share for mail order pharmacy—a key business component of the Favored Purchasers—doubled. (A-1679-93.)

As noted above, in order to overcome an inference of competitive injury under *Morton Salt,* a party must put forth evidence that breaks "the causal connection between a price differential and lost sales or profits." *Falls City,* 460 U.S. at 435; *see also Boise Cascade Corp. v. FTC,* 837 F.2d 1127, 1144 (D.C. Cir. 1988) (defendant must come forward with "[s]pecific, substantial evidence of absence of competitive injury"). That evidence must preclude any "reasonable possibility of competitive injury." *In re Boise Cascade Corp.,* 113 F.T.C. 956, at *12 (1990); *see also Coastal Fuels of Puerto Rico v. Caribbean Petroleum Corp.,* 79 F.3d 182, 194, (1st Cir. 1996). Defendants relied exclusively on the results of

the Matching Process to rebut the *Morton Salt* inference. Notably, Defendants did not even attempt to rebut Plaintiffs' evidence concerning competition in the BNPD market as a whole. The matching results—based on a limited universe of BNPDs and parties, and intended solely to narrow Plaintiffs' potential damages claims—do not come close to rebutting *Morton Salt*.

The District Court relied on *Boise Cascade Corp. v. FTC*, 837 F.2d 1127 (D.C. Cir. 1988), to conclude that Defendants had carried their rebuttal burden. (SPA-139-40.) But in that case, the D.C. Circuit determined only that the FTC had failed to consider relevant evidence that *might have* rebutted the *Morton Salt* inference, and remanded the case to the FTC to consider that evidence in the first instance. *See Boise Cascade,* 837 F.2d at 1148 (the FTC's "rejection on relevancy grounds of Boise's evidence of the absence of competitive injury (or reasonable possibility of competitive injury) was in error.").

Furthermore, *Boise Cascade* involved significantly more rebuttal evidence than what has been offered here. The *Boise Cascade* defendant presented specific evidence of competition in the relevant market, including evidence that: (i) the allegedly disfavored purchasers' sales and gross profits increased significantly during the discriminatory pricing period; (ii) customers frequently switched between dealers, including from favored to disfavored purchasers; and (iii) the disfavored purchasers were uncertain whether differential pricing actually caused

them to lose sales.[17] *Id.* at 1144-45. Notwithstanding that evidence, the FTC determined on remand that the *Morton Salt* inference had *not* been rebutted. *In re Boise Cascade*, 1990 WL 10012588, at *2 ("[W]e have examined th[e] evidence on the assumption that it is relevant, but find that it is of insufficient probative force to rebut the Morton Salt inference."). Given the paucity of Defendants' rebuttal evidence, the same result should follow here.

### D. Plaintiffs Never Agreed to Restrict their Proof of Competitive Injury to the Results of the Matching Process

In addition to misapplying *Morton Salt*, the District Court wrongly concluded that Plaintiffs had agreed to severely restrict the type of evidence they could use to prove competitive injury. The District Court based its conclusion on a stipulation the parties filed with the Court on August 8, 2011, which stated, *inter alia*, that the Matching Process "was designed to determine the universe of potential lost customers that Plaintiffs claim they lost as a result of the pricing practices of Defendants." (A-312.) That language, however, reflected only a limitation on the evidence Plaintiffs could use to prove damages. Nothing in that stipulation was ever intended to limit the proof upon which Plaintiffs could rely to

[17] Plaintiffs here, by contrast, have submitted an affidavit from a large school district customer stating that a Favored Purchaser's lower BNPD prices, which that Favored Purchaser indicated were possible because of the rebates it received from the Manufacturer Defendants, directly caused the customer to switch its BNPD purchases from a Plaintiff to the Favored Purchaser. (A-2547-70.)

establish the elements of a *prima facie* Robinson-Patman violation, including competitive injury.

This Court reviews *de novo* a lower court's interpretation of a negotiated stipulation, even where the lower court entered that stipulation as an order. *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 66-67 (2d Cir. 1998) (lower court's interpretation of stipulation drafted by parties and approved by court "is entitled to no special deference" because it is "more akin to a run-of-the mill contract than to a court order"). Here, the District Court's interpretation of the Stipulation ignored both the actual language of the Stipulation itself as well as the historical context of the Matching Process, and resulted in the improper exclusion of relevant evidence.

*First*, the District Court's interpretation conflicts with the clear language of the Stipulation itself. Although the Stipulation states that the Matching Process was designed to determine the universe of lost customers, it contains no language that limits what type of evidence Plaintiffs could offer to prove a *prima facie* Robinson-Patman violation. To the contrary, paragraph nine of the Stipulation states expressly Plaintiffs intended to rely on evidence *in addition to* the matching results: "Notwithstanding the Parties' disagreement on the legal significance of the matching results *and any other data Plaintiffs may seek to use*, the Parties agree that, prior to engaging in further discovery, this threshold question [of whether Plaintiffs' claims can survive summary judgment] should be resolved." (A-314

(emphasis added).) In any event, review of the Stipulation makes clear that it was intended to clarify the legal issues presented in Defendants' summary judgment motion and establish the procedures for briefing that motion, and that it was not intended to limit Plaintiffs' proof. (A-312, 314-15.)

*Second*, the context in which the parties agreed to undertake the Matching Process and enter into the Stipulation undermines the District Court's conclusion that the parties agreed to restrict Plaintiffs' proof of competitive injury. As described above (*see* pp. 6-8), the parties developed the Matching Process in response to Judge Glasser's summary judgment ruling on damages in order to provide a method for individual Plaintiffs to identify customers lost as a result of Defendants' discriminatory pricing scheme. While industry data show a clear migration of market share (and, thus, customers) from independent retail pharmacy to mail order pharmacy (A-1679-93), particular Plaintiffs—with some notable exceptions[18]—had no way to determine what became of specific individual customers after they stopped purchasing BNPDs from Plaintiffs. The Matching

[18] For example, Plaintiff Pharma-Card identified many customers outside of the Matching Process. Pharma-Card indicated in a 2009 interrogatory response (well before the development of the Matching Process) that it knew that health plans that used Favored Purchaser PBMs were preventing specific in-house pharmacy programs (and the customers for those programs) from continuing to use Pharma-Card for BNPD purchases. (A-2054-56.) Pharma-Card reiterated that claim in its 2011 affidavit. (A-2027-28.) Furthermore, a representative of one of the pharmacy programs submitted an affidavit stating that it decided to switch from Pharma-Card because of the lower BNPD prices offered by a Favored Purchaser. (A-2547-70; *see also* A-1784-85 ("United Auto Workers shifted their prescription benefit plan to one that steered its members to mail order pharmacy, causing my pharmacy to lose the prescription business of the United Auto Workers.").)

Process was intended to provide a method for answering that question, and for some Plaintiffs it represented the only way to do so.

Thus, in an effort to streamline the litigation, the plaintiff group agreed that it would only pursue *damage* claims on behalf of individual plaintiffs who could show lost customers. That understanding was confirmed numerous times in proceedings before the District Court. (*See, e.g.*, A-1527 ("THE COURT: . . . at least with respect to proof of damages, [Plaintiffs] will only seek damages for specifically identifiable customers with respect to specifically identifiable drugs."); A-1643 ("THE COURT: . . . My point again is, just to be crisp about it, the plaintiffs are only going to make claims based on identified patients that used to buy drugs from them that don't anymore. That is the universe."); A-1620 ("THE COURT: So the plaintiffs proof in this case is going to be limited, *for damages purposes*, to patients that used to go to their pharmacies and don't anymore.") (emphasis added).)

Nowhere in the evolution of the Matching Process was there any suggestion that Plaintiffs' proof of competitive injury as part of their *prima facie* case would be restricted to the matching results. To the contrary, Plaintiffs always intended to submit a variety of evidence to support their *prima facie* case; a fact well known to both Defendants and the District Court. For example, Plaintiffs sent a letter to the District Court some three years before the summary judgment briefing at issue here

outlining the types of evidence—including customer testimony, expert testimony, and industry-based evidence—they planned to use to prove up their claims. (A-464-73; *see also* A-1647-48 (Plaintiff's counsel stated at hearing that Plaintiffs intended to prove their case through inferential, anecdotal, and industry evidence).) That letter also stated clearly Plaintiff's intention to rely on a *Morton Salt* inference to establish competitive injury. (A-469-70.)

The District Court's refusal to consider any evidence besides the results of the Matching Process results was plain error, and was a material factor in the District Court's dismissal of Plaintiffs' claims.

### E. The District Court Erred by Concluding that a Robinson-Patman Plaintiff Must Show Substantial Diverted Sales to Establish Competitive Injury on Summary Judgment

After improperly rejecting the *Morton Salt* inference and excluding Plaintiffs' evidence, the District Court compounded its errors by inventing a requirement that a plaintiff must show substantial diverted sales in order to establish competitive injury as part of a *prima facie* Robinson-Patman violation. Reversal is required because the District Court conflated competitive injury with antitrust injury, ignored the text of the Robinson-Patman Act and the binding precedent of this Court, and relied on a mistaken reading of the relevant case law, including the Supreme Court's recent decision in *Volvo*.

*First*, the District Court conflated the separate competitive injury and antitrust injury analyses. The District Court's confusion is evident from the outset of its competitive injury analysis where it quotes Judge Glasser's discussion from an earlier decision in this litigation of "actual injury," *i.e.*, antitrust injury. (SPA-143; *see also Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 378 F. Supp. 2d 134, 139 (E.D.N.Y. 2005) (noting that in order to show "actual injury" caused by price discrimination, the "[p]laintiff disfavored purchaser must show that it lost customers or profits"). That discussion, however, is inapposite to the issue of competitive injury because "[a]ntitrust injury and competitive injury are conceptually distinct," including because competitive injury can be inferred by showing the existence of significant price discrimination over a substantial period of time. *See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels and Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004) ("While 'competitive injury' concerns the potential effect certain conduct may have on competition generally or on the business opportunities of a defined class of competitors, the focus of 'antitrust injury' is on whether the challenged conduct has actually caused harm to the plaintiff.") (quotations omitted). Standing alone, that fundamental misapplication of the applicable law is a sufficient basis for reversal.

*Second*, the District Court ignored the statutory text. "By its terms, § 2(a) is a prophylactic statute which is violated merely upon a showing that 'the effect of

such discrimination *may be* substantially to lessen competition.' . . . '[T]he statute does not require that the discriminations must in fact have harmed competition.'" *J. Truett Payne*, 451 U.S. at 561-62 (quoting 15 U.S.C. § 13(a); *Corn Prods.*, 324 U.S. at 742) (emphasis in original). As this Court has recognized, a plaintiff need only "demonstrate a reasonable possibility" of that harm in order to establish its *prima facie* case. *George Haug*, 148 F.3d at 142.

Nonetheless, the District Court focused on the word "substantially" in the statute and concluded that a plaintiff must show definitively that it lost substantial sales or profits to a favored purchaser in order to survive summary judgment. (SPA-135-37.) But that interpretation, in effect, amends the statutory text by replacing the words "may be" with the word "is." Such an amendment would strip Section 2(a) of its prophylactic character in contravention of Congress's express intent, as interpreted by the Supreme Court. *See, e.g., Falls City*, 460 U.S. at 432 ("In keeping with the Robinson-Patman Act's prophylactic purpose, § 2(a) does not require that the discriminations must in fact have harmed competition.") (quotation omitted). The District Court lacks authority to amend the Act and its reading of Section 2(a) should be rejected.

*Third*, no legal authority supports the District Court's conclusion that *Volvo* imposed a "substantiality" requirement. (SPA-135-36, 141.) According to the District Court, although *Volvo* "focused primarily on the absence of proof that

Volvo dealers simultaneously competed with each other for the same retail customers, it also indicated that the limited evidence of lost sales presented by the plaintiff was insufficient to establish competitive injury." (SPA-135-36.) That interpretation is simply wrong. As explained above (*see* Section I.C), the Court in *Volvo* rejected Reeder's claim because Reeder had failed to show either that it actually competed for specific sales with any purported favored purchaser or that substantial *price discrimination* existed—not because Reeder failed to show a substantial number of lost sales. 546 U.S. at 180 ("In short, if price discrimination between two purchasers existed at all, it [*i.e.*, the price discrimination] was not of such magnitude as to affect substantially competition between Reeder and the 'favored' Volvo dealer."). Here, the existence of substantial price discrimination is not disputed. Moreover, unlike the District Court, the Court in *Volvo* reached its conclusion only after "engaging in a lengthy and detailed factual inquiry" of all the evidence that the plaintiff presented at trial. *See* Suhr, *supra*, at 181; *Volvo*, 170-75, 178-80.

*Fourth*, although the District Court recognized that numerous authorities suggest "that the [Robinson-Patman] Act has no substantiality requirement" (SPA-140-41), it rejected those authorities based on its mistaken reading of *Volvo* and several other cases. None of the cases relied on by the District Court (SPA-136-40), however, even suggests a Robinson-Patman plaintiff must definitively show it

lost a "substantial" number of sales to a favored competitor in order to survive summary judgment.

This Court's decisions in *United Magazine Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008), and *Interstate Cigar Co. v. Sterling Drug Inc.*, 655 F.2d 29 (2d Cir. 1981), do not support the existence of a substantiality requirement. In *United Magazine*, this Court merely repeated *Volvo*'s holding that a plaintiff must "show that any '*price discrimination* between' [plaintiff] and [a favored purchaser] was 'of such magnitude as to affect substantially competition between' the two competitors." 279 F. App'x at 18 (quoting *Volvo*, 546 U.S. at 180) (emphasis added). That is, the amount of the price differential must be substantial. That issue is not disputed in this appeal. *United Magazine* says nothing to suggest that a plaintiff must prove a substantial number of lost sales in order to survive summary judgment on the issue of competitive injury.

Nor does *Interstate Cigar*. In that case, the defendant drug manufacturer offered a discount to distributor customers who had not previously purchased or stocked defendant's product "M-O," but did not offer the discount to preexisting M-O customers. 655 F.2d at 31. After a non-jury trial where the plaintiffs (preexisting customers who did not receive discounts) presented no other pertinent evidence apart from the existence of the discount policy, the District Court dismissed plaintiffs' Robinson-Patman claims, and found that the discount policy

was "equally available on identical terms and administered with an even hand to 'old' and 'new' [M-O] purchasers." *Interstate Cigar Co. v. Sterling Drug Inc.*, No. 79 Civ. 3547, 1980 WL 1862, at *3 (S.D.N.Y. July 3, 1980). On appeal, this Court affirmed because the discount policy "may well have increased competition by inducing newcomers to enter the M-O distribution field," and plaintiffs therefore could not show that the discount policy "would tend to lessen competition substantially." *Interstate Cigar*, 655 F.2d at 31. Here, no evidence suggests the discounts offered by the Manufacturer Defendants were equally available to all purchasers or were intended to induce additional parties into the distribution chain. *Interstate Cigar* accordingly is inapposite and provides no support for granting summary judgment to the Defendants.

The other decisions the District Court relied on from outside the Second Circuit likewise fail to suggest that a substantiality requirement exists. The District Court placed great weight on a passage from the Fifth Circuit's thirty-year old *Chrysler Credit Corp.* decision, which states that "[i]n order to show a violation of Section 2(a) of the Robinson-Patman Act a plaintiff must demonstrate the likely effect of the alleged price discrimination was to allow a favored competitor to draw significant sales or profits away from him, the disfavored competitor." (SPA-136 (quoting *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 581 (5th Cir. 1982).) Notably, and in keeping with the prophylactic nature of the Robinson

Patman Act which the District Court's opinion ignores, this passage refers only to "likely effect." In any event, this passage cannot be divorced from the factual context in which it was made—a situation bearing little resemblance to that at issue in this appeal.

The Fifth Circuit's review in *Chrysler Credit Corp.* was—by its own account—"necessarily focus[ed] on the evidence presented" at trial, which consisted primarily of the "speculative and unsupported testimony" of two witnesses. 670 F.2d at 580-81. Critically, the plaintiffs failed to present *any* firsthand evidence of actual sales or comparative pricing, and other evidence showed that plaintiff's market share actually *increased* during the relevant period. *Id.* at 581. Moreover, the challenged pricing policy was made available to plaintiff and its competitors, and plaintiff's evidence showed that its business difficulties primarily resulted from an inability to obtain financing, whereas the alleged favored purchasers increased their market share because they either opened new facilities or were in areas experiencing population growth. *Id.* Finally, none of the plaintiffs' evidence permitted an inference of competitive injury under *Morton Salt*. *Id.* (finding "*Morton Salt* and its progeny . . . not relevant to the facts of this case"). Here, by contrast, although Plaintiffs have been denied full discovery, much less a trial, they can show undisputed price discrimination over a substantial

period of time in favor of Plaintiffs' competitors and a resulting decline in Plaintiffs' market share, as well as thousands of specific lost sales.

The District Court also relied on *Boise Cascade Corp. v. FTC*, 837 F.2d 1127 (D.C. Cir. 1988), claiming that the Robinson-Patman claim at issue in that case was rejected "because the number of accounts (162) that switched from the disfavored purchasers to the favored purchaser 'was quite small.'" (SPA-136 (quoting 837 F.2d at 1145).) The District Court's statement badly mischaracterizes the facts and holding of that case. The court in *Boise Cascade* did not find that the 162 lost accounts that the disfavored purchasers identified were *de minimis* as a matter of law. Rather, the court focused on the fact that, unlike Plaintiffs here, no disfavored purchaser was able to conclude that Boise's receipt of a favorable discount caused its losses. *Id.* at 1135. More importantly, the evidence showed that the "accounts lost to Boise were counter-balanced by accounts which Boise lost to the [allegedly *disfavored* purchasers]." *Id.* at 1137. Thus, the "162" number cited by the District Court is wholly irrelevant.[19]

The District Court also cited the Seventh Circuit's decision in *Lupia v. Stella D'oro Biscuit Co.*, for the proposition that a plaintiff must prove more than *de*

[19] In any event, the *Boise Cascade* court merely remanded the case to the FTC to consider evidence the defendant might have used to rebut the *Morton Salt* inference. On remand, the FTC found that evidence presented by the defendant—which was far more compelling that what Defendants have presented here—insufficient to rebut the *Morton Salt* inference. *See* Section II.C *above*.

*minimis* lost sales in order to show competitive injury. (SPA-136-37 (citing 586 F.2d 1163, 1171 (7th Cir. 1978).) The court in *Lupia*, however, held no such thing and found —"based on a substantial record assembled by discovery and affidavits, establishing beyond the mere allegations of the pleadings, what the plaintiff was and was not able to prove"—that Lupia never sold any goods in the same territory as a favored purchaser. *Lupia*, 586 F.2d at 1166, 1171. Thus, the court concluded it was unlikely the defendant's discrimination would diminish competition. Specifically, the court stated:

> . . . plaintiff could not detail the extent of its activity in the [territory], the customers he would have been able to deal with absent the discriminatory price, or an estimate of sales actually lost. Thus, plaintiff has not alleged that its sales lost due to secondary price discrimination were more than 'de minimus,' or that they even potentially existed. Yet this court has required such a showing, for if there exists only 'de minimus' or sporadic *competition*, it is unlikely that a lessening of competition or tendency to create a monopoly will occur.

*Id.* at 1171 (quotations omitted, emphasis added). Contrary to the District Court's suggestion that *Lupia* required a showing of substantial lost sales, the *Lupia* court's concern was limited to the plaintiff's failure to show that it engaged in *substantial competition* with the favored purchaser. By contrast, even without a full discovery record, Plaintiffs in this case *can* detail the extent of their activity in the areas where they competed with favored purchasers, *can* identify customers they would

have been able to do business with if they were not subject to Defendants discriminatory pricing practices, and *can* provide an estimate of lost sales.[20]

Finally, the District Court found the Ninth Circuit's decision in *De Modena v. Kaiser Foundation Health Plan, Inc.*, 743 F.2d 1388 (9th Cir. 1984), to be particularly relevant. (SPA-137-38.) But in that case, the Ninth Circuit held that the district court *should not have* granted summary judgment or concluded that a Robinson-Patman claim based on less than 1% of the defendants' total sales was *de minimis* as a matter of law.[21] *De Modena*, 743 F.2d at 1394=95 ("One percent of appellees' total sales might amount to a substantial dollar volume with a dramatic effect on the ability of the relatively small retail drug stores to compete."). The court accordingly remanded to permit the district court to evaluate the impact that those sales had on competition. *Id.*

Although the District Court interpreted the remand to signal the Ninth Circuit's belief that a finding of *de minimis* diverted sales would be fatal to the

---

[20] In any event, Defendants' summary judgment motion did not dispute the existence of competition between Plaintiffs and the Favored Purchasers.

[21] *De Modena* involved a Robinson-Patman claim brought by plaintiff retail pharmacies against defendant participants in a regional health plan that allegedly bought drugs at favorable prices from pharmaceutical companies and dispensed those drugs to the health plan's members. The district court in *De Modena* granted summary judgment against the plaintiffs' claims because it found that the vast majority of the sales at issue were exempt from Robinson-Patman scrutiny under the Nonprofits Institution Act, 15 U.S.C. § 13c. The Ninth Circuit reversed and remanded, however, because defendants also sold a limited number of drugs—an amount which was not *de minimis* as a matter of law (despite amounting to less than 1% of defendants' total sales)—to walk-in customers who were not members of the health plan.

plaintiffs' Robinson-Patman claims (SPA-138), this interpretation assumes too much. Neither the district court nor the Ninth Circuit in *De Modena*, for example, ever concluded that the defendants in that case actually received the benefit of favorable pricing, or that the parties in the case actually competed for the sales at issue. *See De Modena*, 743 F.2d at 1390. *De Modena* thus stands only for the unremarkable proposition that a Robinson-Patman plaintiff must show that a defendant's price discrimination is likely to affect the plaintiff's ability to compete with a favored purchaser.[22]

Accordingly, none of the cases relied on by the District Court support its conclusion that a Robinson-Patman plaintiff must definitively prove that it lost a substantial number of sales to a favored purchaser in order to survive summary judgment on the issue of competitive injury. Instead, the overwhelming weight of authority—which the District Court cited but rejected based on its mistaken reading of *Volvo*—suggests that no such substantiality requirement exists. (SPA-

[22] The District Court also cited to *Erickson's Flooring & Supply Co. v. Basic Coatings, Inc.*, an unpublished decision from the Eastern District of Michigan, to suggest that one instance of discriminatory pricing cannot possibly have a substantial effect on competition. (SPA-137 (citing 2007 WL 3036747, at *6 (E.D. Mich. Oct. 15, 2007).) But the quoted passage had nothing to do with lost sales; rather, the court was addressing whether the plaintiff could even prove that it was a victim of price discrimination. The court concluded the plaintiff had not done so because its only evidence was deposition testimony from one of its officers stating that "I think there was a different price there to [one customer] at that point in time." 2007 WL 3036747, at *6. With respect to the "'harm to competition' element of a secondary-line Robinson-Patman claim,'" the court found that the plaintiff's claim failed because plaintiff could not provide any "evidence that the price discrimination lasted 'over time.'" *Id.* at *7. Here, Defendants' decades-long discriminatory pricing scheme is not disputed.

140-41 (collecting authorities).) To take just one example, Third Circuit Judge D. Brooks Smith—then sitting as a district judge—held in *Precision Printing Co. v. Unisource Worldwide, Inc.*, that "testimony, in the form of a customer's affidavit, that at least one customer shifted business away from [plaintiff] because it was no longer price-competitive" sufficed "to raise a genuine issue of material fact on the issue of competitive harm." 993 F. Supp. 338, 353 (W.D. Pa. 1998). Plaintiffs here presented an analogous customer affidavit (A-2547-70), in addition to much other evidence, but the District Court inexplicably and mistakenly rejected that evidence and concluded that Plaintiffs could not show competitive injury as a matter of law. Because that conclusion was wrong, the District Court's decision should be reversed.

## III. PLAINTIFFS' EVIDENCE OF ANTITRUST INJURY CREATES AN ISSUE OF FACT FOR THE JURY

### A. The Antitrust Injury Requirement

"Damages are not part of the *prima facie* case." (SPA-20.) Once a private litigant establishes a *prima facie* Robinson-Patman violation, Section 4 of the Clayton Act requires that, in order to recover damages, the litigant must allege and prove an "antitrust injury" by showing "(1) an injury-in-fact; (2) that has been caused by [the defendant's] violation; and (3) that is the type of injury contemplated by the statute," *i.e.*, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts

unlawful." *Blue Tree Hotels*, 369 F.3d at 220 (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). To satisfy the antitrust injury requirement, a plaintiff need only "make *some showing* of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne*, 451 U.S. at 562 (emphasis added).[23]

The District Court erred when it concluded that the purported failure of the Matching Process to show substantial damages precluded Plaintiffs from proving antitrust injury. *First*, the plain language of the Clayton Act contains no substantiality requirement. *Second*, this Court has expressly held that even a plaintiff who suffers *nominal* damages can still show antitrust injury under the Clayton Act. *Third*, the District Court misread controlling law on this issue. And *finally*, even under the District Court's erroneous standard, Plaintiffs have presented more than enough evidence to create an issue of fact as to whether Defendants' price discrimination caused them "substantial" damages.

---

[23] Even though the Court in *Truett Payne* described the plaintiff's evidence of antitrust injury—self-serving testimony of plaintiff's owner and that of an expert witness—as "weak," the Court nonetheless vacated the Fifth Circuit's decision directing a verdict to the defendant. *Id.* at 564-69. In so doing, the Court rejected the Fifth Circuit's conclusion that plaintiff could not, as a matter of law, establish antitrust injury because it had "failed to introduce substantial evidence of injury attributable to [defendant's] programs, much less substantial evidence of the amount of such injury." *Id.* at 560; *see also id.* at 565-66 ("The Court has repeatedly held that in the absence of more precise proof, the fact finder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.") (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123-24 (1969)).

### B. The Plain Language of the Clayton Act Has No Substantiality Requirement

The plain language of Section 4 of the Clayton Act provides standing "without respect to the amount in controversy," 15 U.S.C. § 15(a), so long as the fact of an antitrust injury is established, *i.e.*, so long as the plaintiff has suffered an injury "of the type the antitrust laws were intended to prevent," *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The District Court's conclusion that a plaintiff must show more than *de minimis* lost sales to establish antitrust injury therefore incorrectly reads the "amount in controversy" language out of Section 4 altogether. "When interpreting a statute, [courts] are required 'to give effect, if possible, to every clause and word of a statute,' and to 'avoid statutory interpretations that render provisions superfluous.'" *United States v. Kozeny*, 541 F.3d 166, 174 (2d Cir. 2008) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *United States v. Anderson*, 15 F.3d 278, 283 (2d Cir. 1994)). There is no reason to depart from this "cardinal principle of statutory construction" in this case. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Moreover, the Supreme Court has "refused to engraft artificial limitations on the § 4 remedy," and has stated that "in the absence of some articulable consideration of statutory policy suggesting a contrary conclusion in a particular factual setting," courts should apply "§ 4 in accordance with its plain language and its broad remedial and deterrent objectives." *Blue Shield of Virginia v. McCready*,

457 U.S. 465, 472-73 (1982) (quotations omitted). The District Court identified no statutory language or policy that suggests a Robinson-Patman plaintiff need show some particular number of diverted sales in order to have standing to sue under Section 4. Accordingly, this Court should interpret Section 4 according to its plain language, which provides standing "without respect to the amount in controversy" to parties—such as the Plaintiffs here—who have been harmed by a defendant's violation of the antitrust laws.

### C. A Plaintiff with only Nominal Damages Can Satisfy the Clayton Act's Antitrust Injury Requirement

The District Court's holding with respect to antitrust injury is further undermined by the fact that "courts routinely approve the award" of nominal damages under Section 4 of the Clayton Act. *See United States Football League v. Nat'l Football League*, 842 F.2d 1335, 1377 (2d Cir. 1988). While those cases often involve Sherman Act claims, the same standard for showing antitrust injury "applies to all private actions filed under § 4, 'regardless of the type of antitrust claim involved.'" *Blue Tree Hotels*, 369 F.3d at 220 (quoting *Atlantic Richfield*, 495 U.S. at 340).

In *United States Football League*, this Court affirmed a $1 jury award on a Sherman Act monopolization claim brought under Section 4, and noted that the jury was properly instructed that, after finding antitrust injury, it could choose not to award damages or award only nominal damages if "plaintiffs failed to prove an

amount of damages." *Id.* at 1376-78. In other words, the plaintiffs could satisfy the antitrust injury requirement without proving any damages at all. In a subsequent appeal in the same case, this Court noted that because a Section 4 violation—*i.e.*, antitrust injury—had been found, the plaintiffs automatically were entitled under the statute to treble damages and an award of attorney's fees:

> Despite the jury's findings that the NFL had willfully acquired or maintained monopoly power in the United States major league professional football market and that such monopolization had injured the USFL, the jury awarded the USFL only $1.00 in damages. In accordance with section 4 of the Clayton Act, the award was trebled to $3.00 . . . It is clear from the plain meaning of section 4 that an injury is all that is required for an award of attorney's fees.

*United States Football League v. Nat'l Football League*, 887 F.2d 408, 410-11 (2d Cir. 1989). Other courts have reached the same conclusion. *E.g., Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, 841 F. Supp. 212, 215 (E.D. Mich. 1993) ("[E]ven if plaintiff has insufficient proof of amount of damages, the proof of violation and fact of damage is a sufficient basis for an award of nominal damages.") (citing *Sciambra v. Graham News,* 892 F.2d 411, 415 (5th Cir.1990)).

If the District Court's conclusion—that antitrust injury requires a showing of substantial damages—is correct, than this Court should have entered a directed verdict for the defendant in *United States Football League* because the plaintiffs there had not shown *any* damages. Of course, that did not happen. The District Court acknowledged that *United States Football League* contradicted its antitrust

injury analysis, but rejected that case without explanation using a "*but see*" citation. (SPA-143.) That was plainly improper, as this Court's precedential rulings bind the District Court.

### D. The Case Law Cited by the District Court Requires Substantial *Evidence* of an Injury, Not a Substantial *Amount* of Injury

The District Court stated that "[a]lthough there appear to be few precedents on point, the relevant decisions do suggest that a trivial effect on a claimant's sales is insufficient to demonstrate antitrust injury." (SPA-143.) The case law cited by the District Court, however, does not show that at all. To the contrary, the relevant authorities require only substantial *evidence* of the fact of an injury, not evidence that the injury itself caused a substantial amount of damages.

Even Judge Glasser's earlier decision in this case undermines the District Court's antitrust injury analysis. The relevant portion of that decision—which the District Court quoted in a footnote but inexplicably failed to apply (SPA-142 n.20)—provides that a plaintiff need only provide evidence of *some damage* to create an issue of fact as to antitrust injury:

> [P]laintiffs' burden of proving the fact of damage [*i.e.*, antitrust injury] under § 4 of the Clayton Act is satisfied by its proof of *some damage* flowing from the unlawful conspiracy. Once causation is established, the jury is permitted to calculate the actual damages suffered using a reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.

(SPA-64 (quotations omitted, emphasis added).)

The other decisions cited by the District Court likewise hold only that a plaintiff must provide evidence that it suffered *some damage* flowing from the defendants' unlawful conduct. In *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17 (1st Cir. 1981), a wholesaler of stationary and school supplies (Allen Pen) brought a Robinson-Patman claim against one of its suppliers (Springfield). On appeal from a directed verdict, the First Circuit found that Allen Pen could not establish antitrust injury because it had presented "*no evidence*" at trial that it lost sales to any competitor. *Id.* at 22 (emphasis added).

Yet the District Court here concluded that Allen Pen could not show antitrust injury because its "affected sales were but a tiny fraction of [its] business." (SPA-143 (quoting *Allen Pen*, 653 F.2d at 23).) That conclusion is wrong. The First Circuit used the term "affected sales" to refer only to the 1.5% to 2% of Allen Pen's *total sales* that were of products purchased from Springfield—not to the amount of sales that Allen Pen lost to favored purchasers. *Allen Pen*, 653 F.2d at 20, 23. Indeed, the First Circuit never even considered any lost sales because Allen Pen, even with the benefit of a full trial record, did not present any evidence "that specifically shows or even tends to show that any competitor drew either profits or sales away from Allen Pen." *Allen Pen*, 653 F.2d at 22; *see also id.* ("And the evidence of price differences . . . is not by itself sufficiently strong to warrant an inference of actual injury."). In any event, the small portion of affected

sales was just one of many factors the court considered—on a full evidentiary record—in determining that the Plaintiff had not established antitrust injury. Nothing in *Allen Pen* supports the District Court's conclusion that a Robinson-Patman plaintiff must show substantial lost sales in order to avoid summary judgment on the issue of antitrust injury.

The District Court also relied on *Hygrade Milk & Cream Co. v. Tropicana Products, Inc.*, No. 88 Civ. 2861, 1996 WL 257581 (S.D.N.Y. May 16, 1996), for the proposition that antitrust injury cannot be found where a plaintiff can show only "insignificant" lost sales. (SPA-143.) That reliance was misplaced.

*Tropicana* involved claims brought by plaintiff orange juice distributors against a defendant manufacturer (Tropicana) that had allegedly given favorable prices to several wholesale food distributors and direct buying chains. The *Tropicana* court found that several plaintiffs had not provided sufficient evidence of antitrust injury to survive summary judgment because they "ma[d]e no specific claim that their sales of Tropicana product declined over time," they did "not name any significant accounts that they lost," and they offered "no direct evidence of lost profits," and "no expert testimony of lost sales." *Id.* at *18. Instead, those plaintiffs offered affidavits from former customers who claimed they switched to other distributors because of price. Notably, however, "only one of Plaintiffs' former customers claim[e]d that it switched to [a favored purchaser] because of

lower prices." *Id.* The court found that these affidavits "[a]t best, indicate a speculative and insignificant loss of sales," and that "by themselves, [they] do not establish that Plaintiffs suffered actual antitrust injury." *Id.* at *19.

The court found, however, that another plaintiff (Hygrade) *had* provided sufficient evidence to survive summary judgment in the form of (i) a significant decline in the sales of Tropicana during the relevant period; (ii) claims by customers that they stopped buying products from Hygrade because its prices were not competitive; and (iii) testimony from a representative of one of Hygrade's large accounts that his company switched from Hygrade to a favored purchaser solely because of price. *Tropicana*, 1996 WL at *17. The court found that evidence "creates a question of fact as to causation" even though it was unclear "to what extent [] other factors [besides defendants' price discrimination] contributed to Hygrade's lost sales." *Id.* ("Hygrade's inability to ascertain which sales of Tropicana were lost because of price discrimination is not fatal to its claim for damages. Once injury has been established, uncertainty as to the extent of damage does not preclude recovery.").

In this case, Plaintiffs have presented evidence that (i) their market share substantially declined during the relevant period (A-1679-93); (ii) a purchaser for a large account testified that her organization stopped buying BNPDs from Plaintiff Pharma-Card and began buying them from a Favored Purchaser because of that

Favored Purchaser's "ability to pass-on a portion of [its] rebates" to her organization (A-2548); and (iii) Plaintiffs lost specific identifiable customers to the favored purchasers because of Defendants' price discrimination (A-1419). In *Tropicana*, Hygrade presented analogous evidence to defeat summary judgment. The same result should follow here.

## IV. THE DISTRICT COURT IMPROPERLY REJECTED EVIDENCE FROM PLAINTIFF PHARMA-CARD

Even if a substantiality requirement existed for competitive or antitrust injury (and it does not), the lost customers identified by Plaintiff Pharma-Card clearly satisfy that requirement. Through its interrogatory responses and the Matching Process results, Pharma-Card has identified thousands of customers that were lost as a direct result of the Favored Purchasers' ability to obtain BNPDs at lower prices.

Pharma-Card's 2009 interrogatory responses, for example, explained how Pharma-Card knew that it lost customers to Favored Purchasers as a result of the Manufacturer Defendants' price discrimination, and identified the specific customers that it lost:

> [M]y pharmacy filled prescriptions for the 39 in-house pharmacy programs identified in Exhibit A. From 2001 until the present, these 39 in-house pharmacy programs shifted their health plan to a new provider and thereafter those employees utilizing these 39 in-house pharmacy programs no longer were allowed to fill their prescription[s] at my pharmacy. . . . Many more individual lost customers are identified in the documents

> that have been provided in response to [Defendants' document requests].

(A-2055.) Pharma-Card specifically identified the customers it lost in exhibits attached to its interrogatory responses. (A-2061-63.)

Further, in 2011, Pharma-Card provided additional support for its belief that it had lost individual customers to Favored Purchasers.

> By way of background, in approximately 1991, I began marketing my pharmacy business and services to a number of self-insured employer groups including those [identified in] my previous interrogatory responses. I successfully recruited a number of these employers and in exchange for their employees' prescription business, I managed their pharmacy benefits, including establishing formularies. In many instances, I opened new locations to serve this business. At its peak, I operated 14 pharmacy locations in a 4 county area of Northeast Indiana with total prescription sales of approximately $23 million in 2002. During 2002 and 2003 many of my self insured employer groups were approached by a number of PBMs who also owned mail-order pharmacies in an attempt to pursue their business. In each instance, these PBMs emphasized the fact that they could share a portion of rebates received from drug manufacturers with the employer groups. As a result, I ultimately lost all of this business which in prior years comprised almost 50% of my business and today that business is non-existent.

(A-2027-28.)

Pharma-Card's representations have been confirmed by the sworn testimony of a representative of a self-insured employer—Valparaiso Community Schools—that the lower BNPD prices offered by Express Scripts (a Favored Purchaser) was the direct cause of the school district's switch from Pharma-Card to Express

Scripts, and that Express Script's "primary sales pitch" was "their ability to pass-on a portion of rebates received on brand-name prescription drugs." (A-2548.)

The District Court wrongly refused to consider much of that evidence because it: (i) erroneously determined that Plaintiffs agreed to restrict their evidence to Matching Process results (*see* Section II.D *above*); and (ii) disregarded Pharma-Card's evidence after finding that Plaintiffs "offered no convincing explanation for the failure of the matching process to identify the lost customers referenced" in the affidavits. (SPA-129-30.)

It was well-understood that the Matching Process was an imperfect tool and that it was possible (and even likely) that the Process would not capture all lost customers. Indeed, the Stipulation itself expressly noted that the Matching Process "was subject to the following limitations: (i) the universe of so-called favored purchasers was limited to the four PBMs and Omnicare; (ii) the universe of BNPDs was limited to manufacturer Defendants' top-selling maintenance drugs; and (iii) the time periods were limited to data currently maintained by the PBMs and the Plaintiffs." (A-312.) As explained in Pharma-Card's affidavit, a large portion of its business was lost to a PBM that was not even included in the Matching Process. (A-2027-28.) Plaintiffs agreed to forego seeking damages with respect to those lost customers in order to advance the litigation toward trial. But

Plaintiffs never agreed they would ignore relevant evidence that helps prove their *prima facie* case.

In sum, Plaintiff Pharma-Card has submitted evidence, in the form of its own sworn testimony as well as the sworn testimony of a third party with no interest in this litigation, that (i) it lost at least several thousand specific BNPD customers that represented a significant portion of its overall business; (ii) those customers were lost to specific Favored Purchasers; and (iii) the loss was directly related to discounts and rebates granted by Defendants to the Favored Purchasers to whom the business was lost. (A-2026-2131, 2547-70.) The Court's refusal to consider that evidence violates well-settled summary judgment standards that require all reasonable inferences to be granted to the non-moving party. *See Pinto* v. *Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000); *Precision Printing Co.*, 993 F. Supp. at 353 (holding that "testimony, in the form of a customer's affidavit, that at least one customer shifted business away from [plaintiff] because it was no longer price-competitive" sufficed "to raise a genuine issue of material fact on the issue of competitive harm").

## V. PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF SHOULD SURVIVE SUMMARY JUDGMENT

Section 16 of the Clayton Act provides for injunctive relief 'against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The District Court dismissed Plaintiffs' claims for equitable relief solely because it

concluded that Plaintiffs' could not establish competitive injury as a matter of law. (SPA-145.) Because, as explained above (Section II), that conclusion was reversible error, this Court should reinstate Plaintiffs' equitable claims.

## VI. PLAINTIFFS' 2(D) AND 2(F) CLAIMS SHOULD SURVIVE SUMMARY JUDGMENT

In addition to their price discrimination claims, Plaintiffs brought claims against J&J under Section 2(d) of the Robinson-Patman Act for discriminating with respect to the terms of certain promotional allowances, and against Caremark under Section 2(f) of the Act for knowingly inducing or receiving discriminatory prices. The analyses for antitrust and competitive injury do not differ for those claims, except that with respect to the Section 2(d) claim, there is no requirement to prove competitive injury. *George Haug*, 148 F.3d at 145. Accordingly, the District Court also erred by granting summary judgment to Defendants on those claims.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the District Court's order granting summary judgment to Defendants be reversed.

Dated: New York, New York
January 14, 2014

Respectfully submitted,

/S/ Nicholas A. Gravante, Jr.

**DURETTECRUMP PLC**
Wyatt B. Durrette, Jr.
Kenneth D. McArthur
1111 E. Main St.
Twentieth Floor
Richmond, VA 23219
Telephone: (804) 775-6900
Facsimile: (804) 775-6911

**BOIES, SCHILLER & FLEXNER LLP**
Nicholas A. Gravante, Jr.
Steven I. Froot
575 Lexington Avenue
New York, N.Y. 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Michael I. Endler
Robert C. Tietjen
Benjamin D. Battles
30 South Pearl Street
Albany, N.Y. 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief was produced in Times New Roman (a proportionately spaced typeface), 14-point type, and contains 13,795 words (as calculated by the word count function in the Microsoft Word word processing system).

Dated: New York, New York
January 14, 2014

Respectfully submitted,

/S/ Nicholas A. Gravante, Jr.

**DURETTECRUMP PLC**
Wyatt B. Durrette, Jr.
Kenneth D. McArthur
1111 E. Main St.
Twentieth Floor
Richmond, VA 23219
Telephone: (804) 775-6900
Facsimile: (804) 775-6911

**BOIES, SCHILLER & FLEXNER LLP**
Nicholas A. Gravante, Jr.
Steven I. Froot
575 Lexington Avenue
New York, N.Y. 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Michael I. Endler
Robert C. Tietjen
Benjamin D. Battles
30 South Pearl Street
Albany, N.Y. 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665

*Attorneys for Plaintiffs-Appellants*

# SPECIAL APPENDIX

## SPECIAL APPENDIX
## TABLE OF CONTENTS

Memorandum and Order of the Honorable I. Leo Glasser, dated January 25, 2007 ............................ SPA-1

Memorandum and Order of the Honorable I. Leo Glasser, dated December 20, 2007 ........................ SPA-84

Memorandum and Order of the Honorable Steven M. Gold, dated August 16, 2012, Appealed From . SPA-118

Partial Final Judgment, dated November 13, 2012, Appealed From ..................................................... SPA-147

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------x

DRUG MART PHARMACY CORP.,
et al.,

Plaintiffs,

-against-

AMERICAN HOME PRODUCTS CORP.,
et al.,

Defendants.

-----------------------------------------------x

MEMORANDUM AND ORDER
93-CV-5148 (ILG)

GLASSER, United States District Judge:

## INTRODUCTION

Pending before the Court are four motions submitted by the designated defendants for summary judgment pursuant to Fed. R. Civ. P. 56 dismissing the representative plaintiffs' claims under Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) (the "Act"). The designated defendants (hereinafter "designated defendants" or "defendants") seek summary judgment or partial summary judgment on four bases.

First, under the Act, plaintiff must allege and prove, among other things, a difference in price charged to two purchasers in contemporaneous sales in interstate commerce by a single defendant seller of commodities of like grade and quality. 15 U.S.C. § 13(a). There is a narrow exception to this principle, the "indirect purchaser" doctrine, whereby sales from a wholesaler whose pricing is controlled by a manufacturer permits a disfavored purchaser to treat the entities as one and the same. Designated defendants move the court to find that representative plaintiffs cannot show that they

purchased commodities–brand name prescription drugs ("BNPDs")–from that "single seller," and furthermore that the "indirect purchaser" doctrine does not apply (hereinafter the "indirect purchaser motion").

In opposition, the representative plaintiffs argue that, at minimum, the deposition testimony raises a genuine issue of material fact whether the designated defendants set and controlled the prices that the wholesalers charged plaintiffs for the BNPDs they purchased. The representative plaintiffs assert that the only part of the sales price of BNPDs that the wholesalers controlled was the service fee, or markup, which represented the wholesalers' profit. This markup was paid both by the representative plaintiffs, and the favored purchasers, when they bought BNPDs from wholesalers.

Second, a Robinson-Patman violation requires both that favored and disfavored purchasers be in competition with each other and also that they resell products for which they received a favored price. Defendants move for summary judgment with respect to reduced price sales of BNPDs to all for-profit staff-model HMOs ("SM-HMOs"), arguing that, as "insurers," they are not competitors of plaintiffs, nor do they resell BNPDs (hereinafter the "SM-HMO motion").

In opposition, plaintiffs contend that these defendants do compete for customers based upon their BNPD-plan pricing, and also assert that they fill prescriptions for non-members of their plans.

Third, for liability to attach under the Act, there must be at least two purchasers of a commodity, at different prices, where the two purchasers are in competition with each other. Defendants move for summary judgment with respect to all rebate

agreements with legal entities that did not also take title to, resell, or dispense brand name prescription drugs (hereinafter the "non-purchaser motion").

In opposition, plaintiffs dispute the factual description of these entities, and contend that even those entities which did not take title to BNPDs did, nevertheless, exercise "dominion and control" over their distribution and therefore should be held liable.

Fourth and finally, as an element of a Robinson-Patman Act claim, plaintiffs must show that they are entitled to damages stemming from antitrust injury defined under the Clayton Act, 15 U.S.C. § 15. Defendants assert that plaintiffs have failed to make this showing. Plaintiffs oppose this assertion, presenting what they claim is evidence of antitrust injury (hereinafter "damages motion").

Having carefully reviewed the papers submitted by the parties, and as set forth below, the Court denies the designated defendants' motion for summary judgment on the representative plaintiffs' claims with respect to the "indirect purchaser" doctrine, denies the motion for summary judgment with respect to for-profit staff-model HMOs, grants in part and denies in part defendants' motion for partial summary judgment with respect to legal entities that receive rebates but do not "purchase" or take title to BNPDs, and grants the defendants' motion with respect to damages.

## PRIOR HISTORY

The background of this case has been recounted in numerous prior opinions by this Court, by the United States District Court for the Northern District of Illinois, and by the Court of Appeals for the Seventh Circuit. See 2005 WL 1634617 (E.D.N.Y. July 13, 2005); 296 F. Supp. 2d 423 (E.D.N.Y. 2003); 288 F. Supp. 2d 325 (E.D.N.Y. 2003);

2002 WL 31528625 (E.D.N.Y. Aug. 21, 2002). See also 288 F.3d 1027 (7th Cir. 2002); 186 F.3d 781 (7th Cir. 1999); 123 F.3d 599 (7th Cir. 1997); 1999 WL 33889 (N.D. Ill. Jan. 19, 1999); 1996 WL 167350 (N.D. Ill. Apr. 4, 1996); 867 F. Supp. 1338 (N.D. Ill. 1994); 1994 WL 240537 (N.D. Ill. May 27, 1994). Familiarity with prior opinions is therefore assumed and only those facts necessary for a resolution of these motions are restated here.[1]

Designated plaintiffs are seventeen retail pharmacies from fourteen different states asserting claims against defendants, inter alia, under section 2(a) of the Act, 15 U.S.C. § 13(a), for giving discounts, rebates or other "charge-back" benefits (collectively "discounts") on BNPDs to health maintenance organizations ("HMOs"), managed care organizations ("MCOs"), pharmacy benefit managers ("PBMs"), and third-party payors ("TPPs") and mail order pharmacies (collectively, "favored purchasers"), while denying discounts to them.[2] See Defendants' Local Rule 56.1 Statement ("Defs. Rule 56.1

---

[1]In addition to their claims under the Robinson-Patman Act, plaintiffs brought claims against defendants under the Sherman Act, 15 U.S.C. § 1. While this litigation was pending before Judge Charles P. Kocoras of the United States District Court for the Northern District of Illinois, the Court entered Pretrial Order Number 5, which, among other things, bifurcated discovery of the two claims and "contemplate[d] that ... plaintiffs' claims may be tried in two separate trials." (Declaration of Robert Grass executed on January 21, 2005 Ex. 1). This Court severed the Sherman Act claims from the Robinson-Patman Act claims. In November 2004, the parties agreed to settle the Sherman Act claims shortly before trial was scheduled to commence. At that time, fifteen of the defendant manufacturers settled both plaintiffs' Sherman Act and Robinson-Patman Act claims.

Pretrial Order Number 5 stayed the Robinson-Patman Act claims asserted against all non-designated defendants until the first Robinson-Patman Act trial involving designated parties is completed. Pursuant to the pretrial order, the parties designated seventeen plaintiffs to proceed against five defendants. Two of the designated defendants – Ciba Geigy and Searle – remain, as the others have settled with plaintiffs. For the sake of simplicity, references in this opinion to "plaintiffs" and "defendants" are to the designated plaintiffs and designated defendants.

[2]In addition to their section 2(a) claims, the representative plaintiffs assert claims under sections 2(d) and 2(f) of the Act. See 15 U.S.C. §§ 13(d), 13(f).

Statement") ¶ 1.[3] The particular facts and circumstances of these transactions are detailed with the relevant motions herein.

## INDIRECT PURCHASER MOTION

### I. BACKGROUND

Defendants Ciba-Geigy Corporation ("Ciba") and G.D. Searle & Co. ("Searle") manufacture BNPDs. Id. ¶ 2. During the relevant time period, defendants did not sell BNPDs directly to independent pharmacists, including plaintiffs.[4] Id. ¶¶ 6, 7. Plaintiffs, as independent (non-chain) pharmacists, purchased defendants' BNPDs from wholesalers. Id. ¶¶ 7, 12. Plaintiffs wanted to purchase BNPDs directly from defendants because they believed it would be cheaper than purchasing BNPDs from wholesalers. See, e.g., Declaration of Evan Glassman executed on February 28, 2005 ("Glassman Decl.") Aff. X 14 ¶¶ 4-6.

According to defendants, the "pricing and terms of sale by which" plaintiffs "purchased Ciba and Searle products from wholesalers were the result of arms-length transactions between" plaintiffs and "their respective wholesalers." Defs. Rule 56.1 Statement ¶ 15. Plaintiffs counter that the "prices [they] paid for BNPDs were not

---

[3] All references to 56.1 Statements and Declarations pertain to the submissions made with or in opposition to each motion.

[4] It appears that plaintiffs acquired almost all of their BNPDs directly from wholesalers–a chain of distribution separate from the passage of rebate benefits. See Defs. Rep. 56.1 Stmt. ¶ 12. It has been noted in earlier stages of this litigation saga that between 10% and 20% of the BNPDs were obtained directly from the manufacturers. See Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp., No. 93-5148, 2002 WL 31528625, * 3 (E.D.N.Y. Aug. 21, 2002) (citing Def. SJ Mem. at 3). Depositions of many of the plaintiff pharmacists include testimony that on occasion they bought BNPDs directly from manufacturers, although that practice was more or less discontinued in the early to middle 1990s. See, e.g., Aff X 24 (Weaver) ¶¶2-4; Aff. X 25 (Weiss) ¶¶6-8; Aff. X 20 (Tootle) ¶¶2-5. There is no assertion, however, that they were ever participants in a rebate program. Since the Court holds plaintiffs' indirect purchaser argument survives summary judgment, for the purposes of this motion, there is no need to determine whether plaintiffs acquired BNPDs directly from a manufacturer or indirectly via their wholesalers.

determined by wholesalers, but instead were set and determined by BNPD manufacturers," including defendants. Plaintiffs' Rule 56.1 Counter Statement of Disputed Material Facts ("Pls. Rule 56.1 Ctr. Stmt.") ¶ 15. When read in the light most favorable to them, the deposition and affidavit testimony of several plaintiffs and wholesalers reveal that the independent pharmacists always paid the "list price" for defendants' BNPDs which they purchased from the wholesalers, and it "was an accepted fact in the industry that drug manufacturers set the prices" that the wholesalers were required to charge plaintiffs upon pain of losing their relationships with the manufacturers. See Glassman Decl. Aff. X 20 ¶ 8; see also id. Aff. X 9 ¶ 8 ("It was an established fact in the industry that wholesalers could not discount below list price to retail pharmacists ... and could not do so because they did not have the authority of the drug manufacturers, no matter what volumes we were willing to buy or lengths we were willing to go in order to secure discounts."). What could be negotiated between the plaintiffs and wholesalers was a markup (the "markup") that plaintiffs paid the wholesaler and constituted the profit earned by the wholesaler for acting as an intermediary-seller. See Pls. Rule 56.1 Ctr Stmt. ¶ 15 (citing e.g., Glassman Decl. Dep. X 18 at 97-99). When favored purchasers bought BNPDs from wholesalers, they also paid the markup which was subject to negotiation on a case-by-case basis, but it was "quite small" in comparison to the overall price paid for the BNPDs. See Glassman Decl. Dep. X 32 at 57-59; GX 2 at SE 000012638.

The favored purchasers were not required to pay the list prices for the BNPDs they purchased from the wholesalers as a result of, among other things, a "chargeback system" entered into between defendants and the wholesalers. That "chargeback

system" was explained by Searle in an internal memorandum as follows:

> * Searle agrees on a contract pricing with the HMO and the HMO designates one or more of Searle's authorized wholesalers as the wholesaler(s) from which the HMO will buy its products.
> * Searle sends the HMO notice of the contract price, but cautions the HMO that the contract price is the price which Searle will charge the HMO's designated wholesaler for products which the wholesaler re-sells to that HMO. The wholesaler is free to mark-up that price when he re-sells the products to the HMO. Generally, the amount of the wholesale mark-up is quite small.
> * Searle sends the HMO's designated wholesaler notice of the contract price.
> * The wholesaler notifies Searle of the quantity of each product sold to the HMO. The difference between the contract price agreed upon between Searle and the HMO and the wholesaler's normal purchase price from Searle (i.e., the wholesale acquisition cost) multiplied by the quantity purchased is the amount of the chargeback.
> The following is a simple calculation of a chargeback:
> * Wholesale Acquisition Cost (the price paid by the wholesaler to Searle): $10.00
> * Contract price negotiated between Searle and HMO: $7.00
> * Amount of Chargeback: $3.00.
> As you can see, without the chargeback, the wholesaler would lose $3.00 if it sold to the HMO at the contract price of $7.00. The actual price paid by the HMO will probably be slightly more than $7.00, since the wholesaler will add a small mark-up for its profit.

Glassman Decl. GX 2 at SE 000012638.

Representative testimony of the wholesalers concerning the "control" they exercised regarding the prices they charged independent, retail pharmacists for defendants' BNPDs was as follows:

> Q: We talked also earlier a little bit about sales calls and the procedure; do you recall that?
> A: Yes.
> Q: All right. When a – dealing first with an independent retailer.

A: Okay.
Q: Okay? Are one of the terms of the negotiations the cost factor, that is, the cost of the particular drugs that is to be paid by the retailer?
A: No.
Q: No. That's never discussed in the negotiations?
A: No.
Q: Why isn't that?
A: Because it's not very relevant. We do not – the wholesaler does not establish the price of the drug.
Q: Okay. The manufacturer does that?
A: The manufacturer does.
Q: So in other words, as with all classes of trade, Bergen sells it on what we might call a cost-plus basis?
A: That's correct.
Q: Okay. And that cost definition, is that uniform for all customers?
A: Yes.
Q: So Bergen sells it what we might call its wholesale acquisition costs plus its markup for its wholesale services, correct?
A: That's correct.

Glassman Decl. Dep. X 15 at 110-11.

The parties disagree whether the evidence proffered by plaintiffs, including that discussed above, creates a genuine issue of material fact as to plaintiffs' section 2(a) Robinson-Patman Act claims. Defendants argue that it is undisputed that the wholesalers charged prices to purchasers of BNPDs which they set without any input from Ciba or Searle, and that the prices charged by wholesalers included both the acquisition cost of BNPDs plus the wholesalers' markup. It is the wholesalers' ability to control the markup which defendants view as outcome determinative to their motion. Plaintiffs counter by asserting that the testimony raises a genuine issue of fact whether defendants controlled the prices that the wholesalers charged them for BNPDs because it is the actual prices of BNPDs, and not the markup, which created the pricing disparity

which they challenge in this case. According to plaintiffs, the undisputed fact that the wholesalers control the markup is a red-herring. The real question is whether defendants controlled the different prices paid for BNPDs by plaintiffs, on the one hand, and, the favored purchasers, on the other hand, who received substantial discounts through the chargeback system.

## II. DISCUSSION

### A. Standard Governing Defendants' Summary Judgment Motion

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." One of the principal purposes of summary judgment is to "isolate and dispose of factually unsupported claims or defenses..." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

As an initial matter, "the moving party bears the burden of establishing the absence of any genuine issue." Grabois v. Jones, 89 F.3d 97, 99-100 (2d Cir. 1996) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)); FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) (holding that movant for summary judgment must bear burden of production). See also Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001); Higgins v. Baker, 309 F.Supp. 635 (S.D.N.Y. 1970). Without this showing a district court cannot grant summary judgment in favor of a movant, even if the adverse party has not responded. See Anchorage Assocs. v. Virgin Islands Board of Tax Review, 922 F.2d 168, 175 (3d Cir. 1992); Neal v. Elec. Arts, Inc., 374 F.Supp.2d 574, 578 (W.D.Mich. 2005);

10B Wright, Miller Kane, Federal Procedure and Practice, 395 (1998) (citing "Notes of Advisory Committee on Rules," 28 U.S.C.A. Rule 56 (1960), as amended (Supp.) (without at least pointing to the basis for granting summary judgment, the Court cannot grant the motion despite the lack of opposing evidentiary matter)). While this showing need not require the movant to introduce evidence negating the opponent's claim, it must "point out to the district court–that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the prima facie case for the absence of a genuine issue of material fact has been presented, the nonmoving party must produce evidence to counter all of the movant's showings. A genuine issue as to a material fact exists when there is sufficient evidence favoring the nonmoving party such that a jury could return a verdict in its favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Therefore, the nonmoving party "may not rest upon the mere allegations or denials" of its pleadings; rather, its response must go beyond the pleadings to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324.

When evaluating a motion for summary judgment, "[t]he courts must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." L.B. Foster Co. v. Am. Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). If there remains no genuine issue of material fact then the moving party is entitled to judgment as a matter of law.

### B. The Indirect Purchaser Claim Under Section 2(a) of the Act

Section 2(a) of the Act is designed to protect purchasers from a single seller who establishes a discriminatory pricing policy.[5] A plaintiff must allege and prove that the defendant made two sales of the same commodity to at least two different purchasers at different prices. See Fed. Trade Comm'n v. Morton Salt Co., 334 U.S. 37, 45 (1948); see also Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 584 (2d Cir. 1987) (price discrimination means nothing more than a price differential). In this case, plaintiffs concede that they purchased BNPDs not from defendants, but rather from wholesalers, who have a corporate structure independent from defendants. Plaintiffs argue, nonetheless, that they make out a claim under the Act based on the "indirect purchaser" doctrine, which states that a manufacturer, by utilizing a wholesaler which it controls, cannot evade the price discrimination provisions of the Act. See, e.g., Am. News Co. v. Fed. Trade Comm'n, 300 F.2d 104, 109 (2d Cir. 1962), cert. denied, 371 U.S. 824 (1962) ("under § 2(a) ... there need not be privity of contract between seller and an ultimate buyer to establish the buyer as a ... 'purchaser.' If the manufacturer deals with a retailer through the intermediary of wholesalers, dealers, or jobbers, the retailer may nevertheless be a ... 'purchaser' of the manufacturer if the latter deals directly with the retailers and controls the terms upon which he buys"). Stated differently, one who

[5] Section 2(a) states in relevant part as follows: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them...." 15 U.S.C. § 13(a).

purchases a manufacturer's goods through a wholesaler may be deemed to have purchased directly from the manufacturer if the manufacturer deals directly with the wholesaler and controls the terms under which the purchaser buys. See Baim & Blank v. Philco Corp., 148 F. Supp. 541, 543 (E.D.N.Y. 1957) (citation omitted). The critical element in determining whether the indirect purchaser doctrine applies is the degree of control the manufacturer exercises over its intermediate buyer, in this case, the wholesaler. See FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019, 1028 (2d Cir. 1976), cert. denied, 429 U.S. 1097 (1977); see also Barnosky Oils, Inc. v. Union Oil Co. of California, 665 F.2d 74, 84 (6th Cir. 1981); Purolator Prods., Inc. v. Fed. Trade Comm'n, 352 F.2d 874, 881 (7th Cir. 1965), cert. denied, 389 U.S. 1045 (1968) (upholding FTC's finding that manufacturer engaged in price discrimination through its distribution system); see generally Lefrak v. Arabian Am. Oil Co., 487 F. Supp. 808, 818 (E.D.N.Y. 1980) ("The facts before the court clearly indicate that [plaintiff] is not entitled to invoke th[e indirect purchaser] exception. The distributors acted independent of their suppliers, and made contract and pricing decisions according to their individual concerns. This lack of ownership or control is amply supported by the exhibits presented to the court.").

The evidence viewed in the light most favorable to plaintiffs reveals that the defendant manufacturers charged the wholesalers significantly less for BNPDs which they sold to favored purchasers than they did for BNPDs which the wholesalers sold to plaintiffs as a result of the chargeback system. Moreover, defendants exerted economic pressure to ensure that those pricing disparities were passed on to both favored purchasers and plaintiffs. Although the wholesalers were free to negotiate the markup

directly with the purchaser, plaintiffs assert that because the markup was such an insignificant component of the total purchase price of the BNPDs (acknowledged by Searle in its own internal memorandum cited above), defendants engaged in price discrimination when they demanded a lower net sales price from the wholesalers for BNPDs sold to the favored purchasers than those sold to plaintiffs.

In Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964), cert. dismissed, 381 U.S. 125 (1965), the Second Circuit held that an ice cream manufacturer's practice of recommending a retail price to its franchised dealers was lawful where "the franchise provisions explicitly reserved to the individual dealer the right to set whatever price he desired" and where no attempts to enforce the price structure were shown. Id. at 510. The suggested price sheets were, therefore, provided as a convenience to the dealers and were a "floor," that is, provided a suggested minimum price level that the dealers could, but did not have to, use in setting price. See id. See also FLM Collision Parts, 543 F.2d at 1028 (affirming FTC's finding of a violation of the Act but noting that if the court applies the "indirect purchaser" doctrine merely because a manufacturer suggests a price that a dealer or wholesaler could charge a customer, this "would reach the absurd result of extending the [indirect purchaser] doctrine to every resale of goods"); but see Kraft-Phenix Cheese Corp., 25 F.T.C. 537, 546 (1937) (order dismissed complaint on other grounds but explained that retailers buying from wholesalers are considered to be "purchasers" from the manufacturer where the manufacturer promotes sales directly to the retailers and the manufacturer exerts effective control through dissemination of price lists over the prices charged by wholesalers).

In contrast to the facts in Susser, here, plaintiffs have come forward with

admissible evidence that defendants controlled the price of BNPDs which the wholesalers charged plaintiffs. In short, the evidence viewed in the light most favorable to plaintiffs reveals that defendants required plaintiffs to purchase BNPDs through wholesalers, the wholesalers were not free to set their prices, and defendants coerced them to sell BNPDs to plaintiffs at a higher price than they sold BNPDs to favored purchasers. Because of the chargeback system, this is not a case where defendants sold BNPDs to wholesalers at the same price regardless of the type of customer (independent pharmacist or favored purchaser) who bought BNPDs from the wholesalers.

Similarly, defendants' reliance on FLM Collision Parts is peculiarly inapposite because there the manufacturer "did not attempt through the medium of a suggested price or otherwise to set the prices at which its dealers would sell crash parts to FLM." 543 F.2d at 1028. The facts presented by plaintiffs reveal that defendants have done what the Second Circuit in FLM Collision Parts intimated they could not do. Defendants did not set a floor below which the wholesalers could not sell BNPDs to either plaintiffs or favored purchasers. Rather, they set up an unequal pricing mechanism which would, at minimum, lead to plaintiffs paying more for BNPDs than the favored purchasers.

For the foregoing reasons, defendants' motion for summary judgment based upon alleged indirect purchases is denied.

## SM-HMO MOTION

### I. INTRODUCTION

Pending before the Court is a motion for partial summary judgment submitted by the designated defendants relating to all the representative plaintiffs' claims under the Robinson-Patman Act, 15 U.S.C. § 13(a) (the "Act"), as to all discounts on rebates to for-

profit staff-model health maintenance organizations. Based upon the following analysis, that motion is denied.

## II. BACKGROUND

The current motion examines the validity of §§2(a) and 2(d)[6] claims with respect to sales of BNPDs to for-profit HMOs.[7] At issue here is whether or not for-profit staff model health maintenance organizations (hereinafter "SM-HMOs") are in competition with retail pharmacies for the sale of BNPDs, giving rise to a violation of the Robinson-Patman Act, 15 U.S.C. §§ 13(a) and (d). The organization and manner of operation of HMOs is defined by law. See 42 U.S.C. §§ 300e(a) & (b). The statute states that members of an HMO are to be provided "basic health services for a basic health services payment" which is "(A) ...paid on a periodic basis without regard to the dates health services (within basic health services) are provided; and (B) is fixed without regard to frequency, extent, or kind of health service (within the basic health services) actually furnished." Id. See also Local Rule 56.1 Reply Statement, ("Pls. 56.1 Rep. Stmt.") ¶ 6.

SM-HMOs, like many HMOs, are health care organizations that provide

---

[6] The defendants' complaint primarily addresses the section 2(a) claims, although they also argue against 2(d). See Def. Mem. Law 13. Section 2(d) makes it unlawful:

> [F]or any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any service or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d).

Defendants contend that their argument that there is no competition means there is no violation of 2(d) either. Since the basis for their challenge is the same, this discussion applies with equal force to both the 2(a) and 2(d) claims.

[7] Section 2(f) claims were also filed against defendants Caremark, Medco, and Thrift Drug d/b/a Express Pharmacy Services, defendants who owned mail-order pharmacies and are not currently before the Court.

members with an array of health services.[8] See Mincy Aff. ¶ 50. Unlike other types of HMOs, staff-model HMOs offer services provided by salaried employees of the SM-HMO itself, as opposed to arrangements with independent providers. See id. ¶ 56; Declaration of Jennifer M. Driscoll in Support of Designated Defendants' Motion for Partial Summary Judgment, ("Driscoll Decl.") Ex. B-1, Expert Report of Alain C. Enthoven, ("Enthoven Rep.") ¶ 10. Sometimes these services include BNPD-benefit programs. See id. ¶ 11. In return, the SM-HMO collects a fixed-fee for covered services. See Enthoven Rep. ¶¶ 37-40; Mincy Aff. ¶ 50. Often, in addition to paying fixed fees, the consumers which subscribe to these services ("subscribers") will also make a co-payment for goods or services actually rendered. See Mincy Aff. ¶¶ 64, 67; Enthoven Rep. ¶ 40. The use of a deductible by an HMO is authorized by law. See 42 U.S.C. § 300e(b)(1)(D).

Fundamentally, this transaction involves the shifting of risk. Alongside the fixed-fees they receive, SM-HMOs accept the risk that subscribers will consume more health care and/or BNPDs than their payments would otherwise cover. See Enthoven Rep. ¶ 37. Of course, this is not necessarily a losing proposition for the SM-HMOs, because they may also keep any excess fees that are not used to cover a subscribers' health care costs. See id. In return, subscribers protect against the risk of high medical care costs in the event they succumb to a covered medical condition. Subscribers reduce variance in health care costs to a fixed-fee, and for accepting this risk, SM-HMOs charge fees that

---

[8] Although plaintiffs superficially dispute the relevance of many of defendants' Rule 56.1 statements of fact, see, e.g., Pls. 56.1 Rep. Stmt. ¶¶4, 6, 13, these arguments are undercut by the plaintiffs' own expert witness, whose description of SM-HMOs accords with that proposed by defendants. See Mincy Aff. ¶¶ 50-61. In this regard, the facial dispute over the basic structure of SM-HMOs presented by the 56.1 statements appears semantic rather than substantive.

cover the actuary-determined risk and some profit. As a result of this arrangement, SM-HMOs are given an incentive to control the cost of health care, including the costs of BNPDs. See Driscoll Decl., Ex. B-1 ¶¶ 34, 37; Mincy Aff. ¶ 68.

In their briefing papers, the parties offer conflicting descriptions of the operation of several HMOs at issue here. Given the dynamic on-going transformations in the health care industry occurring before, during, and after the relevant time period in this case, it is not surprising that the parties' descriptions of HMOs vary in some respects. Not all of these differences, however, are material. As best can be discerned, the defendants' motion is directed at agreements with those SM-HMOs that share a certain set of attributes, enumerated below. Where plaintiffs have asserted factual differences, those differences will be noted. The Court understands that the defendants' motion is addressed to those SM-HMOs as described above that 1) offer fixed-fee health care services which 2) provide BNPD-benefit programs that 3) actually dispense BNPDs to subscribers, and subscribers only.[9] The Court does not apply its conclusions to the variety of other HMO typologies described in the record, including those SM-HMOs that do not operate in-house pharmacies. It also does not consider the relevance of this discussion to IPA-model, group model, or network model HMOs.

Given the aforementioned characterization of SM-HMOs, defendants make three independent arguments to justify partial summary judgment. First, they assert that SM-HMOs are sufficiently like insurance companies because of their risk-spreading

[9] The parties do not agree on who would be a "subscriber" under the Act. Plaintiffs appear to argue that subscribers include only those individuals who are members of a particular SM-HMO, and do not include the insureds of third-party payors which have contracted with the SM-HMO for pharmacy benefits. See Pls. Mem. 7-9. Defendants appear to group the above categories together. See Defs. Rep. 10.

function. As such, they contend that SM-HMOs are "end-user purchasers" under the Kartell line of cases. See Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922 (1st Cir. 1984), cert. denied, 471 U.S. 1029 (1985); Defs. Mot. 4. As end-users, they argue, they cannot also be considered competitors of retailers, a necessary element of a Robinson-Patman violation.

Second, following the logic of Sano Petroleum Corp. v. American Oil Co., 187 F.Supp. 345 (E.D.N.Y. 1960), they contend that SM-HMOs and retail pharmacies are not in competition with each other because the BNPDs purchased by SM-HMOs are merely one input in the overall health care package that SM-HMOs provide their subscribers. Since they compete with other comprehensive health services organizations, they argue, they do not compete with retailers, so the discounts cannot have harmed retail competition.

Third, they assert that even if as a matter of law SM-HMOs could be considered competitors of retail pharmacies, plaintiffs have produced no evidence that they compete with SM-HMOs.[10]

Plaintiffs generally accept the above characterization of SM-HMOs--one of their proposed experts, David Mincy, avers that he would testify similarly at trial. However, plaintiffs argue in opposition that, as a matter of fact, competition between SM-HMOs and retail pharmacies occurs for subscribers, third-party payor members and cash-paying customers. Plaintiffs dispute the treatment of these agreements as purely

---

[10] Defendants introduce evidence to substantiate their assertion that there is no genuine issue of material fact. They admit that SM-HMOs purchase BNPDs, but produce evidence in the form of contracts with manufacturers promising that the BNPDs will only be dispensed to members of the plan. See, e.g., Driscoll Decl., "Mattox Dep." Ex. 9 (Contract between Ciba and Cigna) Tab A-2, CG00000790.

insurance contracts because benefit plans are sold separately from health insurance plans, and BNPDs are sometimes sold to non-subscribers.[11]

Arguing against defendants' assertion of end-user treatment for insurers, plaintiffs contend that the case law here is inapplicable because it deals exclusively with Sherman Act cases. See Defs. Mot. 15-16. Plaintiffs also contend that co-payments constitute a "resale" of the product, and therefore SM-HMOs are resellers, not end-users. They further assert that these resales are to plaintiffs' actual and potential customers, placing them in competition with SM-HMOs. Even if the Court were to consider the sales here under Kartell as direct sales to subscribers, they argue that sales to non-subscribers would push the present case outside of Kartell's orbit, since the SM-HMOs would in effect be reselling to non-insureds.

Plaintiffs also dispute the analogy to Sano Petroleum for many of the same reasons they dispute Kartell's applicability. They distinguish Sano Petroleum by asserting that the question of competition is generally a factual matter, and their evidence shows that there is some competition.

## III. DISCUSSION

### A. Claims Under the Robinson-Patman Act, 15 U.S.C. §13

#### 1. Secondary Line Injury

Secondary line injury, which plaintiffs claim to have suffered, results from price discrimination between favored and disfavored purchasers. See Texaco Inc. v.

---

[11] With respect to the defendant Searle only, plaintiffs contend that its agreements with SM-HMOs provide no limit on the purchasers' resale rights, thus permitting them to resell BNPDs, regardless of the subscriber status of the end user. Because the Court denies the motion with respect to both defendants on other grounds, it does not consider the significance of this assertion.

Hasbrouck, 496 U.S. 543, 558, n.15 (1990); see also Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 219 (2d Cir. 2004) ("a secondary-line violation occurs where the discriminating seller's price discrimination injures competition among his customers"). To make out a prima facie case for a §2(a) secondary-line price discrimination violation,[12] the plaintiff must show: "(1) that seller's sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition." George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 141 (2d Cir. 1998) (citing Hasbrouck, 496 U.S. at 556). Damages are not a part of the prima facie case.[13]

**2. "In Competition"**

"In order to establish the requisite competitive injury in a secondary-line case, plaintiff must first prove that, as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential." Best Brands Beverage, 842 F.2d at 584 (citing Lupia v. Stella D'Oro Biscuit Co., 586 F.2d 1163, 1170 (7th Cir. 1978), cert. denied, 440 U.S. 982 (1979)); Carlo C. Gelardi Corp. v. Miller Brewing Co., 421 F.Supp. 237, 245 (D.N.J. 1976). See generally, F. Rowe, Price Discrimination Under the Robinson-Patman Act 173-180 (1962) (explaining that a

---

[12] The consolidated complaints against which the defendants now move assert claims under §§ 2(a) and 2(d) of the Robinson-Patman Act as amended, 15 U.S.C. §13. In this motion, the parties focus on the § 2(a) claims. Since the structural elements of a § 2(d) claim are essentially the same as those under § 2(a), the Court's discussion will apply with equal force to both.

[13] Discussion of the damages element of the claim is reserved for the Court's analysis of the damages motion.

"competitive nexus between the customers receiving the higher and the lower prices is a basic predicate of any conclusion of adverse effects at the customer level attributable to a seller's price differentials.").

The plaintiff must also show that the probable effect of the price discrimination would be to allow the favored purchaser to draw sales and profits from the disfavored purchaser. See J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 569-70 (1981) (Powell J., dissenting in part) (citing Enter. Indus., Inc. v. Texas Co., 240 F.2d 457, 458 (2d Cir. 1957), cert. denied, 353 U.S. 965 (1957)).

Competition between the favored and disfavored purchasers must occur at the same functional level. See Best Brands Beverage, Inc., 842 F.2d at 585. In other words, as competitors, they must be "...all wholesalers or all retailers, and within the same geographic market." Id. The Second Circuit has held that "[d]etermining the presence or absence of functional competition between purchasers of a commodity is simply a factual process which focuses on whether these purchasers were directly competing for resales among the same group of customers." Haug, 148 F.3d at 141-42; (citing Fed. Trade Comm'n v. Fred Meyer, Inc., 390 U.S. 341, 349 (1968)).

Since both favored and disfavored purchasers must be competing for customers, the Act is applicable only when the purchasers are also resellers. See, e.g., Lycon Inc. v. Juenke, et al., 250 F.3d 285, 289 (5th Cir. 2001), cert. denied, Lycon, Inc. v. EVI Oil Tools, Inc., 534 U.S. 892 (2001). Normally, direct sales to end-users are not considered sales "in competition." See, e.g., S. Bus. Commc'ns v. Matsushita Elec. Corp. of Am., 806 F.Supp. 950, 960 (N.D. Ga. 1992) (County which purchased for its own use could not be a purchaser under § 2(a) because it did not compete with plaintiff for resales).

For the purchasers of the products to be in competition with each other, they must pass the product on in some form. Generally, a consumer and a retailer cannot compete. See 3 Kintner and Bauer, Federal Antitrust Law 299 (1983) ("...the Act is implicated only when customers pay different prices for goods which they will resell, either in the same... form as purchased, or as a raw ingredient or input into another product. If the two customers are consumers of the product, they are not 'competitors...'"); see also Herbert Hovenkamp, 14 Antitrust Law: An Analysis of Antitrust Principles and Their Application, 89-95 (1999).

It thus follows that if a distributor loses customers to a manufacturer's cheaper direct prices, the Robinson-Patman Act will not offer a remedy. The exceptions prove the rule; when "end-users" begin to resell, or wholesalers begin to compete as resellers, courts have looked through the formal description of economic function to the economic reality of the situation, and found that competition exists. See generally, Hasbrouck, 496 U.S. 543; Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745 (1st Cir. 1994). With these principles in mind, the Court turns to defendants' motion.

**B. Defendants' Arguments**

**1. Insurers as End-User Purchasers: Is Kartell Applicable?**

Defendants argue that SM-HMOs purchase BNPDs on behalf of their subscribers, and dispense them as part of a fixed-fee service. They urge the Court to view them as insurers and/ or as procuring agents acting on behalf of subscribers. This treatment would entitle them to summary judgment, they reason, because discounts to end-users (or agents acting on their behalf) are not discounts to "competing purchasers."

Defendants derive this treatment of SM-HMOs as "end-users" from the Kartell line of cases. See 749 F.2d 922.

Under this theory, the insurer is considered a purchaser on behalf of end-users. For purposes of either granting the insurers standing to sue for antitrust injury, or providing them with a defense against antitrust conspiracy and price-fixing suits, courts have found that insurers are single "buyers" or "purchasers" for antitrust purposes. See, e.g., Kartell, 749 F.2d at 926 (arguing that "[t]he relevant antitrust facts are that Blue Shield pays the bill and seeks to set the amount of the charge. Those facts...convince us that Blue Shield's activities here are like those of a buyer."); Med. Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc., 675 F.2d 502, 505 (2d Cir. 1982) (holding that the imposition of price terms on local pharmacies by insurers was subject to the rule of reason, and upholding district court's finding that "Blue Cross was the purchaser of the prescribed drugs"); Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 881 F.Supp. 1309 (W.D. Wi. 1994) (finding that "[f]or antitrust purposes, Blue Cross is treated as a buyer where it pays the bill and seeks to set the amount charged") (citing Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 216-17 (1979)); Brillhart v. Mut. Med. Ins. Inc., 768 F.2d 196, 199 (7th Cir.1985); Michigan State Podiatry Ass'n v. Blue Cross and Blue Shield of Michigan, 671 F.Supp. 1139, 1152 (E.D.Mich. 1987)); (additional citations omitted); Feldman v. Health Care Serv. Corp., 562 F.Supp. 941 (N.D. Ill. 1982) ("Each federal court which has examined the question in the context of the antitrust laws has decided that an insurer paying out pursuant to its policy of insurance is actually a purchaser of goods or services, and that the insured is merely the recipient of the goods or services pursuant to the policy."). In

short, a chorus of judicial opinion has proclaimed that when insurers purchase health services and pharmaceuticals for the benefit of their members, they are treated like purchasers under the antitrust laws.[14] See Kartell, 749 F.2d at 926 ("The same facts convince us that Blue Shield's activities here are *like* those of a buyer.") (emphasis added). In a sense, these courts have viewed the insurer's role as akin to that of a broker. Id. at 925 ("...from a commercial perspective, Blue Shield in essence 'buys' medical services for the account of others...").

Defendants seek their treatment as end-user purchasers, placing them out of competition with plaintiffs, since direct sales to end-users, even at favorable prices, cannot be construed as sales to competitors. See S. Bus. Commc'ns, 806 F.Supp. at 960.

The rationale behind these decisions is that insurers have incentives to control costs in order to compete on price with other insurance companies, and that such competition produces lower prices inuring to the benefit of consumers. See Blue Cross & Blue Shield of Wisconsin, 881 F.Supp. at 1317, 1319. In the Sherman Act context, policy considerations favoring pro-competitive arrangements have encouraged courts to apply the "rule of reason" analysis to these agreements, see Feldman, 562 F.Supp. at 951, since "the antitrust laws are not intended to protect profit margins but consumer welfare." Id. at 950 (citing Brunswick Corp. v. Pueblo Bowl-o-Mat., Inc., 429 U.S. 477, 488 (1977)).

Despite this voluminous list of Sherman Act cases, this Court has to yet to

---

[14] The simile relationship is important because courts appear hesitant to employ this second-order use of "buyer" in blanket fashion across all of antitrust law. In Kartell, for example, the Court explicitly limited the finding that Blue Shield was a buyer under the antitrust laws to the application before it. See Kartell, 749 F.2d at 926.

find–and the parties have yet to provide–a single related case applying this doctrine to a claim under the Robinson-Patman Act. Defendants ambitiously overstate the law's incorporation of Sherman Act doctrine in the Robinson-Patman context. Nevertheless, the proposition merits discussion, albeit as a novel application of antitrust law. Having considered the question, the Court finds it injudicious to apply Kartell analysis to the present case and thus declines to so do.

The Robinson-Patman and Sherman Acts deal with distinct aspects of competition law. The Sherman Act looks to curb certain forms of illegal monopolies and conspiracies while the Robinson-Patman Act looks to protect smaller competitors by giving them the same access to discounts that would otherwise be reserved for those commanding more buying power. See, e.g., Fred Meyer, 390 U.S. 341; Fed. Trade Comm'n v. Henry Broch & Co., 363 U.S. 166 (1960); Innomed Labs, LLC v. Alza Corp., No. 01-8095, 2002 WL 31521084 (S.D.N.Y. Nov. 13, 2002), aff'd, 98 Fed. Appx. 51 (2d Cir. 2004). It has frequently been noted by commentators that there is a tension between the objectives of the Robinson-Patman and Sherman Acts. See, e.g., 14 Hovenkamp, supra, 118-125. Although the Supreme Court has said that the conflict between the two acts should be minimized as much as possible, see Great Atl. & Pac. Tea Co., Inc. v. Fed. Trade Comm'n, 440 U.S. 69, 80-3 (1979), the case law does not require the two statutes to operate in perfect harmony. See id. (citing Standard Oil Co. v. Fed. Trade Comm'n, 340 U.S. 231, 249 (1951)).

Were the Court to import Sherman Act doctrine wholesale, it would produce a previously nonexistent statutory safe-harbor for the health care industry. Defendants have failed to explain or justify such a radical transformation of the Act which, when

read in its entirety, excludes by enumeration such a safe-harbor. More specifically, they have failed to explain why the pro-competitive rationale used to justify "rule of reason" treatment under the Sherman Act should also be applicable to price discrimination claims under Robinson-Patman, where the pro-competitive effects of price discrimination are irrelevant, unless they ground one of the enumerated defenses. See 15 U.S.C. §13(a).

The fact that none of the courts which have treated purchasers as insurers contemplated liability under Robinson-Patman militates against its application as a matter of law. Those cases considered conspiracy, group buying and tying claims. This case deals with price discrimination between competitors. Defendants' proposed use of Kartell would employ Sherman Act protections for "buyers" of goods that would not otherwise be given under a Robinson-Patman analysis of whether the parties are in actual, functional competition. See Haug, 148 F.3d at 141-42.

Moreover, neither the cited cases nor the elements of claims under these statutes are similar enough to justify this blanket cross-application. The "competing purchaser" element of the Robinson-Patman claim to which defendants wish to apply their theory doesn't exist as an element of the Sherman Act claims under which Kartell, its siblings and progeny were decided. In addition, the language of the Kartell line of cases indicates that those courts limited their holdings to the facts before them. See, e.g., Kartell, 749 F.2d at 926. Were the question whether or not to apply analysis of a claim element shared by both acts, the cross-application might make sense. Here, however, it does not.

Furthermore, the defendants' argument would, in effect, confer exemptions upon

for-profit insurers that are explicitly rejected by the Nonprofit Institutions Act ("NIA"). Under the NIA, nonprofit organizations can accept discounts for goods purchased for their "own-use." See 15 U.S.C. § 13c. The Ninth Circuit has held that it covers nonprofit HMOs that dispense drugs to their patients. See De Modena v. Kaiser Found. Health Plan, Inc., 743 F.2d 1388 (9th Cir. 1984), cert. denied, 469 U.S. 1229 (1985). The "own-use" aspect of the NIA has been enforced. The Supreme Court, for example, has found that local governments are not shielded by the NIA when they resell drugs bought at favorable prices for profit. See Jefferson County Pharm. Assoc., Inc. v. Abbott Lab. et al., 460 U.S. 150 (1983). Defendants' application of Kartell would permit even for-profit insurance companies to buy goods at discounts without regard to competition–despite the clear language of the statute limiting the benefit to "non-profits."

Second, applying Kartell would muddle the jurisprudence on the "business of insurance" exception under the McCarran-Ferguson Act. See 15 U.S.C. §§ 1012(b), 1013(b). The applicability of McCarran-Ferguson exemption for agreements under the "business of insurance" is not before the Court, so no determination with respect to its applicability is made here.[15] However, if the Court were to read the present cases through Kartell, it would conflate Sherman Act doctrine with the more appropriate discussion under McCarran-Ferguson. At the very least, the exemption would parallel that explicitly created by Congress. The Court declines to facilitate this confusion.

**2. BNPDs as Inputs: Is Sano Petroleum Applicable?**

[15] The parties cite to cases in this area, but no claim under the Act is made under this motion. See, e.g., Group Life & Health Ins. Co. v. Royal Drug Co., 440 US. 205, 232 (1979); Klamath-Lake Pharm. Assoc. v. Klamath Med. Serv. Bureau, 701 F.2d 1276 (9th Cir. 1983), cert. denied, 464 U.S. 822 (1983).
.

Defendants' second argument relies upon Sano Petroleum, 187 F.Supp. 345 (E.D.N.Y. 1960). In that case, defendant American Oil was a seller of gasoline to a variety of distributors[16] including plaintiffs and Metropolitan, a company which leased trucks and provided gas for them. Metropolitan used the gas exclusively to refuel its fleet of rental trucks. See Sano Petroleum, 187 F.Supp. at 350. Because Metropolitan acquired gas at a discounted price, the gas stations brought a 2(a) price discrimination claim against the seller. The court found that a truck leasing company which bought gas at a discount for the exclusive use of its fleet was not in competition with local gas retailers, and therefore found there to be no "favored purchaser." The basis for its decision was that the two were not in competition: "it was Metropolitan rental arrangement, rather than the price discrimination afforded Metropolitan by American, that foreclosed the market." Id. at 357.

Defendants assert that Sano Petroleum is apposite here. They contend, in essence, that both the bundling of health care services with BNPDs and the insurance element of BNPD benefit plans use BNPDs as a mere "input" in the package sold. Despite their concession that Haug, a case controlling the Court's decision of this issue, focuses the inquiry on the question of actual competition, defendants argue that the specific determinations in Sano Petroleum foreclose the inquiry.

Sano Petroleum carries some weight as an analogue to the present case. Yet Sano Petroleum's finding does not relieve the Court of the obligation to review the record in a light most favorable to plaintiffs to see if they have proffered any evidence of "actual

[16] Two other purchasers of gasoline, Swift and Uneeda, were also discussed in the opinion, but defendants' argument is largely based on the analogy to Metropolitan. See Def. Mem. 9-11.

competition" as mandated by Haug. That case dealt with a price discrimination claim where the plaintiff was an auto parts dealer and the alleged favored purchaser was a parts and service dealer that also sold cars. The Second Circuit found that the allegations of competition in the pleadings were sufficient to survive a motion to dismiss. See Haug, 148 F.3d at 141-42. That court reasoned that the "presence or absence of functional competition between purchasers of a commodity is simply a factual process which focuses on whether these purchasers were directly competing for resales among the same group of customers." Id. The court in Haug also noted that even if they were not on the same functional level, evidence could show competition. See id. at 142.

This Court is compelled to follow Haug. To the extent that Sano Petroleum implies that, as a matter of law, goods sold in conjunction with other agreements do not compete with similar goods sold separately, Haug overrules it, since Haug treats the question of competition as a factual inquiry. Indeed, in Sano Petroleum the judge found, as a matter of fact, that there was no competition between plaintiff and favored purchasers. See Sano Petroleum, 187 F.Supp. at 347, 357. As long as plaintiffs make a showing that they functionally compete with SM-HMOs, they can survive summary judgment.

**C. Evidence of Competition**

To establish actual competition, plaintiffs need only show "competitive contact," that the favored and disfavored purchasers competed on the same functional level and in the same geographic market. See Best Brands Beverage, 842 F.2d at 584-85. See also Godfrey v. Pulitzer Publ'g Co., 276 F.3d 405, 409-10 (8th Cir. 2002). Plaintiffs have

proffered evidence of competition sufficient to survive summary judgment.

Plaintiffs proffered evidence that a trier of fact could believe, including official reports from Ciba-Geigy indicating that the biggest threat to retail pharmacies comes from the development of HMO in-house pharmaceutical sales. See Ex. MX 51, CGOO257794-816, at CGoo257803, CGoo257806. Seen in its best light, the evidence creates a factual dispute regarding SM-HMO competition with retail pharmacies, whether those customers be subscribers or non-subscribers.[17]

Plaintiffs also proffer evidence that sales of BNPDs have been made by SM-HMOs to "walk-in"[18] customers. Plaintiffs contend that retail pharmacies compete with SM-HMOs for sales to both cash-paying customers and members of other third-party plans. They assert that several SM-HMOs have admitted that although they do not seek-out fee-for-service customers, they would sell them pharmaceuticals. See Ramirez Dep. X28 (Kelsey-Seybold), 224:15-225:22; Reitz Dep. X30 (Columbia Health Plan), 30:10-31:26; Greenwald Dep. X16 (Group Health Plan), 20:1-21. While the evidence does not clearly point to actual competition for cash paying customers, seen in a light most favorable to plaintiffs, it could support the SM-HMO understanding that they competed with retail pharmacies.[19]

---

[17] The Court does not examine the question of liability exemptions for subscribers under any theory other than those proposed here, which it rejects.

[18] By "walk-in" customers, plaintiffs mean "both cash-paying and members of other insurance plans." Pls. Mem. 3. By "cash-paying" customers, plaintiffs appear to refer to those customers who are neither members of the SM-HMO from which they acquire the drugs nor subscribers to a third-party payor plan. By members of other insurance companies, plaintiffs appear to be referring to individuals that have insurance from elsewhere which may or may not include a prescription benefit program run through the SM-HMO, but nevertheless acquire drugs through the HMO.

[19] Q: (By Mr. Armstrong) would any of – would you compete for the filling of the prescription of a Sanus member with another retail pharmacy?
A: Yes.

Defendants assert that the above testimony was, at most, speculation by the deponents. See Defs. 56.1 Rep. Stmt. ¶ 41. But a trier of fact could reasonably read the above and other statements as acknowledgments that a consumer not otherwise a member of a company's BNPD benefit program had the opportunity, and the choice, of buying through an SM-HMO's in-house pharmacy or at a retail pharmacy. This would place the pharmacies in competition. At any rate, "the Supreme Court has repeatedly held that section 2(a) does not 'require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they 'may' have such an effect.'" Godfrey, 276 F.3d at 410 (citing Corn Prods. Ref. Co. v. Fed. Trade Comm'n, 324 U.S. 726, 742 (1945); Falls City Indus., Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 434-35 (1983); J. Truett Payne, 451 U.S. at 561-62; Morton Salt, 334 U.S. at 46). Defendants' motion with respect to SM-HMOs is therefore denied.

**CONCLUSION**

Because defendants' motion is to categorically exclude from Robinson-Patman liability those agreements with SM-HMOs that purchase BNPDs and dispense them through their in-house pharmacies and plaintiffs have raised an issue of fact with

---

Q: Would you compete with another retail pharmacy for the filling of an Aetna member?
A: Yes.
Q: Would you compete with another retail pharmacy for the filling of a Blue Cross Blue Shield member?
A: Yes.
Q: Would your testimony be the same for all the other third-party groups?
A: Yes.
Q: Can a Sanus member who has elected to have medical benefits provided by a physician outside the Kelsey-Seybold network have his prescription filled from a Kelsey-Seybold clinic?
A: Yes.

Glassman Decl., Dep. X 28 (Ramirez Dep.) 249:24-250:19.

respect to at least some of them, the motion is denied.

## NON-PURCHASER REBATES MOTION

The Court next considers defendants' motion for partial summary judgment relating to all the representative plaintiffs' claims under the Robinson-Patman Act, 15 U.S.C. § 13(a) (the "Act"), as to all legal entities which received rebates that do not take title to, resell, or dispense brand name prescription drugs. Having carefully reviewed the papers submitted by the parties, and as set forth below, the Court grants defendants' motion for summary judgment in part and denies it in part.

## I. BACKGROUND

### A. Current Dispute

At issue here are agreements that defendant-manufacturers have made with PBMs and TPPs,[20] which manage the drug benefit portion of many healthcare enterprises. Defendants argue that there is no title transfer of BNPDs to PBMs. At most, they conceive of PBMs as purchasing agents for large healthcare and insurance providers and consumers. In moving for partial summary judgment, defendants make two arguments: (1) that the relevant PBMs did not "purchase" the drugs because the rebate agreements did not constitute "sales," and (2) that no competitive injury resulted

---

[20] Unfortunately, the parties' briefs are not entirely consistent on the difference between PBMs and TPPs, to the extent there is one. At times, the PBM is described as the agent of the TPP, because it makes the agreement with the manufacturer for the benefit of the TPP's consumers (the "insured"). At other times, the terms seem to be used interchangeably (compare 56.1 Stmt., ¶ 12, with id. at ¶ 14). The confusion seems to arise from the parties' attempts at simplifying for trial a multitude of different organizational structures in the health care industry. Fortunately, the inconsistency does not hinder the resolution of this motion. For the limited purpose of deciding this motion, the Court will use the term "PBM" to refer to the pharmacy benefit managers subject to this motion, and "TPP"as the institutional clients (including insurance companies) that contract with PBMs for pharmaceutical services, and which deal directly with consumers.

from the transactions.

In opposition, plaintiffs contend that the agreements between PBMs and manufacturers are, in fact, discounted sales to the PBM. Additionally, plaintiffs ascribe some PBMs to BNPD purchases made by affiliated legal entities such as “mail order pharmacies.” When no such affiliations exist, they argue that the PBMs nevertheless exercise “dominion and control” over the BNPDs and therefore qualify as “purchasers” under the Act. Plaintiffs contend that the evidence raises an arguable factual issue as to whether or not the agreements that form the basis for this motion qualified certain PBMs as “purchasers.” Finally, plaintiffs assert that PBMs, as affiliates of mail order pharmacies, do compete with designated plaintiffs in the BNPD resale market.

**B. The Agreements**

Because the transactions at issue are rather complex, some background is warranted. Although the agreements at issue are technically those between manufacturer and PBM, the plaintiffs take a larger view of the interaction of these and other agreements, including those by which title to BNPDs actually pass to retail and mail order pharmacies via wholesalers. It is therefore prudent to review the related agreements between various actors in the distribution and pricing of BNPDs.[21]

The first agreement entered into is between the PBM and its client. The PBMs act “for the benefit of the plans or payor with which they have contracted.” Designated Defendant’s Response to Plaintiffs’ Statement of Additional Dispute Material Facts...,

[21] The ordering of the agreements in this memorandum and order is analytic rather than chronological, intended only to outline the transactions at issue.

(hereinafter "Def. Rep. 56.1 Stmt.") ¶ 11. These PBMs "contract with HMOs, employers, insurance companies, and other entities to manage the drug benefit component of health care plans..." Def. Rep. 56.1 Stmt. ¶ 11. Presumably, this contract is entered into because of the cost reductions that PBMs can offer; PBMs are able to and have negotiated lower BNPD costs for their clients through the aggregation of buying power and the threat of switching[22] to a competitor's product.[23] See id. at ¶¶ 8, 9.

The PBM then makes a second agreement with the manufacturer. The gist of this agreement is that the manufacturer agrees to "discount" the prices of its BNPDs for the PBM in return for its agreement to either purchase the manufacturer's BNPDs either for itself or on behalf of its client. The discounts at issue here are paid in the form of "rebates." Examples of these transactions, the terms of which are not materially disputed, see Def. Rep. 56.1 Stmt. ¶¶ 16, 17, are attached to the Affidavits of Marlene Dubas and Jennifer Driscoll. See Dubas Aff. Ex. A-E; Driscoll Aff. Ex. E, F. Generally, the PBM is paid a percentage rebate for every covered prescription filled at a "network pharmacy." See Ex. B to Dubas Aff. SE000066660. In other words, the rebate payment to the PBM is based upon and triggered by a patient's actually filling a prescription at a

---

[22] The possibility of switching occurs when two BNPDs are considered "therapeutic equivalents." Thus, even though two BNPDs might otherwise be able to obtain lawful monopoly returns for their manufacturers, the buyers' ability to shift demand from one drug to the other forces the manufacturers to compete on price.

[23] It should be noted that plaintiffs dispute that the application of greater buying power forced defendants to enter into these agreements, because "most health care entities maintained open or recommended formularies... [and] [r]etail pharmacists were able to override formulary restrictions by obtaining plan authorizations on behalf of their customers for BNPDs excluded from that plan's formularly." Mincy Aff. 27-28. This evidence, however, does not directly contradict the apparent buying power of the PBMs and TPPs central to the economics at issue here. At most, the plaintiffs' expert indicates that some bargaining power remained with both manufacturers and retail pharmacies.

pharmacy. The rebate is then paid to the PBM.[24]

In return for the rebate, the PBM provides the manufacturer a host of services, including the development and publication of formularies,[25] see Ex. A to Dubas Aff. SE000066642, and information on participating pharmacies. See id. at SE000066643. It must also "impose penalties to secure the prescribing and dispensing activity in conformity with the direction indicated in the Universal Formularies."[26] Id. In short, PBMs provide manufacturers with market information on their products and encourage sales of agreed upon drugs, and in return the manufacturers issue the PBMs a rebate. This is the "quid pro quo" of the second agreement.

The third and final agreement is between the PBM and retail pharmacies. "[T]hird party plans and PBMs contract with retail pharmacies to act as participant pharmacies and set the prescription drug reimbursement rates for participating pharmacies." Designated Plaintiffs' Local Rule 56.1 Statement of Disputed Material Facts (hereinafter "Pls. 56.1 Stmt.") ¶ 5. In this agreement, the parties come to terms on the retail price that the pharmacy will charge participants of TPPs' plans. In return, the pharmacy is admitted as a "participating" or "network" pharmacy. See Driscoll Aff., Ex. F, NOVMDL001369. This status provides the retail pharmacy with access to PBM-

---

[24] It appears that the rebate might be paid to the TPP or other entity, but for the purposes of this motion, the Court considers only those instances in which the PBM is paid some or all of the rebate.

[25] A "formulary" is a list of drugs with their uses and methods of use, and may include substitutes for the drug.

[26] Many of these services are also provided to the HMOs and plans that contracted to have the PBMs act as their buyers. See Defs. 56.1 Rep. Stmt. ¶ 11.

controlled clients.[27]

Plaintiffs characterize the aforementioned series of transactions as a circuitous means of favoring some purchasers of BNPDs while disfavoring them. Plaintiffs assert that they were resigned to making purchases of BNPDs from wholesalers without the benefit of the rebate. Their argument, in essence, is that even though the rebates are tied to consumer purchases and paid after those purchases are made, they are nothing more than a favorable discount to some buyers. Applying their theory to the legal entities at issue here, they contend that the PBMs are often nothing more than purchasing wings for mail-order pharmacies. By analogy, the argument proceeds, those PBMs which are unaffiliated with any BNPD reseller exercise the same dominion and control over those drugs, and should therefore be considered as purchasers for Robinson-Patman purposes.

### C. Corporate Structure of PBMs

During the May 26, 2005 oral argument, both parties described the PBM agreements in three groups, each of which was based on the PBM's relationships with legal entities that do take title to, distribute, or resell BNPDs. See May 26, 2005 Transcript of Motion ("5-26 Trans.") 83-123. The first group of agreements are with those PBMs which have no legal affiliation with a company that takes title to, resells or dispenses BNPDs and do not do so themselves. The Court will refer to these as "stand-alone PBMs." The second group are those PBMs that have a legal affiliation – most frequently a parent-subsidiary or co-subsidiary relationship – with an entity that does

---

[27] The parties have extensive disagreements over the amount of pressure exerted by PBMs against retail pharmacies to get them to comply with terms of the agreement, but this dispute is immaterial for the present motion.

take title to, resell, or distribute BNPDs. The Court will refer to these as "affiliated PBMs." Finally, the third group of PBMs are those which perform the contracting services described above and which also take title to the drugs, generally through a wholly owned pharmacy. The Court will refer to these as "unified PBMs." Only the stand-alone and affiliated PBMs are subject to the current motion–the defendants have decided to "punt" on the unified PBMs. See 5-26 Trans. 91.

In short, the parties dispute in summary judgment how profound the affiliation between two legal entities must be to trigger the Robinson-Patman Act prohibition against price discrimination.

## II. DISCUSSION

The Court applies the well-recognized standards for summary judgment motions discussed supra, "Indirect Purchaser Motion" II.A., pp. 9-10.

### A. Elements of a Section 2(a) Robinson-Patman Act Claim

To proceed on their Robinson-Patman claims, plaintiffs must make a factual showing as to all material elements, detailed supra "Indirect Purchaser Motion" II.B. pp. 10-14. Here, defendants challenge whether certain agreements make them "purchasers" or whether they can be considered "in competition" with plaintiffs.

#### 1. Purchasers

A necessary condition of being a purchaser is that a "sale" be made to the purchaser. See 3 P. Areeda & H. Hovenkamp, Antitrust Law, 20 (1999) ("Because § 2(a)...speaks only of price discrimination between two different 'purchasers,' it does not cover transactions unless they can reasonably be construed as 'sales.'"). There is no special definition of "sale" to be applied under the Act. Instead, courts have resorted to

the general law of sales. See Loren Speciality Mfg. v. Clark Mfg. Co., 241 F.Supp. 493, 498-99 (N.D. Ill. 1965), aff'd, 360 F.2d 913 (7th Cir. 1966). See also Island Tobacco Co. Ltd. v. R.J. Reynolds Indus. Inc., 513 F.Supp. 726, 733 (D.Haw. 1981); Kennedy Theater Ticket Serv. v. Ticketron, Inc., 342 F.Supp. 922, 925 (E.D. Pa. 1972) (courts have generally looked to the indicia of sales law and transfer of title).

Even though the case law does not clearly define what constitutes a sale, some parameters are apparent. When parties act as intermediaries for a transaction and do not buy and resell the commodities, no sale between them has occurred. See Metro Commc'ns Co. v. Ameritech Mobile Commc'ns, 984 F.2d 739, 746 (6th Cir. 1993). A consignment, whereby market risks remain with the consignor, for example, cannot constitute a sale. See 14 Hovenkamp, Antitrust Law, ¶2312b, 21; Loren Specialty, 360 F.2d at 913 ("Preferences granted to a legitimate sales agent are not actionable because there is no sale to the agent"); Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367, 373 (3d Cir. 1985) (discussing preferences given by seller to seller's agent) (citing United States v. GTE, 272 U.S. 476 (1926)).

**B. Stand Alone PBMs**

Defendants contend that all PBMs subject to the motion "are not 'purchasers' within the meaning of the Act...[because]... title to the goods must pass from the seller to the 'purchaser' or at a minimum, the 'purchaser' must exercise dominion and control over the goods." Correspondingly, defendants argue that the rebate transactions cannot constitute "sales," since PBMs never take possession of the BNPDs.

**1. Are they "purchasers"?**

Plaintiffs assert that to be a "purchaser" under the Act, one of two standards must

be met: 1) title must pass from the seller to the purchaser; or 2) the purchaser must exercise dominion and control over the goods. Although the difference between these two standards is not entirely clear, it has been noted in the case law. See, e.g., Reines Distribs., Inc. v. Admiral Corp., 241 F. Supp. 814, 815 (S.D.N.Y. 1964); Baim & Blank, 148 F.Supp. 541 (holding that subsidiary that set its own pricing policies was an independent legal person and therefore a different seller from parent); see also Loren Speciality, 241 F.Supp. at 493 ("For a sale to occur there must be a transfer of title. Dominion and control of the goods seems to be essential in arriving at a determination that a vendor-purchaser relationship exists."); Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 354 (1922) ("Full title and dominion passed to the buyer. While this contract is denominated one of agency, it is perfectly apparent that it is one of sale."). Defendants concede that the language of dominion and control exists in the case law, but do not agree in the expansive scope plaintiffs accord it. See Defs. Mem. Law 5.

Plaintiffs admit that stand alone PBMs do not "take title," and therefore can only be considered purchasers if they exercise "dominion and control" over the goods. See 5-26 Trans. 114. However, plaintiffs do contend that "dominion and control" is enough to violate the Act.[28] They assert that dominion and control is expressed by controls which stand alone PBMs exert over BNPD distribution: purchase prices, formulary limitations, resale prices, retailer participation, and reimbursement rates. See Memorandum in

[28] Plaintiffs also argue that 80% of all PBMs do, in fact, take *title* to the goods, because they are affiliated with or own entities that undeniably do so. See Memorandum in Opposition to Designated Defendants' Motion for Partial Summary Judgment as to All Robinson-Patman Act Claims Based on Rebates Paid to Legal Entities that do not Take Title to, Resell or Dispense Brand Name Prescription Drugs ( "Plt. Memo in Opp.") at 15. Setting aside the question of whether or not affiliation with a BNPD-purchasing company permits an inference of title-taking, it is clear that this argument carries no weight in the stand-alone context, where no such ties exist. Aggregate analysis of the industry is too general to sustain plaintiffs through summary judgment with respect to stand-alone PBMs.

Opposition to Designated Defendants' Motion for Partial Summary Judgment as to All Robinson-Patman Act Claims Based on Rebates Paid to Legal Entities that do not Take Title to, Resell or Dispense Brand Name Prescription Drugs ("Plt. Memo in Opp.") at 19. In short, plaintiffs argue that the influence that stand-alone PBMs exert over rebate terms and the pressure it can bring to bear on insurers, insureds, and retail pharmacies qualify as "dominion and control" of the BNPDs themselves.

The plaintiffs' theory is unpersuasive because their application of "dominion and control" is not substantiated by the case law. It has been referenced only in contexts very different from the present. Importantly, the cases to which plaintiffs cite discuss either of two situations inapposite to the present case: (1) when there is a question of whether or not an intra-corporate transfer of goods has affected a "sale," courts look to whether the receiver exercised "dominion and control" over the product exclusive of the corporate parent; or (2) when a court must discern between a sale and a consignment, courts look to see if the consignee exercises "dominion and control" as an indicia of ownership. Critically, liability in these instances has been found only when there has been a formal transfer of either title or possession to the purchaser. Where it has not existed, no court has found a sale.

The relevant case law shows that defendants must transfer title or possession to stand-alone PBMs for the question of "dominion and control" to arise. First, in Reines, the plaintiff moved for a pretrial order determining that a subsidiary was sufficiently distinct from the parent to qualify as a "purchaser" (and therefore competitor) under the Act. The Court found that this was a question of fact that could not properly be determined on summary judgment. See Reines, 241 F. Supp. at 815. Unlike the present

case, there was no question in Reines that the subsidiary had obtained title in the more restrictive, actual possession-based sense of the term. The dominion and control inquiry was limited to the subsidiary's dominion and control over the goods, exclusive of the parent's control. Here, with respect to stand-alone PBMs, the question of dominion and control does not arise because there is no possession.

In Baim & Blank, the case from which the "dominion and control" language in Reines is purportedly derived,[29] the court essentially addressed a question of whether or not the indirect purchaser doctrine would apply. Plaintiff-retailer sued manufacturer and its wholly owned distributors based upon favorable pricing given by those distributors to plaintiff's competitors. Defendant contended that although the manufacturer owned its distributors, the evidence indicated that pricing and sales policy were determined by each distributor. Since no control was exercised over pricing the manufacturer could not be liable for the distributor's pricing policies and, in that case, there would be no evidence that discriminatory pricing was performed by a single seller. Plaintiff failed to persuade the court that the manufacturer and its distributors qualified as a single seller offering discriminatory pricing to plaintiff's competitors. In Baim & Blank, to the extent there was an inquiry into dominion and control, the analysis involved whether the corporate affiliation between the two entities qualified them as a single seller–a separate question from whether defendants exercise enough control over the selection and pricing of a good which they never actually come to possess.

Island Tobacco Co., 513 F.Supp. 726, also provides little support for the plaintiffs

---

[29] Interestingly, the phrase "dominion and control" is not used a single time in the Baim & Blank case. See Baim & Blank v. Philco Distributors, 148 F. Supp. 541 (E.D.N.Y. 1957).

"dominion and control" argument. In that case, the defendant holding company transferred tobacco products to its wholly-owned subsidiary distributor. In deciding that the transfer between the manufacturer and the wholly-owned subsidiary did not constitute a "sale" under the act, the court adopted the Fifth Circuit position as announced in Security Tire & Rubber Co. v. Gates Rubber Co., 598 F.2d 962 (5th Cir. 1979), cert. denied, 444 U.S. 942 (1980), that a transfer to a wholly-owned subsidiary could not qualify as a "sale" under the Act. Id. at 965. In a more limited holding, the Supreme Court later adopted a similar position in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984). Again, the case did not revolve around the issue presented here--whether or not "dominion and control" over the product can exist without possession or title--but instead on the independence of a subsidiary corporation, and whether the transfer of possession also included the passing of dominion and control.

The case law simply does not reach far enough to embrace plaintiffs' notion of "dominion and control," and this Court refuses to extend it that far. These "dominion and control" cases deal with the legal significance of intra-enterprise transfers, or sale-like transactions and not, as in the present case, the question of whether or not a PBM has exerted significant enough control over property transferred between a manufacturer and a third-party purchaser so as to constitute a "purchase" of the property. Emphatically absent from these cases is the legal rule that would save the plaintiffs' argument–that is, a rule that would provide that some combination of the alleged controls exerted by stand-alone PBMs would constitute "dominion and control" over the BNPDs themselves, thus qualifying the defendants as "purchasers" under the

Act.[30] Even if plaintiffs could meet their own standards for dominion and control it would not matter, since with a transfer of title or possession, there has been no sale (and thus no "purchase") that would justify an inquiry into the substance of a transaction.

Ultimately, plaintiffs' argument amounts to the contention that stand-alone PBMs exercised control over purchasing choices of both TPPs and consumers and that this constituted "dominion and control" over the goods. The case law does not support such a charitable reading of "dominion and control." First and foremost, the terms are used to describe a party's relationship with the goods or commodities in question, not the influence it exerts upon other transactions.

The other cases cited by the plaintiffs are equally unavailing.[31] In Loren Speciality, 241 F.Supp. 493, plaintiff sued defendant manufacturer and competitor distributors because of favorable prices they had received from the manufacturer. Unlike the aforementioned cases, the defendants here were unrelated legal entities. The question before the Court was whether the nominal "agency" distribution agreements between defendant manufacturer and distributors were in fact sales. See id. at 495. The

[30] Although the argument is not explicitly raised in the plaintiffs' briefs, the essence of their argument might be a claim of "constructive possession." The sum of controls that plaintiffs allege do not constitute constructive possession. Moreover, a review of their analysis indicates something much more far-fetched. Namely, that by controlling consumer preference, one controls the product. That proves too much.

[31] Plaintiffs also cite to a series of Sherman Act cases in which insurers were found to be purchasers of medical services. See Pls. Mem. Law at 19-20 (citing Desiano v. Warner-Lambert Co., 326 F.3d 339 (2d Cir. 2003); Kartell v. Blue Shield of Massachusetts, 749 F.2d 922 (1st Cir. 1984); Westhcester Radiological Assocs. v. Empire Blue Cross & Blue Shield, Inc., 707 F.Supp. 708 (S.D.N.Y. 1989), aff'd, 884 F.2d 707 (2d Cir. 1989)) (additional citations omitted). Throughout this Memorandum & Order these cases are referred to as the "Kartell" cases. For the reasons stated supra SM-HMO Motion III.B.1. and infra Non-Purchaser Rebates Motion II.B.2.b. for rejecting the applicability of this line of cases the Court also rejects their application here.

Court found that they were not, citing the determinative facts.[32]

Loren Specialty taught that the Court should look to the substance and not the mere form of a transaction. See 241 F.Supp. at 500. However, it did so only when, in substance, the goods had actually been transferred to the distributor. Here, there is no allegation that such transfers were made to stand-alone PBMs. Loren Specialty does not contemplate looking beyond this lack of quintessential substance to analyze "dominion and control" over the aspects of another transaction.

When plaintiffs' evidence regarding these transactions is evaluated to determine whether stand alone PBMs exercise "dominion and control" over BNPDs, and granting plaintiffs every inference, it is clear that they aver no facts that would create an issue of material facts, even under their proposed standard. They contend that PBMs "...actively manage the pharmacy benefit," Watson Aff. ¶ 26 (attached as Defs. Ex. D to Driscoll Decl.), "...demand discounts of payments for 'formulary access' or to become a 'preferred' product...," Watson Aff. ¶ 29, and sometimes "...assume financial risk for the providing of the pharmacy benefit such that... the entity benefits from pharmaceutical cost-containment strategies," Watson Aff. ¶ 42. Plaintiffs describe the variety of ways that PBMs exert influence over insurers, end-users, retail pharmacies and mail-order

---

[32] The Court in Loren Speciality relies on analysis in Mathews Conveyor Co. v. Palmer-Bee Co., 135 F.2d 73, 81 (6th Cir. 1943) to list the relevant factors for separating agency from sale transactions:

> From a consideration of the evidence and a review of the foregoing cases, we arrive at the conclusion that the contract was one of sale and not of agency. The products were bought outright from plaintiff by defendant. The latter dealt directly with its own customers in securing orders and in delivering and installing the equipment. It billed such customers in its own name, assumed all credit risks for payment, and, having obtained full title to the goods, exercised complete control over them, including installation and erection, as well as assuming all liability incidental thereto. It engaged on its own behalf in procuring business for plaintiff's products and carried on its own business for itself, and not for plaintiff.

Id. at 81.

pharmacies, but this is not evidence of control over the goods. Control over consumer, insurer, or retail pharmacy preferences for the goods are not the same as control over the goods themselves, and none of the cases cited by plaintiffs come close to bridging this analytical gap. Furthermore, the PBMs under consideration here do not take title to BNPDs, they assume no credit risk in their transfer, and they play no part in their shipping or distribution. The statutory language is clear: the favored competitor must in fact be a purchaser. Plaintiffs fail to identify one.

Viewed "in the light most favorable to the party against whom summary judgment is sought" and drawing "all reasonable inferences in his favor," the evidence might support an assertion that the stand-alone PBMs are a significant force in the prescription drug marketplace, but it would not establish evidence of a "purchase." The defendants' motion is therefore granted with respect to this class of agreements.[33]

**2. Are they "in competition"?**

**a. Is there functional competition?**

The standards governing a determination of whether or not two entities are in competition with each other are derived from George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 141 (2d Cir. 1998) and discussed supra, SM-HMO Motion III.A.2. Because plaintiffs cannot show that stand-alone PBMs take title to BNPDs, the

[33] Defendants urge the Court to treat these agreements as nothing more nor less than a consignment or agency relationship. See Defs. Mot. at 6. Jurisprudence under the Act has not considered consignments to be sales. See 3 Kintner and Bauer, Federal Antitrust Law 198-202 (1983). The Court's decision here does not reach so far as to make a determinative finding as to whether or not these agreements, as a matter of law, are "consignments." Today's decision is grounded in the lack of a showing of a "purchaser" under these agreements, combined with the fact that two totally unaffiliated legal entities cannot be considered a single-entity under antitrust analysis–a matter discussed in the second half of this opinion. Should the issue become relevant in subsequent litigation, the Court will revisit it.

Court need not reach the question of whether or not they are in competition with plaintiffs. Nevertheless, even if a "dominion and control" analysis would indicate that stand-alone PBMs are, in fact, purchasers, they cannot be considered competitors under the Act because they do not operate at the same functional level.

Although the determination of whether or not actual competition exists is a factual one, to extend that reasoning to the present motion for summary judgment would swallow the requirement that the competition between favored and disfavored purchasers be functional. Assuming, arguendo, that stand-alone PBMs do exert control over prices throughout the chain of BNPD distribution, plaintiffs make no showing of functional equivalence aside from an assertion by one of plaintiffs' experts that retail pharmacies could and would perform the same services as PBMs. See Mincy Aff. ¶¶ 98-101.

In effect, plaintiffs' argument leap frogs the "functional competition" analysis and proceeds directly to the impact that the exertion of purchasing power by PBMs has upon their profit margins. It may very well be the case that in acquiring rebates from manufacturers and price ceilings from participating pharmacies, PBMs obtain some profits from pharmaceutical sales that might otherwise go to retail pharmacies. This alone, however, does not show that stand-alone PBMs and retail pharmacies are in functional competition. If it did, it would provide no logical stopping point from considering parties at all levels in the chain of distribution from being in competition with each other. The Act does not regulate how the spoils of business are distributed vertically through the chain of distribution; instead, it levels the playing field at each functional step in that chain. For this reason, the loss must result in the reduction of the

plaintiff's ability to compete with the favored purchaser. See, e.g., Morton Salt, 334 U.S. at 47. Here there is no showing that retailers and stand-alone PBMs were engaged in such competition.

Plaintiffs' primary response to defendants' assertion of non-competition is that the factual record says otherwise–but the arguments are unavailing against stand-alone PBMs. They say that "retail pharmacies directly and intensely compete with PBMs and third-party payors. ...[This is] illustrated by the PBMs who own and operate mail order pharmacies." Pls. Memo in Opp. at 25. The brief contends that "some health care plans, including IPA-model HMOs, own and operate in-house and mail order pharmacies that directly compete with retail pharmacies." Pls. Memo in Opp. at 27 (citing Mincy Aff. ¶¶53, 160, 182). These allegations are irrelevant for the class of stand-alone PBM agreements under consideration here.[34] Thus, the Court holds that plaintiffs have not produced a genuine factual dispute on whether or not stand-alone PBMs are "in competition" with them.

**b. Is Kartell applicable?**

Although plaintiffs fail to make a showing of functional competition, it is not, as

---

[34] The plaintiffs do contend that retail pharmacies face competition from health care plans which do not own and operate in-house or mail-order pharmacies. See Pls. Memo in Opp. at 28. This contention is unsubstantiated by the Mincy Affidavit referred to. It states: "Health plans, and other third-party payors, also vigorously compete with retail pharmacies for BNPD customers. These health plans often designed their prescription drug benefit plans so that their members (BNPD customers) are either exclusively required to use, or given a financial incentive to use, the in-house or mail order pharmacy owned by or contracted with the health plan." Mincy Aff. ¶ 182. The gist of the contention, like the vast majority of the plaintiffs' arguments on competition, deal with PBMs that are either affiliated with or in an ownership relationship with a pharmacy. Whatever "issue" might be raised by the phrase "contracted with" in the Mincy Affidavit, it is not sufficient to raise a genuine issue of material fact with respect to stand alone PBMs. As discussed above, the affiliated PBMs present the problem of whether or not the companies are in fact a single entity, making the plaintiffs' evidence here potentially relevant in the affiliated PBM context. See supra, pp. 32-7.

defendants suggest, because PBMs merit treatment as "buyers" under Kartell, 749 F.2d 922. Defendants assert that, to the extent that stand-alone PBMs are considered purchasers under the Robinson-Patman Act, it should be by analogy to insurers as interpreted by Kartell under the Sherman antitrust laws. See Defs. Rep. at 7-10.

Defendants' plea for the application of Kartell proves too much in the Robinson-Patman context. It would eviscerate the Robinson-Patman Act. In theory, all retailers are purchasers for the benefit of their consumers. In a competitive market economy, retailer and consumer interests are aligned in controlling costs emanating from higher up in the distribution chain. Retailers are interested in receiving lower prices, which they might pass on to consumers to increase sales volume, and consumers are interested in paying the lowest price possible for any given product. The same logic would apply to wholesalers in their negotiation with distributors, or distributors in their negotiations with manufacturers. If the Court were to accept defendants' position, these companies would be able to escape "favorable purchaser" status by being considered purchasers on behalf of end-users, particularly with respect to PBMs that might also be considered sellers, it would permit all varieties of price discrimination currently prohibited by the Act. Defendants' argument offers no logical stopping point if extended to cover this case.

The analysis of this argument in the context of the SM-HMO Motion is applicable here.[35] In essence, the difference between the two acts and the fact that this line of cases has never been applied in the Robinson-Patman context inveighs against importing the

---

[35] The detailed discussion of Kartell is located supra SM-HMO Motion III.B.1.

exception whole cloth.

### C. Affiliated PBMs

#### 1. Movant's burdens of production

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for the motion." Celotex, 477 U.S. at 323. Although the movant need not introduce evidence, see id., the movant must inform the court of the basis of its motion. See 11 Moore's Federal Practice § 56.13[1] (3d ed. 2000) (citing Williams & Sons Erectors v. S. Carolina Steel, 983 F.2d 1176, 1183-84 (2d Cir. 1993) (finding in the context of contract interpretation that the presence of an ambiguous clause in contract raised sufficient issue of fact precluding grant of summary judgment).

As Justice White noted in Anderson v. Liberty Lobby, trial courts should act with caution in granting summary judgment, and they may deny it when there is reason to believe the better course would be to proceed to a full trial. See 477 U.S. at 255 (White, J., concurring). A court might reject summary judgment when the factual record has been inadequately developed with respect to determinative issues in the case. See United States v. Small, 24 F.R.D. 429, 431 (S.D.N.Y. 1959). Exactly what the law requires movant to show is subject to some debate. Nevertheless, in Justice White's concurrence in Celotex he noted that, "[i]t is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." 477 U.S. at 328 (White J., concurring).

#### 2. Movants' production

As defined for the purposes of this motion, affiliated PBMs are those companies

that have a corporate affiliation with a pharmacy which does take title to, resell, or dispense BNPDs. In the affiliated PBM context, the tripartite division of PBM organizational structures proffered by the parties seems simple enough, but conceals a complex web of corporate relationships that might play some role in determining liability. During oral argument, both parties agreed that affiliated PBMs might include companies in parent-subsidiary and sibling-subsidiary relationships. See 5-26 Trans. at 92, 112-13. The affiliated PBM category might include affiliates that are partly owned, majority owned, or fully owned by a third company. It appears, therefore, that the affiliated PBM category is an amorphous one that serves as a catch-all for a variety of legal arrangements between PBMs that bargain for rebates and affiliated pharmacies that actually purchase BNPDs. It also appears that within defendants' affiliated PBM category there would be factual differences relevant to a summary judgment determination of the matter. Despite the wide variety of possible and relevant legal relationships that affiliated PBMs might have to resellers of BNPDs, defendants make no attempt to clarify to which of these many companies their motion should apply.[36] Without a more precise proffer of what is at stake, the Court finds it premature to decide an issue better fit for trial.

Although the defendants do not move for summary judgment with respect to unified PBMs, their use of the unified PBMs as an analytical counterweight warrants discussion. Were the plaintiffs' claims with respect to unified PBMs inadequate to survive summary judgment, that determination would apply a fortiori to affiliated

[36] Defendants do identify several PBMs which they assert are "affiliated" with BNPD resellers, but move for summary judgment with respect to all affiliated PBMs as a class. See Def. Rep. Mem. at 11.

PBMs, mooting the significance of the ambiguous affiliated PBM category. But plaintiffs have produced evidence that, taken in the best light, permits the litigation to survive dismissal.

For the purposes of this motion, it is not disputed that unified PBMs include pharmacies that do take title to, resell and/or dispense pharmaceutical drugs. Plaintiffs have also provided evidence in the form of exhibits, producing material from websites and 10-K statements indicating as much. See Iovieno Decl. at IX 1; IX 2; IX 3; IX 4; IX 8; IX 9. The companies described include Medco Health Solutions, Inc., Caremark, and Express Scripts. Defendants do not contest the structure of these organizations, arguing only that they are not subject to the motion. See Def. Rep. at 3, 10. Furthermore, it is not contested at this point in the litigation that the mail-order components of these organizations are "purchasers" of BNPDs.

Likewise, plaintiffs provide evidence of competition between mail-order pharmacies owned by unified PBMs and themselves, including information on a market-wide decline in sales for retail pharmacies and a corresponding increase for mail-orders, see Mincy Decl. at MX56, MX57, providing some basis for viewing retail and mail-order pharmacies as "competitors." Even more relevant is a document analyzing emerging mail-order competition with respect to particular BNPDs produced by Searle. See, e.g., Searle Memorandum from Kathryn Giusti to K. Mann, May 1, 1992 ("Giusti Memo") at MX 32 SE000020267-89. The Giusti Memo notes that retail customers often switch to mail order operations to reduce their costs. See id. at SE000020274. In a discussion of the prescription sales in the anti-arthritic drug market, the report compared retailer and mail-order sales volume. See id. at SE000020283. From this report, a reasonable trier

of fact could draw the inference that mail-order pharmacies compete with retail pharmacies for BNPD sales. See id. at SE000020281, SE000020286. From this evidence it is apparent that plaintiffs would survive a motion for summary judgment with respect to unified PBMs. Whether or not plaintiffs could make a similar case with respect to affiliated PBMs would require the Court to decide an additional issue, single entity analysis, discussed infra–that is, whether rebates given to one affiliate and purchases made by another constitute a single transaction with a single entity.

At root, the problem with defendants' motion is that it is little more than the assertion of an intermediary category of corporate structures, undefined to the Court, which, it is contended, cannot as a matter of law violate the Act. Were the Court to permit this type of argument on summary judgment, it would be forced to enter into an analysis of untold complexities and unbriefed legal analyses. In complex cases such as this one, it would impose asymmetric burdens on non-movants, who would be forced to produce evidence to counter unsubstantiated theoretical parsing of the case by defendants. The movants must offer at least some initial kernel of clarity with respect to the factual disputes. Sweeping categories of legal entities do not suffice.

An examination of the underlying purposes of motions of partial summary judgment endorse this decision. First, there is very little to be gained in trial expediency if the motion is granted with respect to affiliated PBMs. Plaintiffs' claims with respect to unified PBMs would remain unscathed by this motion, and in any event this Court and the parties would be left with the task of deciding which agreements were subject to the motion.

Second, although it is useful to allow summary judgment to clarify the precise

range of dispute in complex antitrust cases, there is nothing to be gained by deciding whether the catch-all category of affiliated PBMs are more akin to stand alone or unified PBMs. To the extent that any can be brought to this dispute, today's decision narrows the case to the question of whether or not a given set of parties should be considered a single entity for the purposes of the act. Nothing more could be achieved by taking a blind stab in the dark as to the single entity standing of organizations that have hardly been identified to the Court.

Finally, the relevant facts here will require the Court to decide how far antitrust "substance over form" analysis should protrude into Robinson-Patman jurisprudence with respect to affiliated entities. A guiding principle of antitrust law is "that substance and true competitive function control rather than corporate form." Sec. Tire & Rubber Co. v. Gates Rubber Co., 598 F.2d 962, 965 (5th Cir.1979), cert. denied, 444 U.S. 942 (1979); see also Loren Specialty, 241 F.Supp. 493. This guiding principle cuts to the core issue in dispute in this case–whether or not the rebate transactions and separate sales of BNPDs to a PBM-affiliate constitute a single transaction with a single entity.

The law governing single-entity consideration for the purposes of antitrust law stems from Copperweld Corp., 467 U.S. 752. There, a tubing company sued another tubing company and its parent corporation as well as others under the conspiracy prong of the Sherman Act. The issue facing the Supreme Court was whether or not a parent and its wholly owned subsidiary were legally capable of conspiring with each other under section 1 of the Sherman Act. Copperweld held that, for purposes of § 1, all wholly-owned subsidiaries could not conspire with their parent corporation. See Copperweld, 467 U.S. at 777. The Court reasoned that the identity of interest made the

inquiry into actual details of ownership and control unimportant.

This holding has been applied in the Robinson-Patman context as well. See Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co., 772 F.2d 214 (6th Cir. 1985) ("the parent and subsidiary are a single economic unit. The Robinson-Patman Act is not concerned with transfers between them."); Sec. Tire & Rubber Co., 598 F.2d at 965-67 (making a pre-Copperweld determination that a tire manufacturer's sales to its wholly-owned subsidiary could not constitute the basis for a price discrimination claim). Indeed, in City of Mt. Pleasant, Iowa v. Associated Electric Cooperative, 838 F.2d 268 (8th Cir. 1988), the Eight Circuit affirmed a district court's dismissal of Robinson-Patman price discrimination claims on the basis that the purported "sales" of electricity by a rural electric cooperative to its subsidiary retail and distribution cooperatives at favorable prices could not constitute a sale, because they were not separate entities, despite their cooperative forms, which were governed by the Rural Electrification Act of 1936, 7 U.S.C. §§ 901-06. The rationale for this cross-application is that the economic substance of a transaction, and not mere corporate formalities, should control the application of the antitrust laws.[37] Along these lines, the Eighth Circuit found that "the logic of Copperweld reaches beyond its bare result, and it is the reasoning of the Court, not just the particular facts before it, that must guide [the] determination." Id. at 274.

---

[37] As noted in Copperweld:

> At least when a subsidiary is wholly owned, however, these factors are not sufficient to describe a separate economic entity for purposes of the Sherman Act. The factors simply describe the manner in which the parent chooses to structure a subunit of itself. They cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary must be viewed as a single economic unit.

Copperweld, 467 U.S. at 772, n.18 (emphasis added).

The Eighth Circuit went on to assert that the essence of Copperweld was that "economic reality, not corporate form, should control the decision of whether related entities can conspire." Id. at 275. It would be anomalous, the court reasoned, to give single entity status to certain forms of corporate organization under § 1 of the Sherman Act, while not following a similar mode in considering those same entities under 2(a) of Robinson-Patman. Id. at 279. Accord, Bishop v. GNC Franchising LLC, 403 F.Supp.2d 411 (W.D.Pa. 2005).

Whether or not Copperweld applies to multiple entities on the buyer's side of a section 2(a) price discrimination claim is a question of the first instance. Its novelty alone, however, does not necessarily make Copperweld inapposite. In an area of such legal complexity as the antitrust laws, judicial discretion counsels against granting summary judgment when the parties have failed to brief the relevant law.[38]

**3. Defendants' other arguments**

Defendants make several other arguments that merit discussion. None of these arguments can overcome the genuine issues raised by plaintiffs. First, defendants' application of Kartell which this Court has found not applicable to stand alone PBMs is even less applicable here. Even if Kartell was applicable in the Robinson-Patman context, the Court would still have to make a determination of whether or not they could be considered end-users if they maintained a corporate affiliation with a BNPD reseller.

[38] In mid-July, 2005, over a month and a half after oral argument, and several months after the briefing schedule, plaintiffs submitted a sur-reply brief that was not requested by the Court but briefed the issues discussed here. Rule IV.B of the Individual Rules of this Court states that "sur-reply papers shall not be filed or considered." Individual Rules of Senior Judge I. Leo Glasser, March 22, 2006. Shortly thereafter, defendants requested that the Court ignore the arguments not raised in plaintiffs' timely response papers, or, in the alternative permit defendants to file a sur-reply addressing the relevant issues.

In reaching its decision today, the Court does not consider the arguments made in either parties' sur-replies.

In that case, the rebate transaction and the BNPD purchase might arguably flow to that single entity.

Similarly, the defendants' second argument that the plaintiffs "flip-flop" in alternately assigning the manufacturer rebate to either the PBM or its affiliated-purchaser is unpersuasive. Defendants contend that plaintiffs "assign" the rebate to stand-alone PBMs, while reversing course in the affiliated PBM context by "assigning" the rebate to the affiliated purchaser. However, the legal significance of the plaintiffs' position is that affiliated PBM and affiliated purchaser are, for the purposes of the Robinson-Patman Act, a single entity, and that therefore the rebate transaction and the BNPD purchase are, in fact, two parts of a single transaction with a single entity.

Third, defendants argue that the connection between an affiliated PBM and affiliated pharmacy is irrelevant, since "the amount of the rebate is the same whether the BNPD is dispensed by a mail order pharmacy or by a retail pharmacy. Thus, if the health plan is affiliated with, or even owns, a mail order pharmacy, the rebate is the same for a BNPD dispensed by that pharmacy as it is for a drug dispensed by a retail pharmacy in the PBM's or HMO's 'retail pharmacy network.'" Defs. Rep. at 12 (emphasis omitted). Defendants argue that the ramifications of this fact are twofold. First, they argue that it undercuts the plaintiffs' claim that the rebates create plan incentives for members to use an affiliated mail-order pharmacy. Second, they contend that since the rebates are competitively neutral, they do not offer any advantage to the receiving PBM or its affiliated pharmacy, since they will receive rebates regardless of whether the BNPDs are purchased at a retail or mail-order pharmacy.

This does not squarely address the plaintiffs' preoccupation with rebates paid to

one branch of a single-entity that also purchases and resells BNPDs. It is a preoccupation at the heart of the Robinson-Patman Act--that large buyers should not be permitted to employ economies of scale to extract favorable pricing at the expense of their smaller competitors. The purpose of the Act was "'to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power.'" Sano Petroleum, 187 F.Supp. at 353 (citing Henry Broch & Co., 363 U.S. 166); see also The Evolution of the Robinson-Patman Act: A Twenty-Year Perspective, 57 Colum.L.Rev. 1059, 1061 (1957) (arguing that the Act was an effort to preserve traditional marketing channels against the encroachment of mass distributors and chains); Hovenkamp, 14 Antitrust Law: An Analysis of Antitrust Principles and Their Application, 98 (1999) (contending that, "[t]he real gravamen of the offense declared by the...Act was powerful buyers...that forced suppliers to give them concessions that other buyers did not receive").

The motivating fear behind the Act is that favored pricing will allow one party to resell at lower prices, gain market share, and perhaps run its competitors out of business. The Act exists as a stop-gap measure against the development of market power, particularly monopsony power. This concern, as articulated in terms of this case, is that affiliated PBMs will pass their rebates on to mail-order affiliates (or that unified ones will do so internally), which will use them to out-compete retail pharmacies. Even if defendants are correct that the rebate is paid to the PBMs or TPPs regardless of whether or not the BNPDs are disbursed from a retail or mail-order pharmacy, that showing is not enough, because the Act makes discriminatory pricing and terms illegal,

regardless of how they are provisioned.[39] See Indian Coffee Co. v. Procter & Gamble Co., 752 F.2d 891, 902 (3d Cir. 1985), cert. denied, Folger Coffee Co. v. Indian Coffee Corp., 474 U.S. 863 (1985) (district court must consider offering of customer coupons to only some retailers as a form of price discrimination); O'Connell v. Citrus Bowl, 99 F.R.D. 117, 122 (E.D.N.Y. 1983) (prompt payment discount offered to some buyers but not others constitutes discrimination); Diehl & Sons v. Int'l Harvester Co., 445 F.Supp. 282 (E.D.N.Y. 1978) (higher truck allowances given to some buyers could constitute discrimination); Guyott Co. v. Texaco, 261 F.Supp. 942, 948-49 (D.Conn. 1966) (waiver of shipping charge to some buyers but not others constitute price discrimination).

Therefore, the opportunity to receive rebates triggered by actual resales to end users may constitute a form of unlawful favoritism, when only one of several resellers has access to the benefit. That is enough to survive summary judgment.[40]

## III. CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment on plaintiffs' claims under the Robinson-Patman Act, 15 U.S.C. §§13(a), 13(d) & 13(f), is granted with respect to PBMs that do not take title to, resell, or dispense brand name drugs and denied with respect to PBMs that are affiliates of entities that take title to, resell or dispense brand name drugs.

---

[39] There are, of course, several statutory defenses available to defendants, which have yet to be raised and are not considered here. See 15 U.S.C. § 13.

[40] To the extent that plaintiffs' argument is an assertion of a lack of "antitrust injury" entitling them to damages under § 4 of the Clayton Act, it is discussed in the Court's Memorandum and Order on "Defendants Motion for Summary Judgment on the Ground that Plaintiffs have not Shown That They are Entitled to Damages Under the Act."

## DAMAGES MOTION

### I. INTRODUCTION

Pending before the Court is a motion for summary judgment submitted by the designated defendants relating to the representative plaintiffs' claims under the Robinson-Patman Act, 15 U.S.C. § 13(a) (the "Act") on the ground that plaintiffs have not shown that they are entitled to damages under the Act. Having carefully reviewed the papers submitted by the parties, and as set forth below, the Court grants defendants' motion for summary judgment on the ground that plaintiffs have failed to show they are entitled to damages.

### II. BACKGROUND

In response to interrogatories, plaintiffs stated that the amount of sales and profits they allegedly lost due to defendants' price discrimination would "be the subject of an expert report." See Pls. Opp. 56.1 Statement ¶ 3. The plaintiffs submitted an expert report on or about September 29, 1995 (the "1995 Expert Report"), which included Robinson-Patman Act damage calculations. See Grass Decl. Ex. 3. The 1995 Expert Report did not include final Robinson-Patman Act damage calculations for the plaintiffs because all of the data required for such calculations was not then available from Chicago Partners, plaintiffs' data management experts, due at least in part to plaintiffs' receipt of the data only shortly prior to the court-ordered deadline for submission of expert reports. See Pls. Opp. 56.1 Statement ¶ 4.

Plaintiffs have been granted the right to supplement "their expert report with Chicago Partners data" provided that "the identity of the expert and the basic theory of damages ha[s] not also been changed." Declaration of Steven I. Froot ("Froot Decl.")

executed on February 28, 2005, Ex. 1, attaching September 1, 2004 Court transcript. Therefore, to the extent that defendants successfully cast doubt on the validity of the damages theories set forth in the 1995 Expert Report, any supplementation by plaintiffs would not fortify the theories because only the data, but not the underlying theories, would change. This Court expressly came to such a conclusion in an order issued on February 4, 2005, consistent with the express language of the 1995 Expert Report. See Pls. Opp. 56.1 Statement, attaching order; Grass Decl. Ex. 3 ("additional calculations described in Section X [of the 1995 Expert Report] will be completed as the necessary data and information are obtained").[41]

The 1995 Expert Report sets forth plaintiffs' Robinson-Patman Act damages calculations in sections X and XI. See Grass Decl. Ex. 3. According to plaintiffs' experts, "[r]etrospective price discrimination damages consist of four components: 1) Lost profits on actual sales where the profits were lost as a result of the price discrimination; 2) Lost profits on lost sales of BNPDs where the sales and profits were lost as a result of the price discrimination; 3) Lost profits on lost sales of products other than BNPDs ("lost ancillary profits") where the sales and profits were lost as a result of the price discrimination; and 4) special damages resulting from the price discrimination." Grass Decl. Ex. 3 at 144. Lost profits on actual sales of BNPDs "have been determined by multiplying actual sales volume for each BNPD sold by the" designated plaintiffs "by the amount of the increase in the profit margin for that drug that would have occurred if

[41]For this reason, the parties' arguments regarding whether, and to what extent, the plaintiffs may supplement the 1995 Expert Report are not relevant to the issues presented by defendants' motion because plaintiffs do not have the right to introduce new damages theories, but rather are limited to "freshening" their damages data.

there had been no price discrimination." Id. Plaintiffs' experts also calculated lost profits on sales not realized because of the purported discrimination "by multiplying the lost sales volume for each BNPD by the profit margin that would have been realized if there had been no price discrimination." Id. at 145.

The 1995 Expert Report further provided data and calculations supporting plaintiffs' claims to lost ancillary sales and prospective damages. Lost ancillary sales were calculated by multiplying the increase in the annual volume of BNPDs that plaintiffs would have sold absent price discrimination "by the percentage of nonprescription sales that represent the proportion of nonprescription items purchased by prescription customers," and that amount "was multiplied by the profit margin on ancillary sales to calculate lost ancillary sales." Grass Decl. Ex. 3 at 145. Finally, prospective damages were "determined by estimating the overcharge damages and lost profits on both BNPDs and ancillary products and, where appropriate, discounting future losses to a present value using an appropriate discount rate." Id.

The focus of defendants' motion is their argument that plaintiffs have failed to set forth a cognizable theory of damages under the Robinson-Patman Act, which is part of their burden to prove "antitrust injury" as discussed below.

## III. DISCUSSION

### A. The Damages Standard Under Section 2(a) of the Robinson-Patman Act

The aforementioned standards for summary judgment are applied to this motion as well. Plaintiffs allege that the defendants have engaged in unjustified price discrimination in violation of Section 2(a) of the Robinson-Patman Act, 15 U.S.C. §

13(a). Although § 2(a) of the Robinson-Patman Act defines certain conduct as illegal, it does not create a private right of action for damages resulting from violations of the Act. Instead, the private right of action for a § 2(a) Robinson-Patman Act claim, as for all private plaintiff antitrust rights of action, is provided by § 4 of the Clayton Act. See Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 853 (2d Cir. 1987).

The relevant text of the two statutes governing this motion are as follows. Section 2(a) of the Robinson-Patman Act states: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." 15 U.S.C. § 13(a). Section 4 of the Clayton Act provides: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.[42]

---

[42]Under the Robinson-Patman Act, a prevailing plaintiff may be entitled to monetary damages, injunctive relief and/or a declaratory judgment. See generally John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 588 F.2d 24, 27 (2d Cir. 1978), cert. denied, 440 U.S. 960 (1979). In this case, plaintiffs seek

In order to recover damages for a claim under § 2(a) of the Robinson-Patman Act, a plaintiff must satisfy, among other things, two elements, commonly known as the "injury to competition" or "competitive injury" requirement, and "antitrust injury." Competitive injury is one element necessary to make out a prima facie case. "Antitrust injury" is not part of the prima facie case.

There are two types of "competitive injuries" generally alleged under Section 2(a), "primary line" and "secondary line." Primary line injury occurs when there is harm to the seller's competition through predatory pricing. Secondary line injury occurs when there is a harm to the buyer's competition. See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Group, 509 U.S. 209, 221 (1993). Secondary line injury, which plaintiffs claim to have suffered, results from price discrimination between favored and disfavored purchasers. See Hasbrouck, 496 U.S. at 558, n.15; see also Blue Tree Hotels, 369 F.3d at 219 ("a secondary-line violation occurs where the discriminating seller's price discrimination injures competition among his customers"); Best Brands Beverage, 842 F.2d 578 at 585 (the competitive injury requirement may be satisfied by showing that, at the time of the price differential, "the favored and disfavored purchasers competed at the same functional level, *i.e.*, all wholesalers or all retailers, and within the same geographic market") (citing F. Rowe, Price Discrimination Under the Robinson-Patman Act, 173-180 (1962)). To establish competitive injury, plaintiffs are not required to show that the discrimination harmed competition, but only "a reasonable possibility that a price difference may harm competition." Falls City Indus., 460 U.S. at 434-35. For purposes of this motion, defendants assume that plaintiffs have

only monetary damages.

satisfied their prima facie case and thus the competitive injury requirement as well.[43]

In addition, and separate from the prima facie case, plaintiffs must also establish "antitrust injury," which is "actual injury attributable to something the antitrust laws were designed to prevent." J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562 (1981) (hereinafter "Truett Payne"). In Robinson-Patman cases, there are ultimately two related but distinct inquiries to establish antitrust injury. First, the plaintiffs must prove the fact of antitrust injury;[44] second, they must make a showing regarding the amount of damages in order to justify an award by the trier of fact. See Truett Payne, 451 U.S. at 568. Concerning the former, courts apply the ordinary standard of proof, but with respect to the latter, the standard is somewhat relaxed. As the Supreme Court explained in Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 110, 114, n.9 (1969) (hereinafter "Hazeltine"), plaintiffs' burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy. Once causation is established, the jury is permitted to calculate the actual damages suffered using a "'reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.'" In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1176 (3d Cir. 1993), cert. denied, Bessemer and Lake Erie

---

[43] In a secondary-line price discrimination case, the favored purchaser has an advantage over its competitors who pay more for goods of like kind because the competitor can more easily lower its resale price, incur more business expenses, or make a greater profit to facilitate expansion. The Robinson-Patman Act was designed to limit the availability of price differentials to situations where there are adequate and objective economic justifications. See Earl W. Kintner and Joseph P. Bauer, Federal Antitrust Law, Vol. III, 295-6 (1983).

[44] "Antitrust injury" compels plaintiffs to show that they were in fact injured by the price discrimination, that the injury is of the type the Act was intended to prevent, and that the injury is causally connected with the violation of the Act. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).

R. Co. v. Wheeling-Pittsburgh Steel Corp., 510 U.S. 1091 (1994) (citing MCI Commc'ns Corp. v. Am. Tel. & Tel. Co., 708 F.2d 1081, 1161 (7th Cir. 1983), cert. denied, 464 U.S. 891 (1983)) (other citations omitted).

The plaintiffs therefore must proffer evidence of some damage, with the recognition that the actual amount need not be proven to the same degree of certainty as proving some quantum of damages. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562 (1931). The "wrongdoer is not entitled to complain that [the damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." Id. at 563. Stated differently, the plaintiff must come forward with substantial evidence from which a jury can determine the amount of damages from a "just and reasonable estimate of the damage based upon relevant data." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946), reh'g denied, 327 U.S. 817 (1946). "Even though the burden of proving damages is lessened by the fact of antitrust violation and injury, the plaintiff is still required to put forth substantial relevant evidence." Chrysler Credit Corp. v. J. Truett Payne Co., Inc., 670 F.2d 575, 582 (5th Cir. 1982), cert. denied, J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 459 U.S. 908 (1982). See generally Borger v. Yamaha Int'l Corp., 625 F.2d 390, 398 (2d Cir. 1980) (juries cannot speculate when establishing damages).

The Supreme Court has rejected a mechanical approach to calculating damages simply by comparing the price differentials of defendants' transactions between favored and disfavored competitors. "Damages resulting from illegal price discrimination may not be measured merely by determining the overcharge to the disfavored buyer, *i.e.*, the

excess paid by a disfavored buyer for the goods it purchased." Truett Payne, 451 U.S. at 557; see id. at 565 (plaintiffs have the burden of proving damages "on the basis of plaintiff's estimate of sales it could have made absent the violation") (citing Hazeltine, 395 U.S. at 123-24). Antitrust injury, therefore, is an "undercharge" to the favored purchaser and not an "overcharge" to the plaintiffs, because in the absence of discrimination, plaintiffs may not necessarily have received the lower, favored price.

For purposes of Robinson-Patman secondary-line cases, antitrust injury is the competitor's unfair competitive edge that is used to attract sales or profits from the plaintiffs. Thus, the injury must be traced to the competitors' competitive use of their price advantage. See Uniroyal, Inc. v. Jetco Auto Serv., Inc., 461 F. Supp. 350, 358 (S.D.N.Y. 1978). Proof of a lower resale price is a prerequisite to recovery in a secondary line price discrimination case because only then may the defendants' grant of an unlawful lower price to the favored purchaser possibly result in injury to the plaintiffs. See id. at 359. As one court has commented, "[i]f the price discrimination ... was the cause of the plaintiffs' injury, the plaintiffs should be able to match up their losses with gains to the favored competitors." Hasbrouck v. Texaco, Inc., No. C-76-27, 1980 WL 1843, at *19 (E.D. Wash. Mar. 31, 1980), aff'd in part, rev'd in part, 663 F.2d 930 (9th Cir. 1981); see also Alexander v. Texas Co., 165 F. Supp. 53, 58 (W.D. La. 1958) ("Assuming that defendant committed unlawful price discrimination, plaintiff must still show that Texaco's price differences were the proximate cause of a diversion of business from him to the 12 preferred Texaco dealers.").

### B. The Parties' Arguments

### 1. The Burden of Proof

Defendants argue that plaintiffs have failed to come forward with any recognized form of damages theories for the alleged Robinson Patman Act violations. In response, and as a preliminary matter, plaintiffs rely on Fed. Trade Comm'n v. Morton Salt Co., 334 U.S. 37 (1948) (hereinafter "Morton Salt"), for the proposition that an inference of antitrust injury arises "when the alleged price difference is substantial and persists over time." Pls. Opp. at 7-8. Plaintiffs argue, therefore, that under the relaxed damages standard discussed above, they are "entitled to rely on the Morton Salt inference of harm" as a proxy for their burden to come forward with some evidence that they sustained damages as a result of defendants' alleged unlawful conduct. Id. at 9. However, plaintiffs' argument is not supported by the case they cite. In Morton Salt, the Supreme Court held that an injury to competition might be inferred from evidence that some purchasers had to pay their supplier "substantially more for their goods than their competitors had to pay." 334 U.S. at 46-7. The Court was dealing with what the Federal Trade Commission had to show to establish liability under Section 2(a) of the Robinson-Patman Act. No Section 4 Clayton Act damage issue was involved, and thus damages were not even discussed by the Supreme Court. In relevant part, the Court held that plaintiff did not need evidence to prove "that which we believe to be self-evident, namely, that there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers." Id. at 50. The Court's analysis was focused exclusively on the narrow issue of competitive injury, one of the elements necessary to establish a prima facie case

under the Robinson-Patman Act discussed above.

Morton Salt does not support plaintiffs' position that proof of a Robinson-Patman Act claim automatically entitles plaintiffs to damages because it "confuses the distinction between the showing of injury necessary to establish a prima facie case under section 2(a) of the Robinson-Patman Act with the showing of actual injury to the individual competitor - plaintiff necessary for the recovery of damages." See, e.g., H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc., 672 F. Supp. 724, 744, n.27 (S.D.N.Y. 1987), aff'd, 879 F.2d 1005 (2d Cir. 1989). Here, defendants' primary argument is that their motion should be granted because plaintiffs have failed to prove antitrust injury as a result of the purported unlawful conduct and they have therefore also neglected to establish the existence of any damages. This is distinct from the competitive injury element discussed in Morton Salt. The Morton Salt test does not substitute "injury to a competitor" for "injury to competition," but simply highlights one manner of showing injury to competition.

### 2. Overcharge Damages v. Other Recognized Damages

The parties recognize the controlling principle from Truett Payne that precludes the application of the so-called automatic damage theory – that a jury may infer the requisite injury and damage under § 4 of the Clayton Act from a showing of substantial price discrimination. Truett Payne, 451 U.S. at 561-62. They differ in their view as to whether plaintiffs have proffered sufficient evidence of actual injury based on alleged price discrimination and damages specific and individualized to each defendant.

In opposing summary judgment, plaintiffs make the following arguments. First, plaintiffs argue that the 1995 Expert Report adequately explains that they are seeking

"lost profits" as a result of defendants' conduct, and not merely automatic damages. They assert that they "prepared an expert report that described the but-for-price that would have been charged absent a Robinson-Patman Act violation; then calculated the difference between how much of the price differential was passed on to retail customers and therefore recovered, versus how much of the cost differential plaintiffs absorbed in the form of lost profits; then estimated the lost sales that were materially caused by plaintiffs' inability to match their competitors' retail prices that were near, or in some cases below, plaintiffs' costs to purchase the same drugs." Pls. Opp. at 15; 1995 Expert Report at 165. Contained within this damages theory are the following premises: 1) plaintiffs' profits would have been higher if they were not required to pay more to purchase BNPDs in relation to favored purchasers, and they would have maintained some, but not all, of this price differential as profits, see 1995 Expert Report at 165; 2) plaintiffs' profits would have been higher if they were not forced to lower their prices to compete with the prices of the favored purchasers, see id.; and 3) absent discrimination, plaintiffs' profits would have been higher because they would have passed at least some of their lower costs on to consumers and therefore the market for BNPDs would have expanded, resulting in greater sales, and hence profits, see id. at 122. Each of these is addressed in turn.

**a. Claims of Lost Profits Based on Price Differentials**

Plaintiffs claim that they have proffered evidence of damages consisting of lost profits, which they measure "according to the larger profit margin on all sales that plaintiffs would have obtained but for the competitive distortions created by defendants' two-tier pricing structure." Froot Decl. Ex. 2 at 6. In addition, as a corollary, had

plaintiffs been able to purchase BNPDs at the lower prices available to favored purchasers, they claim that this would have resulted in increased profits for them. See id.

These two theories, however, are merely an iteration of the discredited automatic damages theory. Plaintiffs' contention is that the difference between the price charged to them as disfavored purchasers of BNPDs in comparison to the price charged to favored purchasers of BNPDs depressed their profit margin. Also, according to plaintiffs, if they had been able to purchase BNPDs at the same price as the favored purchasers, they would have been able to divert at least some portion of the lower price to profit. Either way, plaintiffs' damages claim is predicated on the difference between what defendants charged the favored purchasers and what they charged plaintiffs – the essence of an overcharge.

Because damages may not be based on the pricing margin caused by the discrimination, but on estimates of plaintiffs' sales absent the discrimination, this theory does not support a claim for damages under the Act. As the Second Circuit held in Enterprise Industries, Inc. v. Texaco Co., 240 F.2d 457, 459-60 (2d Cir. 1957), cert. denied, 353 U.S. 965 (1957), the pricing margin caused by the illegal discrimination can only be used to quantify damages if the plaintiffs demonstrate that the favored purchasers lowered their prices in an amount equivalent to the illegal benefit they received. Because plaintiffs' damages theory, based on a lost profit margin, fails to prove that their competitors – the favored purchasers – lowered their prices in a manner which affected plaintiffs' profits – they cannot rely on the amount of the alleged illegal discrimination to establish damages even if styled as "lost profits." See also

Edward J. Sweeney and Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 118-19, n.6 (3d Cir. 1980), cert. denied, 451 U.S. 911 (1981) ("the amount of illegal discrimination can only be used to quantify damages if the plaintiff demonstrates that favored purchasers lowered their prices in an amount equivalent to the illegal benefit they received.").

In discussing the analogous price discrimination prohibitions established by the Interstate Commerce Act, Justice Cardozo similarly explained that "[t]he question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less." Interstate Commerce Comm'n v. United States, 289 U.S. 385, 390 (1933). Plaintiffs' arguments relating to their claim for damages based on lost profits address only the first, irrelevant question. As such, the Court finds that plaintiffs do not advance a proper measure of damages under the Robinson-Patman Act.

In support of their argument that they have proffered evidence of antitrust injury and damages sufficient to stave off summary judgment, plaintiffs rely heavily on Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414 (11th Cir. 1990), reh'g denied, 929 F.2d 704 (11th Cir. 1991). In that case, the Eleventh Circuit held that while the plaintiff apparently had no direct evidence of either diverted sales or lost profits, it proffered evidence suggesting that the favored competitor's use of defendant's discrimination to gain a promotional advantage may have caused a substantial decrease in plaintiff's market share, and that was sufficient to preclude summary judgment on the issue of antitrust injury. Nonetheless, the Court recognized that causation "asks for something other than an inquiry into whether an antitrust violation has put a plaintiff in a worse position than it otherwise would have been in." Alan's of Atlanta, 903 F.2d at 1427.

"The causation question asks not whether the antitrust violation caused the plaintiff's injury, but whether the banned effects flowing from that violation – as opposed to the beneficial ones – led to plaintiffs's harm." Id. The plaintiff proffered sufficient evidence to have its claims heard by a jury because its expert evidence revealed that as a result of the price discrimination, it lost profits to the favored purchaser. See id. at 1426. In contrast, here, plaintiffs improperly seek damages for lost profits on actual sales caused by defendants' failure to offer them lower prices which represents the overcharge, a theory rejected by the Supreme Court in Truett Payne. See also J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1540 (3d Cir. 1990), cert. denied, 499 U.S. 921 (1991) (proof requirements of section 4 are satisfied by direct evidence of lost sales, evidence that the substantial price discrimination reflected in the resale prices of Feeser and the favored competitors directly resulted in Feeser losing certain sales and losing profits on others, and expert report outlining the magnitude of the price difference); Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1273 (3d Cir. 1995), cert. denied, 516 U.S. 1172 (1996) (plaintiff failed to prove lost sales or profits caused by discriminatory pricing); Walker v. Hallmark Cards, Inc., 992 F. Supp. 1335, 1339-40 (M.D. Fla. 1997) (court required showing that "but for" defendant's discriminatory pricing, plaintiff's alleged injury would not have occurred, and suggested that favored customer's reputation for low prices may have caused plaintiff's loss of business without regard to alleged benefits from defendant-supplier); Bryant Corp. v. Outboard Marine Corp., No. C93-1365R, 1994 WL 745159, at *4 (W.D. Wash. Sept. 29, 1994), aff'd, 77 F.3d 488 (9th Cir. 1996) (plaintiff failed to show lost profits or diverted sales caused by discrimination); Perkasie Indus. Corp. v. Advance Transformer, Inc., No. 90-7359, 1992

WL 296398, at *2 (E.D. Pa. Oct. 8, 1992), aff'd, 19 F.3d 644 (3d Cir. 1994) (plaintiff purchaser of ballasts as component for certain light fixtures was unable to show that discrimination caused lost accounts); S&W Constr. & Materials Co. v. Dravo Basic Materials Co., 813 F. Supp. 1214, 1223-24 (S.D. Miss. 1992), aff'd, 1 F.3d 1238 (5th Cir. 1993) (plaintiff failed to show that preferential prices drew sales or profits from plaintiff); but see Innomed Labs, 2002 WL 31521084, at *3 (requiring evidence that claimed losses were caused by discrimination; issue for jury on facts of case).

**b. Lost Sales Due to A Shrunken Market**

Plaintiffs also argue that had they been able to purchase BNPDs at the same price paid for by the favored purchasers, they would have passed some of the savings on to their customers and the market for BNPDs would have expanded, resulting in greater sales and profits. See Grass Decl. Ex. 3 at 122. The increased market share is referred to in the 1995 Expert Report as TSI, or "total sales increase." Id. This theory fails because it is speculative. Plaintiffs have failed to come forward with any competent proof either that their customers would have received more prescriptions for BNPDs with lower prices, or that they would have filled those prescriptions at the retail pharmacies which plaintiffs own. It is, of course, well-accepted that speculation is insufficient to overcome a summary judgment motion.

**c. Lost sales of BNPDs to Favored Purchasers**

Plaintiffs also contend that they lost sales of defendants' BNPDs by relying on a calculation which they call TSS, or "total sales shift," which purports to demonstrate that the percentage growth in the market shares of mail order and HMO-run pharmacies between 1985 and the writing of the 1995 Expert Report was caused by BNPD sales that

disfavored purchasers lost as a result of defendants' alleged price discrimination. See Grass Decl. Ex. 3 at 163. Fatal to plaintiffs' argument is their failure to offer any evidence to support their claim as it relates to each plaintiff. The TSS in the 1995 Expert Report is stated as a percentage, 5.1%, and reflects an aggregate amount of sales lost by all of the plaintiffs as a group.

Under the Robinson-Patman Act, plaintiffs must carry their burden of proof to demonstrate that they individually suffered damages. See, e.g., Hasbrouck, 842 F.2d at 1045 ("Injury to the specific plaintiff is the sine qua non of a section 4 claim, once injury to competition has been established."); O'Connell, 99 F.R.D. at 123 ("once an injury in fact has been demonstrated each class member would be required to adduce proof of the quantum of damages on an individual basis") (citing Truett Payne, 451 U.S. at 561-62); Kemp-Pontiac Cadillac, Inc. v. Hartford Auto. Dealers' Ass'n, Inc., 380 F. Supp. 1382, 1386 (D. Conn. 1974) (under section 4 of the Clayton Act, a plaintiff brining a private suit must establish damage "to a specific individual"). For example, in American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc., 135 F. Supp. 2d 1031, 1040-42 (N.D. Cal. 2001), the court found that the plaintiff's expert testimony of actual damage from alleged price discrimination under the Robinson-Patman Act was inadmissible because it was entirely speculative. The expert improperly assumed damage to each individual plaintiff by averaging the alleged effects of book discounts on the industry, rather than showing damage was individually suffered. See id. at 1041. Having found no evidence of actual damage, the court thus granted summary judgment to the defendant on plaintiff's claims for damages. See id. at 1041-42.

Similarly, here, plaintiffs have failed to proffer evidence that specific plaintiff

pharmacies lost sales of BNPDs manufactured by defendants to any specific favored purchaser. Exhibits D through T of the 1995 Expert Report, which purport to calculate damages "for each designated plaintiff and separately with respect to each plaintiff's sales of each designated defendant's BNPD products," do not connect lost sales of specific plaintiffs with increased sales of favored purchasers. Rather, the calculations are industry-wide and then averaged to provide a generalized damages figure for each individual plaintiff. See, e.g., Grass Decl. Ex. 7, deposition of Jeffrey L. Harrison, plaintiffs' expert, at 281, "Q: So for purposes of calculating damages, when you calculate a total shift in market share from disfavored purchasers to favored purchasers, you're doing that on an aggregate basis for the entire group of plaintiffs in theses cases, correct? A: It's expressed as a percentage, but yes." (emphasis added).

The application of a general damages calculation representing harm to a class of individuals or entities, and then attempting to apply that same calculation to a specific individual or institution, offends the rule requiring an individualized damages determination. As such, this portion of plaintiffs' damages theory is untenable and cannot be accepted at the summary judgment stage.

**d. Plaintiffs' Affidavit and Deposition Testimony**

Plaintiffs further argue that they have proffered deposition testimony and affidavits to support their position that they have raised a genuine issue of material fact as to whether they suffered recognized damages under the Robinson-Patman Act as a result of defendants' pricing decisions. See Pls. Opp. at 20. However, in responses to interrogatories served in 1995, plaintiffs stated that the amount of sales and profits that they allegedly lost because of defendants' price discrimination would be the "subject of

an expert report." Grass Decl. Ex. 2. Therefore, to the extent that plaintiffs now attempt to introduce other evidence to support their contention that they lost sales and lost profits as a result of defendants' alleged unlawful price discrimination, that evidence cannot be considered by the Court because it contradicts the 1995 Expert Report. See Margo v. Weiss, 213 F.3d 55, 60 (2d Cir. 2000) ("the well-settled rule in this circuit [is] that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony" and noting that counsel's filing in a civil action of, inter alia, affidavits, in which the plaintiffs contradicted their earlier deposition testimony and interrogatory answers, in order to defeat defendants' summary judgment motion, warranted the imposition of Rule 11 sanctions) (citations and internal quotation omitted); Mazzuocola v. Thunderbird Prods. Corp., No. 90-0405, 1995 WL 311397, at *9 (E.D.N.Y. May 16, 1995) ("[f]actual assertions made in an affidavit submitted in opposition to a motion for summary judgment may be disregarded if those assertions are contradicted by statements in response to interrogatories"). The affidavit testimony properly only elucidates the damages theories set forth in the 1995 Expert Report, and does not bolster plaintiffs' damages theories as against summary judgment.

### 3. Whether Plaintiffs Have Accounted for Factors Other than Price Discrimination That Could Have Caused Their Damages

Defendants argue that the 1995 Expert Report fails to take into account factors other than the alleged unlawful price discrimination for their lost profits and sales. They provide three such factors: 1) defendants gave discounts to non-profit HMOs, which sales are exempt from Robinson-Patman Act liability under the Nonprofit

Institutions Act, 15 U.S.C. § 15c; 2) "the discounts granted to so-called favored purchasers may be payments for services, such as formulary access and access to patients who are covered by third-party payor plans, which [p]laintiffs do not provide"; and 3) "plaintiffs assume that all gains in market share by all mail order and HMO-run pharmacies were attributable to unlawful price discrimination." Defs. Reply Mem. at 16-17.

In response, plaintiffs argue that "the governing law does not require that defendants' antitrust violations be the sole cause of plaintiffs' damages – only that they be a material cause of the harm." While plaintiffs are correct that they are not obligated at this stage of the litigation to exclude each and every possible explanation for the lost profits other than price discrimination, they must "attempt to account for intervening market factors," for example, the factors cited by defendants, or others. Bigelow, 327 U.S. at 264 (emphasizing that antitrust damages cannot be awarded for injury that is attributable to causes other than the defendant's misconduct); The Intimate Bookshop, Inc. v. Barnes & Noble, Inc., No. 98-5564, 2003 WL 22251312, at * 7 (S.D.N.Y. Sept. 30, 2003) (same). In this respect, plaintiffs state in conclusory fashion that their "experts devoted considerable analysis to the issue of what caused the shift in market share from plaintiffs to HMOs and mail order, and concluded based on testimony from plaintiffs' industry expert and plaintiffs themselves that the only reason for the shift of market share and the harm to plaintiffs' bottom line was defendants' price discrimination." Pls. Opp. at 45. However, plaintiffs' argument acknowledges that their inquiry into the causes of their alleged lost sales and profits did not go beyond their belief, set forth in expert testimony and from plaintiffs themselves, that price discrimination was the cause

of their claimed damages. Plaintiffs' damages theories do not attempt meaningfully to factor out other causes.

Most striking on this point is plaintiffs' statement that their "experts properly assumed that the principal cause of the extreme price differentials was defendants' illegal conduct." Pls. Opp. at 46 (emphasis added). This is a patently improper approach to establishing damages under the Robinson-Patman Act. See, e.g., The Intimate Bookshop, 2003 WL 22251312, at *7 (granting summary judgment to defendants where plaintiffs' experts "were each asked to assume that the entirety of [the plaintiff's] loss is attributable to the defendants' allegedly unlawful conduct"). For this independent reason alone, defendants' motion for summary judgment is granted.

### 4. Whether Plaintiffs Have Proffered Evidence of Lost Ancillary Sales

The 1995 Expert Report also states that as a result of defendants' discriminatory pricing practices, plaintiffs lost "ancillary sales" – revenue generated from plaintiffs' customers buying products, other than BNPDs, as a result of filling a prescription. As set forth above, because plaintiffs have failed to offer competent proof that they suffered lost profits or lost sales as a result of defendants' alleged pricing practices, they also cannot establish a nexus between those practices and the loss in ancillary sales.

Moreover, even assuming that they had established such a nexus, plaintiffs have failed to come forward with evidence that these specific plaintiffs suffered lost ancillary sales. Plaintiffs assert in conclusory form that "there is sufficient evidence in the record, in the form of both expert testimony and the testimony of plaintiffs, to entitle plaintiffs to make their presentation to a jury that as plaintiffs' sales of BNPDs fell, so did its

revenue from sales of over-the-counter medicines, toiletries and sundries that bore a predictable relationship to BNPD sales." Pls. Opp. at 40. However, plaintiffs' argument fails to acknowledge that the sole basis for their claim of lost ancillary sales is an unsupported assumption that because they lost sales and profits as a result of the pricing practices, they also lost ancillary sales.

In addition, the absence of individualized proof is fatal to plaintiffs' claims for ancillary sales. See, e.g., The Intimate Bookshop, 2003 WL 22251312, at *7. While plaintiffs correctly state that they are only required to provide "a reasonable estimation of plaintiffs' damages, not absolute or theoretical precision," Pls. Opp. at 40, they are not relieved from their obligation to prove damages, including ancillary sales, specific to each plaintiff. They have failed to sustain that burden here. Accordingly, defendants' motion for summary judgment is granted to the extent that plaintiffs seek damages consisting of ancillary sales.

**5. Whether Plaintiffs Have Proffered Evidence of Special Damages**

Defendants assert that plaintiffs have failed to raise a genuine issue of material fact as to their claim for special damages, which "represent losses incurred by plaintiffs who sold or terminated their business." Grass Decl. Ex. 3 at 146, 178-81. Four of the seventeen plaintiffs claim such damages, which are bottomed on the assumption that an owner of a pharmacy will value his or her pharmacy at the time of sale taking into account the profitability of the business, including the ability to sell defendants' BNPDs at top dollar. Regarding one of the plaintiffs, Fox Drug Stores, deposition testimony revealed that Revco purchased this business "to prevent Walgreens from operating in

Revco home territory, that Revco never examined the financial statements, and that the price had nothing to do with a rational decision to buy a going business." Pls. Opp. at 42. Plaintiffs' response fails to acknowledge, and contradicts, this testimony. They state that the "fact remains, however, that Fox would never have sold to Revco, regardless of Revco's agenda, had the price offered Fox not been in line with the value of the pharmacy – specifically the value of the pharmacy as diminished by its reduced profitability owing to defendants' unlawful conduct." Id. However, the deposition testimony cited by defendants states that the purchase price of the pharmacy did not reflect the profitability of the business. Plaintiffs' burden is to proffer competent proof that there is a genuine material factual issue as to whether plaintiffs suffered special damages as a result of defendants' pricing practices. Simply stating that they did is insufficient to overcome defendants' summary judgment motion.

Similarly, plaintiffs argue that the testimony of Randall Weaver, the former owner of the pharmacy The Medicine Shoppe – that the bankruptcy and sale of his business resulted, in part, from onerous royalty payments, see Grass Decl. Ex. 9, attaching deposition transcripts at 14-17, 57, 107-08 – supports their claim for special damages. See Pls. Opp. at 43. However, Mr. Weaver's statement that there is a correlation between his pharmacy's bankruptcy and defendants' pricing practices is conclusory and not supported by evidence other than his own self-serving statements. Accordingly, defendants' summary judgment motion with respect to plaintiffs' claim for special damages is granted.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment on the

ground that plaintiffs have not shown that they are entitled to damages under the Robinson-Patman Act is granted.

**CONCLUSION**

For the foregoing reasons, the Court DENIES the designated defendants' motion for summary judgment on the representative plaintiffs' claims with respect to the "indirect purchaser" doctrine, DENIES the motion for summary judgment with respect to for-profit staff-model HMOs, GRANTS in part and DENIES in part defendants' motion for partial summary judgment with respect to legal entities that receive rebates but do not "purchase" or take title to BNPDs, and GRANTS the defendants' motion with respect to damages.

SO ORDERED.

Dated: January 25, 2007
Brooklyn, New York

__/s/_____________________
I. Leo Glasser
United States District Judge

Copies of the foregoing were sent on this day to:

Attorneys for Plaintiffs:
Mary McInnis Boies
Mary Boise & Associates
Empire Building
P.O. Box Drawer 67
Suite 5
Bedford, NY 10506

Nicholas A. Gravante, Jr.
Steven I. Froot
Philip J. Iovieno
David A. Barrett
Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022

Durrette Bradshaw, PLC
Wyatt B. Durrette, Jr.
Kenneth D. McArthur, Jr.
Main Street Center, 20th Floor
600 East Main Street
Richmond, Virginia 23219

Attorneys for defendant Ciba-Geigy Corporation:
Wayne A. Cross
Robert A. Milne
Michael J. Gallagher
White & Case LLP
1155 Avenue of the Americas
New York, New York 10036

Attorneys for defendant G.D. Searle & Co.:
Saul P. Morgenstern
David S. Copeland
Robert Grass
Kaye Scholer LLP
425 Park Avenue
New York, New York 10022

John Treece
Craig B. Sonnenschein
Sidley Austin Brown & Wood
Bank One Plaza

10 South Dearborn Street
Chicago, Illinois 60603

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x
DRUG MART PHARMACY CORP., et al.,

Plaintiffs,

-against-

AMERICAN HOME PRODUCTS CORP., et al.,

Defendants.

-------------------------------------------------x

MEMORANDUM AND ORDER
93 - CV - 5148

GLASSER, United States Senior District Judge:

The Designated Defendants Ciba-Geigy Corporation and G.D. Searle & Co. in this antitrust action have moved for summary judgment as to the Designated Plaintiffs' claims for declaratory and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Designated Defendants argue that the prior order of this Court, issued on January 25, 2007, see Drug Mart Pharm. Corp. v. American Home Prods. Corp., 472 F. Supp. 2d 385 (E.D.N.Y. 2007) ("January 25 Order"), which granted summary judgment in favor of the defendants as to the Designated Plaintiffs' claims for treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and which held that the Designated Plaintiffs had failed to establish a genuine issue of material fact as to the existence of an actual antitrust injury, compels the conclusion that the Designated Plaintiffs' claims for equitable relief under Section 16 must likewise fail. For the reasons stated below, the Designated Defendants' motion for summary judgment as to the Section 16 claim is granted.

Also pending is the Designated Plaintiffs' motion to alter or amend the January 25 Order, which incorrectly stated that the Designated Plaintiffs are not seeking equitable or injunctive relief. For the reasons stated below, that motion is granted.

## BACKGROUND

### 1. Procedural History

The complicated facts of this case have been set forth in numerous prior opinions of this and other courts, familiarity with which is assumed. See January 25 Order, 472 F. Supp. 2d at 390 (citing cases). The facts relevant to this motion are relatively simple. The Designated Plaintiffs are a group of seventeen retail pharmacies from fourteen states, who allege, inter alia, that the Designated Defendants, manufacturers of brand-name prescription drugs ("BNPDs"), have violated Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), by engaging in illegal price discrimination in the form of discounts, rebates, and other "charge-back" benefits offered to certain favored purchasers, such as health maintenance organizations and mail-order pharmacies, but not to the Designated Plaintiffs. In 2005, the Designated Defendants filed a motion seeking summary judgment on the ground that the Designated Plaintiffs had failed to set forth a cognizable theory of damages under the Robinson-Patman Act and were therefore unable to establish the element of antitrust injury, as is required to obtain damages under Section 4 of the Clayton Act.[1] In opposition to the Designated Defendants' motion, the Designated Plaintiffs relied on their 1995 Expert Report, which identified four "components" of the Designated Plaintiffs' actual damages:

> 1) Lost profits on actual sales where the profits were lost as a result of the price discrimination; 2) Lost profits on lost sales of BNPDs where the sales and profits were lost as a result of the price discrimination; 3) Lost profits on lost sales of products other than BNPDs ("lost ancillary profits") where the sales and profits were lost as a result of the price discrimination; and 4) special damages resulting from the price discrimination.

January 25 Order, 472 F. Supp. 2d at 421 (quoting Declaration of Robert Grass ("Grass Decl."), dated January 21, 2005 (docket no. 464), Ex. 3 at 144). The Designated

[1] The Designated Defendants filed three other motions for summary judgment on different grounds, all of which were addressed in the January 25 Order. Because the defendants' damages motion is the only one relevant to the present motion, the Court shall limit its discussion of the January 25 Order to that motion.

Plaintiffs also argued that certain statements contained in depositions and affidavits submitted in opposition to the Designated Defendants' motion offered further evidence of their damages, but the Court declined to consider that extraneous evidence, finding that because the plaintiffs stated "in responses to interrogatories served in 1995. . . that the amount of sales and profits that they allegedly lost because of defendants' price discrimination would be the 'subject of an expert report,'" they were limited to the theories of damages contained in that report in opposing the defendants' motion. January 25 Order, 472 F. Supp. at 430 (quoting Grass Decl. Ex. 2). The Court granted summary judgment to the defendants, holding with respect to each of the Designated Plaintiffs' theories of injury that the Designated Plaintiffs failed to allege an antitrust injury cognizable under Section 4 of the Clayton Act or failed to offer sufficient empirical evidence in support of a cognizable theory to create an issue of fact as to the Designated Plaintiffs' actual injury.

**2. The Pending Motion**

In the Rule 56 motions decided in the January 25 Order, the Designated Defendants did not move for summary judgment as to the Designated Plaintiffs' claims for equitable relief pursuant to Section 16 of the Clayton Act; indeed, the January 25 Order expressed the Court's erroneous belief that the Designated Plaintiffs sought only monetary damages in this case. 472 F. Supp. 2d at 422 n. 42. Shortly after the January 25 Order was issued, the Designated Plaintiffs moved pursuant to Federal Rule of Civil Procedure 59(e) and several other rules of procedure to alter or amend that erroneous statement, noting that "[t]he Complaints filed by the 17 Representative Plaintiffs seek not only monetary damages, but also declaratory and injunctive relief." Representative Plaintiffs' Memorandum of Law in Support of Their Motion Pursuant to Fed. R. Civ. P. 59(e), Fed. R. Civ. P. 60(a), Fed. R. Civ. P. 60(b) and Local Civil Rule 6.3 to Correct a Mistake or Error in, or in the Alternative, to Alter or Amend, a Judgment or Order

(docket no. 526), at 1-2.[2] Additionally, in a letter to this Court dated March 1, 2007 (docket no. 532), and a letter to Magistrate Judge Gold dated March 13, 2007 (docket no. 533), the Designated Plaintiffs sought leave to conduct "focused discovery" regarding the state of the BNPD market from 1995 through 2007 for the purpose of developing their case for injunctive relief prior to trial. The defendants responded to these letters in a letter to the Court dated March 16, 2007 (docket no. 534), in which they asserted that the plaintiffs "erroneously assume[] that injunctive and declaratory relief remain open to them in these cases," arguing that "[t]he Court's January 25 Order precludes such relief. . . ." Id. at 1. Reviewing the January 25 Order's holding that the plaintiffs failed to present evidence of actual antitrust injury, the defendants argued that "[h]aving failed to show that they suffered antitrust injury in support of their Robinson-Patman Act claims, or any causal connection between Defendants' conduct and the purported harm, Plaintiffs a fortiori cannot show the threat of antitrust injury necessary to support an injunction." Id. at 2. The Designated Defendants therefore asked leave of the Court to move for summary judgment as to the Designated Plaintiffs' claims for equitable relief prior to a decision being made on the Designated Plaintiffs' request for additional discovery or any further case management decisions. Such leave was granted, and this motion was filed on April 10, 2007.

## DISCUSSION

This case presents a complicated question of statutory interpretation, the complexities of which are not fully addressed by either party in the briefing submitted to

---

[2] Although the defendants filed a nominal opposition to the plaintiffs' Rule 59(e) motion, they do not dispute that the plaintiffs' complaints do seek such relief, but simply maintain that "Plaintiffs are entitled to no such relief," a contention which is relevant to the motion for summary judgment currently pending but does not undermine the plaintiffs' point that the January 25 Order incorrectly characterized their case as seeking only money damages. Designated Defendants' Memorandum of Law in Response to Representative Plaintiffs' Motion to Correct a Mistake or Error in, or in the Alternative, to Alter or Amend, a Judgment or Order (docket no. 530), at 2. The plaintiffs' Rule 59(e) motion is therefore granted, and the Court shall issue an amended order correcting the language of footnote 42.

the Court. The fundamental question this Court is called upon to answer is whether an antitrust plaintiff, having failed to establish the element of actual antitrust injury for purposes of a claim for treble damages under Section 4 of the Clayton Act, can nevertheless maintain an action for injunctive relief under Section 16, on the premise that the same purportedly anticompetitive conduct which has been determined not to have harmed the plaintiff might nevertheless create a risk of threatened antitrust injury in the future. While the Court ultimately concludes that, at least in the factual situation presented by this case, that question must be answered in the negative, an examination of the historical development of the antitrust laws and a survey of the controlling case law is necessary to place that answer into a properly limited and qualified context.

**1. The History of Sections 4 and 16**

Section 4 of the Clayton Act states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States. . . [and] shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee," 15 U.S.C. § 15, while Section 16 states that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief. . . against threatened loss or damage by a violation of the antitrust laws. . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity. . . ." 15 U.S.C. § 26. By its express terms, Section 4 contemplates a monetary award only to plaintiffs who have already sustained actual damages, while Section 16 permits a plaintiff to obtain an injunction prior to sustaining actual injury by demonstrating that the defendant's anticipated violation of the antitrust laws threatens to cause injury to the plaintiff if consummated. This feature of Section 16, permitting equitable relief prior to the occurrence of actual injury, was expressly noted in the legislative history of Section 16 as an intended benefit of the legislation.

The House Report on that legislation recognized that

> [u]nder [the law in effect at the time], a person injured in his business and property by corporations or combinations acting in violation of the Sherman antitrust law, may recover loss and damage for such wrongful act. There is, however, no provision in the existing law authorizing a person, firm, corporation, or association to enjoin threatened loss or damage to his business or property by the commission of such unlawful acts, and the purpose of this section is to remedy such defect in the law.

H.R. Rep. No. 627, 63d Cong., 2d Sess., pt. 1, p. 2 (1914), quoted in Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 112 (1986). Representative McGillicuddy, a member of the House Judiciary Committee, said the following in reference to the statutory paradigm as it existed prior to the implementation of Section 16:

> [t]here is no provision under the present law [] to prevent threatened loss or damage even though it be irreparable. The practical effect of this is that a man would have to sit by and see his business ruined before he could take advantage of his remedy. In what condition is such a man to take up a long and costly lawsuit to defend his rights? The proposed bill solves this problem for the person, firm, or corporation threatened with loss or damage to property by providing injunctive relief against the threatened act that will cause such loss or damage. Under this most excellent provision a man does not have to wait until he is ruined in his business before he has his remedy.

51 Cong. Rec. 9261 (1914), quoted in Cargill, 479 U.S. at 112 n. 8.[3] While the legislative history may be read to suggest that Congress intended Section 16 to be limited in its application to situations in which a plaintiff does not have a ripe claim for damages under Section 4, the Supreme Court has adopted a contrary reading, observing that "the

---

[3] Prior to the enactment of Section 16 of the Clayton Act, the Supreme Court had held, on the basis of an application of the canon of expressio unius est exclusio alterius to the text of Section 4 of the Sherman Act, that injunctive relief against anticipated violations of the antitrust laws was not available to private plaintiffs. See Minnesota v. Northern Sec. Co., 194 U.S. 48, 70-71 (1904) ("We cannot suppose it was intended that the enforcement of the act should depend in any degree upon original suits in equity instituted by the states or by individuals to prevent violations of its provisions. On the contrary. . . we think that its intention was to limit direct proceedings in equity to prevent and restrain such violations of the anti-trust act as cause injury to the general public. . . to those instituted in the name of the United States. . . by district attorneys of the United States, acting under the direction of the Attorney General. . . ."); Paine Lumber Co. v. Neal, 244 U.S. 459, 471 (1917) (Holmes, J.) ("[I]f the facts show any violation of the [Sherman Act], a private person cannot maintain a suit for an injunction under § 4 of the same. . . .") (Holmes, J.). Three Justices dissented from the Court's holding in Paine Lumber, arguing that "in the absence of some provision to the contrary, the right to relief by injunction, where irreparable injury is threatened through a violation of property rights, and there is no adequate remedy at law, rests upon settled principles of equity that were recognized in the constitutional grant of jurisdiction to the courts of the United States." Id. at 473 (Pitney, J., dissenting).

evident import of Congress' reference to 'threatened loss or damage' is not to constrict the availability of injunctive remedies against violations that have already begun or occurred, but rather to expand their availability against harms that are as yet unrealized." California v. American Stores Co., 495 U.S. 271, 282 n. 8 (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130 & n. 24 (1969)); see also Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc., 140 F.3d 1228, 1236 (9th Cir. 1998) (quoting American Stores Co.).

The distinction between Section4 and Section 16 was recognized by the Supreme Court in the 1927 case of Bedford Cut Stone Co. v. Journeyman Stone Cutters Ass'n, 274 U.S. 37, 54 (1927), in which the Court, reversing a judgment of the Seventh Circuit that affirmed a decree of the district court denying a preliminary injunction and dismissing the complaint against union workers who refused to work with construction stone cut by the petitioners' non-union workers, noted that "[t]he record does not disclose whether petitioners, at the time of bringing suit, had suffered actual injury; but that is not material. An intent to restrain interstate commerce being shown, it is enough to justify equitable interposition by injunction if there be a dangerous probability that such injury will happen; and this clearly appears." Likewise, in Zenith Radio, the Court reinstated an injunction imposed by the district court pursuant to Section 16, which had been vacated by the Sixth Circuit on the ground that the plaintiff's "failure to prove the fact of injury barred injunctive relief as well as treble damages." 395 U.S. at 130. The Court rejected the Sixth Circuit's reasoning as "unsound," concluding that equitable relief under Section 16 "is characteristically available even though the plaintiff has not yet suffered actual injury; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Id. (citation omitted). The Court held that, notwithstanding the fact that the petitioner had failed to prove actual injury, the evidence established that the

respondent was conspiring to exclude the petitioner from the Canadian market for radios and television sets, a "clear violation of the antitrust laws" that made the entry of an injunction pursuant to Section 16 "wholly proper." Id. at 132. The principle that a plaintiff need not be entitled to actual damages under Section 4 of the Clayton Act in order to pursue an injunction against threatened injury under Section 16 has been recognized in many other cases. See, e.g., Hampton v. Graff Vending Co., 478 F.2d 527, 536 (5th Cir. 1973) (finding in the context of an action for price discrimination in violation of the Robinson-Patman Act that "[t]hat there is no entitlement to damages, however, is not dispositive of the question of permanent injunctive relief" pursuant to Section 16 of the Clayton Act); Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 407-08 (1st Cir. 1985) (district court's application of the requirements of Section 4 to a claim for equitable relief under Section 16 was reversible error; "[p]lainly, Congress empowered a broader range of plaintiffs to bring § 16 actions because the standards to be met are less exacting than those under § 4; under § 16, a plaintiff need show only a threat of injury rather than an accrued injury."); Datagate, Inc. v. Hewlett Packard Co., 941 F.2d 864, 869-70 (9th Cir. 1991) ("[S]ummary judgment was granted to HP because of Datagate's failure to show that it has suffered actual injury as a result of the new policy. However, section 16 of the Clayton Act 'invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of threatened injury.' Because the district court only considered the evidence with regard to actual injury, and did not consider the threat of loss or damage to Datagate, we reverse and remand for the trial court to make such findings.") (quoting Zenith Radio, 395 U.S. at 130) (emphasis in original);[4] Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft, No. 79-2066,

---

[4] Datagate further noted that "[t]o establish a claim for injunctive relief under section 16, Datagate must demonstrate 'a cognizable danger' of injury not just a 'mere possibility,'" and noted that evidence of customers' complaints about the new HP policy, while not sufficient to establish actual injury, "may be indicative of a threat of injury." Id. (quoting TRW, Inc. v. FTC, 647 F.2d 942, 954 (9th Cir. 1981)).

1983 WL 1932, at *1 (D. Md. November 10, 1983) ("More than a showing that the violation has occurred is necessary [to obtain injunctive relief under Section 16], although relief is available without a showing of actual injury.") (citation omitted). However, as shall be demonstrated below, the fact that the standard for injunctive relief under Section 16 is less exacting that the standard to be met when seeking actual damages under Section 4 does not mean that a plaintiff's failure to establish actual antitrust injury is always irrelevant to the Section 16 inquiry.

### 2. The Concept of Antitrust Injury and its Applicability Under Sections 4 and 16

While the defendants do not dispute the fact that Section 16 requires a plaintiff to allege only a threat of future injury rather than past or contemporaneous injury compensable under Section 4 in order to seek an injunction, they suggest that the recently developed concept of "antitrust injury" applies to claims for legal or equitable relief under the Clayton Act somewhat differently than the inquiry into the element of actual injury discussed in cases such as Bedford and Zenith Radio. The concept of antitrust injury, which is related to, but distinct from, both actual injury and antitrust standing,[5] was first articulated by the Supreme Court in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977). In that case, the plaintiff-respondents, operators of bowling centers in New York, New Jersey, and Colorado, sued the defendant-appellant for damages under Section 4 of the Clayton Act for violation of Section 7 of that Act, 15 U.S.C. § 18, alleging that the defendant's act of taking over financially struggling bowling centers in the plaintiffs' local markets and operating them in

---

[5] Courts occasionally refer to the question whether a plaintiff has alleged or proven an antitrust injury as a question of "standing," but such phrasing is imprecise. Although the inquiries into antitrust injury and antitrust standing often overlap, the antitrust injury component of a Section 4 or Section 16 claim, as discussed further below, requires a determination of whether the injury alleged by the plaintiff as a result of the defendant's violation of the antitrust laws is the kind of harm that the antitrust laws were intended to prevent, while the antitrust standing inquiry examines whether the plaintiff is the most efficient party to prosecute the action. See generally William H. Page, The Scope of Liability for Antitrust Violations, 37 Stan. L. Rev. 1445 (1985), cited in Cargill, 479 U.S. at 110 n. 5; see also Diseños Artisticos E Industriales, S.A. v. Work, 676 F. Supp. 1254, 1275 n. 18 (E.D.N.Y. 1987) (Glasser, J.) (citing Page).

competition with the plaintiffs damaged the plaintiffs by depriving them of the additional profits they would have earned had the struggling centers gone out of business, thereby decreasing competition among bowling centers in the local markets.[6] The Court rejected this theory, holding that in order for

> the plaintiffs to recover treble damages on account of s 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

Id. at 489; see also J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562 (1981) (Section 4 of the Clayton Act requires a plaintiff to demonstrate, inter alia, that it has suffered an "actual injury attributable to something the antitrust laws were designed to prevent" in order to recover treble damages for the defendant's violation of the antitrust laws), cited in January 25 Order, 472 F. Supp. 2d at 37. Because the petitioner's actions promoted, rather than inhibited, competition in the relevant market, the respondents were not entitled to relief under the antitrust laws, notwithstanding the fact that they lost profits because of the petitioner's actions.

In Cargill, the case on which defendants principally rely in support of this motion, the Court extended the applicability of the antitrust injury rule from the context of a Section 4 claim for damages in which it was initially developed in Brunswick to the context of a Section 16 claim for injunctive relief against an anticipated violation of the antitrust laws, holding that "a plaintiff seeking injunctive relief under § 16 of the Clayton

---

6 Section 7 of the Clayton Act states in relevant part:

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18.

Act must show a threat of antitrust injury, and that a showing of loss or damage due merely to increased competition does not constitute such injury." 479 U.S. at 122. The plaintiff-respondent in Cargill, Monfort of Colorado, was the nation's fifth-largest beef packer,[7] which brought an action under Section 16 against the second-largest beef packer, Excel Corporation, and its parent company, Cargill, Inc., seeking to enjoin a merger between Excel and Spencer Beef, the third-largest beef packer. Monfort argued that the proposed merger would violate Section 7 of the Clayton Act by substantially reducing competition or creating a monopoly in the beef packing industry. Following a trial, the district court issued a memorandum and order in which it concluded that the plaintiff had proved its allegation that the merger would create a "cost-price squeeze" in the beef packing industry and that such injury would constitute antitrust injury, and therefore found that the proposed merger would violate Section 7 and granted the injunction prohibiting it; the district court's decision was affirmed by the Tenth Circuit. Id. at 108 (citing Monfort of Colorado, Inc. v. Cargill, Inc., 761 F.2d 570 (10th Cir. 1985)). On review of the Tenth Circuit's decision, the Supreme Court recognized that "[t]his case requires us to decide, at the outset, a question we have not previously addressed: whether a private plaintiff seeking an injunction under § 16 of the Clayton Act must show a threat of antitrust injury," a question the Court answered in the affirmative. Id. at 109. In reaching that result, the Court acknowledged that "[i]t is plain that § 16 and § 4 do differ in various ways," including by the fact that "§ 4 requires a plaintiff to show actual injury, but § 16 requires a showing only of 'threatened' loss or damage. . . ." 479 U.S. at 111. Notwithstanding these differences, the Court concluded that "[i]t would be anomalous. . . to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred," and noted that "the legislative history of

---

[7] I.e., an owner and operator of plants for the slaughter of cattle and the fabrication of beef.

§ 16 supports the view that § 16 affords private plaintiffs injunctive relief only for those injuries cognizable under § 4." Id. at 112. Concluding that "Sections 4 and 16 are thus best understood as providing complementary remedies for a single set of injuries," the Court held that "in order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed [sic] to prevent and that flows from that which makes defendants' acts unlawful.'" Id. at 113 (quoting Brunswick, 429 U.S. at 489).[8] The Court then further concluded that the plaintiff's theories of injury did not constitute antitrust injury. Addressing Monfort's first theory, that after the contemplated merger it would be forced to lower its prices in order to compete with Excel's increased efficiency in production and therefore might be driven out of the beef packing market, the Court held that "the logic of Brunswick compels the conclusion that the threat of loss of profits due to possible price competition following a merger does not constitute a threat of antitrust injury." Id. at 116-17. Monfort's second theory of injury was that "after the merger Excel would attempt to drive Monfort out of business by engaging in sustained predatory pricing," which was defined as "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run. . . a practice that harms both competitors and competition." Id. at 117-18 (emphasis in original). The Court noted that the Tenth Circuit found that Monfort had established a threat of injury from predatory pricing, but further observed that the appellate court's use of the term "predatory pricing" was not clear, finding that it could mean either: a) "that Monfort's allegation of losses from the above-cost 'price-cost squeeze' was

[8] Cargill incorrectly quotes Brunswick as defining antitrust injury as an injury of the sort that the antitrust laws were "designed" to prevent; Brunswick actually uses the word "intended" rather than "designed." Compare Brunswick, 429 U.S. at 489, with Cargill, 479 U.S. at 113. Given that the words "designed" and "intended" are synonymous in this context, this Court does not infer any difference in meaning in the definitions of antitrust injury adopted by Brunswick and Cargill; indeed, it is clear that the Cargill Court intended to incorporate the concept of antitrust injury as defined in Brunswick into the context of a Section 16 claim.

equivalent to an allegation of injury from predatory conduct," or b) "that Monfort had shown a credible threat of injury from below-cost pricing." Id. at 118. Regarding the first interpretation, the Court held that Monfort could not establish a cognizable threat of antitrust injury because, as it noted in discussing its first theory of damages, "price competition is not predatory activity. . . ." Id. Regarding the second interpretation, the Court acknowledged that below-cost pricing can constitute predatory activity prohibited by the antitrust laws, but held that "[t]o the extent the judgment rests on this ground. . . it must also be reversed, because Monfort did not allege injury from below-cost pricing before the District Court." Id. at 119. Finding that Monfort had alleged no cognizable theory of antitrust injury, the Court reversed the court of appeals and the district court, holding that Monfort "failed to make the showing § 16 requires" in order to enjoin the merger of its competitors. Id. at 122.

### 3. The Plaintiffs' Failure to Establish Actual Antitrust Injury Precludes Their Claim for Equitable Relief Under the Circumstances Presented in This Case

As Cargill makes clear, a plaintiff seeking equitable relief under Section 16 need only establish the existence of a threatened antitrust injury, not a past or contemporaneous injury, arising from the defendant's anticompetitive conduct in order to prevail.[9] As a result of Section 16's more liberal standard, it is usually the case that a plaintiff's failure to establish the existence of actual antitrust injury in pursuit of a claim for treble damages under Section 4 does not necessarily preclude a claim for equitable relief under Section 16. However, a relatively narrow line of precedent running through

---

[9] The Second Circuit expressly recognized this distinction in Consol. Gold Fields PLC v. Minorco, S.A. 871 F.2d 252 (2d Cir. 1989). In that case, the plaintiff obtained a preliminary injunction from the district court against a hostile takeover, arguing that the hostile bidder would use its control over the plaintiff following the takeover to shut down the plaintiff's gold mining operations, thereby reducing competition in the market. After a brief discussion of Cargill, the Second Circuit affirmed the district court's determination that the plaintiff had alleged a threat of antitrust injury sufficient to seek injunctive relief under Section 16, noting that the plaintiff's contention "that it would suffer reduced profits because the takeover will enable outside corporate forces to cause it to restrain its own competitiveness and thereby reduce competition in the relevant market. . . is precisely the type that the antitrust laws were designed to protect against." Id. at 257-58.

the larger body of Section 16 case law recognizes an exception to that general principle when the allegedly anticompetitive conduct has been ongoing for a sufficient period of time that the plaintiff's failure to demonstrate actual injury gives rise to a reasonable presumption that, absent a change in circumstances, the conduct at issue also does not create a risk of future antitrust injury. While that exception has never been acknowledged by the Second Circuit, the Court finds the reasoning of those cases persuasive and applicable to the Designated Plaintiffs' Section 16 claims in this case.

### a. Section 16 Requires a Plaintiff to Demonstrate Only Threatened Antitrust Injury

In opposition to the defendants' motion for summary judgment, the plaintiffs rely on a number of cases that apply the principle recognized in Cargill, that an antitrust plaintiff need establish only threatened antitrust injury, rather than past or contemporaneous injury, in order to prevail on a claim for equitable relief under Section 16. In H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005 (2d Cir. 1989), the plaintiffs, a distributor of dental x-ray equipment and a related mail-order vendor of that equipment, brought several antitrust claims against the manufacturer and two competing distributors of the equipment, alleging, inter alia, price discrimination in violation of the Robinson-Patman Act, and seeking monetary damages under Section 4 of the Clayton Act as well as equitable relief under Section 16. The district court granted summary judgment to the defendants as to both claims on the ground that the plaintiffs had failed to establish antitrust injury. The Second Circuit affirmed the dismissal of the Section 4 claims for the reason identified by the district court, holding that "[t]he three instances of injury cited by plaintiffs, and discounted by the district court, are inadequate to make the required showing of antitrust injury," id. at 1021, because even assuming price discrimination in violation of the Robinson-Patman Act, the plaintiffs failed to "establish some connection between those violations and injuries to the plaintiffs in the form of lost sales or profits." Id. at 1022. However,

the court rejected the district court's conclusion that the plaintiffs' failure to establish actual antitrust injury for purposes of their Section 4 claim also required dismissal of the Section 16 claim, noting that "a determination which assumes a statutory violation without a demonstration of antitrust injury does not provide a basis to dismiss plaintiffs' Robinson-Patman Act claim insofar as it seeks [equitable] relief." Id. The court affirmed the dismissal of the Section 16 claims on a different ground, however, noting that "[s]ince [the defendant manufacturer] is no longer selling to [the plaintiffs], as is its right, there is no danger that it will sell to them on discriminatory terms. . . and accordingly no basis for a Robinson-Patman injunction." Id. (citation omitted).[10]

A very similar situation was presented to the Tenth Circuit in B-S Steel of Kansas, Inc. v. Texas Indus., Inc., 439 F.3d 653 (10th Cir. 2006). In that case, the plaintiff, an independent distributor of wide flange steel beams, brought an action alleging, inter alia, price discrimination in violation of the Robinson Patman Act against four steel manufacturers that extended various sales incentives including rebates and discounts to five favored purchasers, but not to the plaintiff. One of the four defendants, Chaparral Steel Midlothian, L.P. ("Midlothian"), moved to stay the action and to refer all of the claims against it arising from transactions prior to April 3, 2001, to arbitration, pursuant to an arbitration clause in its contract with the plaintiff. Discovery in the

---

[10] In seeking to distinguish Hayden from the present case, the Designated Defendants place peculiarly heavy emphasis on the fact that the Hayden court ultimately affirmed summary judgment in favor of the defendants, albeit on grounds that are concededly not present in this case. See Def. Mem. at 11 ("First, the Second Circuit in Hayden affirmed the grant of summary judgment as to plaintiffs' claim for injunctive relief, albeit on different grounds."); Reply Mem. at 13 ("Defendants find it curious that Plaintiffs continue to rely on a case which affirmed the grant of summary judgment as to the plaintiff's claim for an injunction and in which the claimant actually proffered evidence of competitors receiving a lower price. . . .") (emphasis in original). The Court is somewhat at a loss to comprehend why the Designated Defendants apparently view the ultimate outcome of Hayden to be of such significance in undermining the Designated Plaintiffs' Section 16 claim when there is no doubt in this case that, unlike Hayden, the Designated Plaintiffs continue to purchase the Designated Defendants' BNPDs. Obviously, this Court is aware of the fact that defendants' motions for summary judgment in antitrust actions are sometimes granted, and is capable of appreciating that the legal reasoning applied by one case might dictate a different outcome in a subsequent case in which the facts found to be dispositive in the first case are not present. The Court therefore would have found a more substantive discussion of the Hayden court's reasoning to be a much more useful undertaking on the Designated Defendants' part than their talismanic invocation of Hayden's bottom line.

arbitration proceeding against Midlothian and in the district court action against the other three defendants proceeded in parallel, and the plaintiff submitted the same expert report, purporting to quantify its actual damages, in both proceedings. The arbitration panel denied B-S Steel's claims for damages under Section 4 of the Clayton Act, finding that Midlothian had engaged in unjustified price discrimination during the period at issue, but, as in this case, "conclud[ing] that B-S Steel had failed to meet its burden of proving that it had suffered antitrust injury because it could not establish a causal connection between any incentives given to other buyers and any harm to B-S Steel." Id. at 658. When the district court subsequently confirmed the arbitration decision in Midlothian's favor, the remaining three defendants moved for summary judgment, "arguing that the arbitration award disposed of B-S Steel's claims for damages under the doctrines of res judicata and collateral estoppel. . . and that B-S Steel lacked standing to seek injunctive relief." Id. at 659.[11] The district court granted the defendants' motion, finding the arbitration decision preclusive on the question of B-S Steel's actual damages, and that B-S Steel's failure to provide evidence of actual damage likewise precluded its claim for injunctive relief.

On appeal, the Tenth Circuit affirmed the district court's judgment on the preclusive effect of the arbitration decision, but rejected its conclusion that "B-S Steel lacked standing to pursue injunctive relief because the arbitrators had already determined that it could not show antitrust injury for purposes of its pre-April 3, 2001, damages claim." Id. at 666. The court held that the district court's conclusion that the failure to show evidence of actual antitrust injury necessarily precludes the availability of injunctive relief "is in error. . . because it ignores the distinction. . . between showing

---

[11] The district and circuit court opinions in B-S Steel follow the pattern, addressed in note 5, supra, of discussing the question of antitrust injury in terms of "standing" rather than as a substantive element of the cause of action. However, as the subsequent discussion shall demonstrate, the Tenth Circuit's analysis of the issue is essentially identical to that of other cases, including Hayden, which, correctly in this Court's view, treat the question of antitrust injury as a substantive element of an antitrust claim.

that antitrust injury actually occurred in the past and showing that it might occur in the future. . . ." Id. at 668. The court further noted that, because the standards for relief under Section 4 and Section 16 are not identical, "simply because the arbitrators concluded that B-S- Steel failed to meet its evidentiary burden in regard to past violations does not mean, as a matter of law, that it would be impossible for B-S Steel to show a threat of future injury." Id. However, the Tenth Circuit ultimately affirmed the district court's grant of summary judgment as to the Section 16 claim because, as in Hayden, the defendants no longer maintained a commercial relationship. Because "B-S Steel [was] no longer a purchaser of [steel beams] from the appellees and has failed to show any possibility that it might resume such purchases in the future," it could not demonstrate the threat of antitrust injury necessary to seek equitable relief under Section 16. Id. (citing Hayden, 879 F.2d at 1022).

The Ninth Circuit addressed another very similar case in Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc., 140 F.3d 1228 (9th Cir. 1998), in which it held that a plaintiff that could not demonstrate a cognizable antitrust injury for purposes of a claim for damages under Section 4 could nevertheless pursue a claim for equitable relief under Section 16. In Lucas Automotive, the plaintiff had been a distributor and downstream purchaser of Firestone vintage tires[12] from the 1970s until 1992, when Bridgestone/Firestone, Inc. ("BFI"), awarded an exclusive distributorship for Firestone Tires to Coker Tires, the plaintiff's chief competitor in the vintage tires market. The Firestone contract, in addition to its other exclusive distributorships, gave Coker Tire exclusive control of 90% of the relevant market in "original equipment" vintage tires. About a year later, Lucas Automotive filed an action against Coker Tire, BFI, and The Firestone Tire and Rubber Company of New Zealand, Ltd. ("FNZ"), a subsidiary of BFI

---

12 Vintage tires are "replicas of the tires which originally were sold on vintage, antique and collector cars, and are no longer made for use on modern cars." Id. at 1230.

which had been the manufacturer of the vintage tires during the relevant period. The complaint alleged, inter alia, that the defendants had violated Section 7 of the Clayton Act, and sought both treble damages under Section 4 of the Clayton Act and an order pursuant to Section 16 compelling divestiture of Coker Tire's exclusive distributorship of Firestone vintage tires. The district court granted a motion by BFI and BNZ for summary judgment, finding that they lacked specific intent to monopolize and that there were legitimate business reasons for their preference of Coker Tire over Lucas Automotive; the plaintiff did not appeal that ruling. The court then granted a motion for summary judgment by Coker Tire, holding, inter alia, that summary judgment was appropriate because Lucas Automotive did not "produce[] evidence to show that its losses flow from any alleged monopoly by Coker Tire," and that it did not "produce[] any evidence to show that Coker Tire has in fact raised prices on the brand name vintage tires it distributes. . . ." Id. at 1231.

Lucas Automotive appealed the grant of summary judgment in favor of Coker Tire. The Ninth Circuit affirmed summary judgment as to the claims for treble damages under Section 4, but reversed the district court as to the Section 16 claim for divestiture. In analyzing the question whether summary judgment was warranted on the plaintiff's Section 16 claim, the court noted at the outset that "[t]o maintain an antitrust divestiture suit [under Section 16], a private plaintiff must generally meet all the requirements that apply to the damages plaintiff, except that the injury itself need only be threatened, damage need not be quantified, and occasionally a party too remote for damages might be granted an injunction." Id. at 1234 (citing 2 Areeda & Hovenkamp, Antitrust Law ¶ 360, at 193-94). The first part of the court's analysis held that Lucas Automotive lacked standing as a competitor to seek a divestiture order because the injury it suffered was particular to itself as a competitor, and not to competition in general; i.e., "because Lucas Automotive cannot show that it would not be similarly

threatened had a small business acquired the right to manufacture and to distribute Firestone Tires, Lucas Automotive lacks competitor standing to sue for divestiture under § 16." Id. at 1235 (citing Brunswick, 429 U.S. at 487; Cargill, 479 U.S. at 113; 2 Areeda & Hovenkamp, Antitrust Law ¶ 349.2a, at 480-81). However, the second part of the Section 16 analysis found that Lucas Automotive had consumer standing to assert a Section 16 claim against Coker Tire on the theory that Coker Tire's monopolistic control over the vintage tire market would harm competition. Underlying the holding of the second part of the Court's Section 16 analysis was its conclusion that "[t]he district court erred in failing to distinguish Lucas Automotive's standing to sue for equitable relief under § 7 of the Clayton Act from its standing to sue for treble damages," in support of which it emphasized that "an antitrust plaintiff seeking injunctive relief need only show a threatened injury, not an actual one." 140 F.3d at 1235 (emphasis in original). The court then concluded that, notwithstanding the fact that Lucas Automotive lacked standing to seek damages under Section 4, the evidence it presented demonstrated that "Coker Tire's conduct threatens 'substantially to lessen competition' and 'tends to create a monopoly' at the primary line level of the vintage tire market," which it recognized as "precisely the antitrust harm § 7 was intended to protect against." Id. at 1236. The court therefore held that "Lucas Automotive. . . as a customer in a market controlled by a monopolist, has standing to assert a § 7 claim for equitable relief, including divestiture, under § 16," and reversed the district court's decision to the contrary. Id. at 1237.

In American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc., 135 F. Supp. 2d 1031 (N.D. Cal. 2001), another case upon which the plaintiffs rely heavily, an association of independent booksellers brought an action for damages and injunctive relief against several defendants associated with bookstore chains, alleging price discrimination from book publishers and distributors in the chains' favor in violation of the Robinson-

Patman Act. The district court granted the defendants' motions for summary judgment as to the plaintiffs' claims for damages, but denied their motions for summary judgment as to the plaintiffs' Section 16 claims, observing that "[i]n order to obtain an injunction. . . each plaintiff does not need to prove that it was actually injured by the unlawful price discrimination. Instead, the plaintiffs must show only that there is a reasonable possibility that the price discrimination may harm competition. . . ." Id. at 1036-37. Later in its opinion, the district court elaborated on that point, explaining that the defendants' challenge to the plaintiffs' expert report provided no basis for granting summary judgment on the plaintiffs' Section 16 claim because "plaintiffs do not have to show that they suffered actual injury in order to obtain injunctive relief under the Robinson-Patman Act. Instead, plaintiffs must show only that there is a reasonable possibility that the unlawful price discrimination received by defendants may harm competition." Id. at 1037 (emphasis in original); see also Balaklaw v. Lovell, 822 F. Supp. 892 (N.D.N.Y. 1993). In Balaklaw, the district court recognized that

> [u]nder section 16 of [the Clayton] Act, a plaintiff need only establish 'threatened' loss or damage, rather than actual loss or damage, in establishing a violation under this section. As a result of these differences, the standing requirement for a section 16 claim is somewhat less demanding: courts are less concerned about whether a plaintiff is an efficient enforcer of the antitrust laws. However, as under section 4, for section 16 injunctive relief, a plaintiff still must allege 'antitrust injury' (in the form of threatened loss or damage) as well as the defendant's causal responsibility for that injury.

Id. at 898 (emphasis added, citations omitted).

The Designated Defendants, who on one hand expressly disavow the position that a plaintiff's failure to establish actual antitrust injury for purposes of a Section 4 claim automatically precludes that plaintiff's ability to pursue equitable relief under Section 16,[13] and on the other hand seemingly assert that very argument in favor of their motion

---

[13] See Reply Mem. at 3 ("[N]ot once did the Defendants argue that a failure to prove damages, in and of itself, precludes injunctive relief.").

for summary judgment as to the plaintiff's Section 16 claims,[14] correctly argue that neither the Second Circuit's dicta in Hayden nor the district court's decision in American Booksellers are binding on this Court, and further suggest that even if those cases do support the Designated Plaintiffs' position, the Court should nevertheless grant the Designated Defendants' motion for summary judgment because "Hayden and American Booksellers cannot supplant Cargill." Reply Mem. at 13. The Designated Defendants' perception that Cargill's holding is in tension with that of Hayden, American Booksellers, and presumably the other cases discussed above is apparently grounded in their view that Cargill establishes that "Sections 4 and 16 share the common element of antitrust injury," subject only to the "temporal distinction" between actual and threatened antitrust injury. Id. at 8. The Designated Defendants' characterization of Cargill and of the relationship between Section 4 and Section 16 misleadingly suggests a non-existent parity between those sections by eliding the qualitative distinction between the real and the merely hypothetical or contingent that Congress expressly incorporated into the Clayton Act and which was recognized by Cargill, Hayden, and all of the cases cited in this section. Far from seeking to "supplant" Cargill, these cases simply acknowledge and apply the differences between Sections 4 and 16 recognized by the Supreme Court in Cargill to conclude, correctly, the very point that the Designated Defendants elsewhere purport to acknowledge: that in the usual antitrust case, a plaintiff need not demonstrate actual antitrust injury in order to obtain injunctive relief

---

[14] For example, the Designated Defendants' moving brief argues on the first page that "[w]hether [the plaintiffs] seek monetary damages or equitable relief in the form of an injunction, the law is clear that proof of antitrust injury is an essential element of their claims." Def. Mem. at 1; see also id. at 4 ("Whether [Plaintiffs] seek monetary damages or equitable relief in the form of an injunction, the law is clear that proof of antitrust injury is an essential element of their claims. Their failure to raise any genuine issue of material fact as to antitrust injury requires granting Defendants summary judgment as to Plaintiffs' claims for declaratory and injunctive relief."); id. (arguing that "[t]he [January 25] Order could not have been more clear, and indeed, the Court found that Plaintiffs had failed in numerous ways to raise a genuine issue of material fact as to any of their damage theories," and arguing on the basis of that fact that the plaintiffs' "failure to raise any genuine issue of material fact as to antitrust injury requires granting Defendants summary judgment as to Plaintiffs' claims for declaratory and injunctive relief.").

under Section 16. A violation of Section 16 can be analogous to an inchoate criminal offense– the act giving rise to the claim for equitable relief need not have actually occurred, and if it has occurred, it need not have caused actual injury to the party in whom the law nevertheless recognizes a right to seek equitable relief. Thus, no tension or inconsistency exists between Cargill, Hayden, and the other cases discussed in this section, and in the usual case, the fact that this Court has determined that the Designated Plaintiffs have not established the element of actual antitrust injury would not be a sufficient basis upon which to grant summary judgment in favor of the Designated Defendants as to the Section 16 claims against them, because actual antitrust injury is not an element of a Section 16 claim. However, for the reasons discussed below, this case is not the usual antitrust case, and, while actual antitrust injury is not a formal element of the Designated Plaintiffs' Section 16 claims, their failure to establish actual injury is sufficiently relevant to the merits of their claims for equitable relief as to be dispositive of those claims.

**b. Where the Purportedly Anticompetitive Conduct has been Ongoing for Some Time, Failure to Establish Actual Antitrust Injury Precludes a Demonstration of Threatened Antitrust Injury**

Although the Designated Defendants overstate their case in attempting to distinguish the line of cases discussed above from Cargill and from this case, and misleadingly minimize the degree of distinction between the legal standards imposed on plaintiffs seeking damages under Section 4 of the Clayton Act and those seeking equitable relief under Section 16, they also point, albeit obliquely, to an exception to the general rule discussed above that the failure to establish actual antitrust injury is not usually fatal to a Section 16 claim. While it is true that the standards for obtaining relief under Section 4 and Section 16 are not identical in most cases, the requirements of the two sections coalesce in situations where the purportedly anticompetitive conduct has been ongoing for a substantial period of time. In those cases, a plaintiff's failure to

demonstrate actual injury has the effect of precluding the possibility of establishing a threat of future injury from the same conduct.

The first case to illustrate that principle was Judge Wright's opinion in Merit Motors, Inc. v. Chrysler Corp., 569 F.2d 666 (D.C. Cir. 1977) (Wright, J.). Merit Motors affirmed the grant of summary judgment in favor of the defendant automobile manufacturer as to the plaintiffs' claims for damages and injunctive relief. The plaintiffs, two dealers of Chrysler automobiles, alleged that Chrysler's programs offering subsidies to "fleet purchasers"– those which purchased 10 or more automobiles in a 12-month period– violated the Sherman Act and the Robinson Patman Act and caused damage to the plaintiffs' business. The district court granted summary judgment on the ground that the plaintiffs' expert report failed to establish that the programs, which had been in operation for approximately 8 years when the action was commenced,[15] caused any actual injury to the plaintiffs' businesses. In affirming the summary judgment, the appellate court noted that the parties and the district court had focused primarily on the viability of the plaintiffs' allegations of injury with respect to their Section 4 claims, but added that it must address the Section 16 claim separately. Id. at 668 n. 2. The court recognized that "[t]he showing of injury required for a suit seeking an injunction is less than that required to sue for treble damages since only threatened rather than actual damages must be proved," but noted an important exception to that general principle: "where the programs in question have been in existence long enough for their potential effects on dealers to manifest themselves, the difference in the two standards is not so consequential." Id. at 670 n. 14. The court therefore proceeded to examine the plaintiffs' expert report, affirming summary judgment as to both the Section 4 and

---

[15] The court notes that the subsidy program at issue had been in effect since "around 1962." Thus, assuming the case was commenced in 1970, as the docket number of the district court proceeding (Civ. A. No. 2000-70) appears to indicate, the subsidy program had been in effect for about 8 years when the complaint was filed.

Section 16 claims on the basis of its conclusion that the expert report failed to create a genuine issue of fact as to whether the plaintiffs had sustained actual injury from the operation of Chrysler's incentive programs.

The Merit Motors principle was recognized and applied in two decisions by the United States District Court for the Southern District of New York in the case of Ashley Meadows Farm, Inc. v. American Horse Shows Association, Inc. See Ashley Meadows Farm, Inc. v. American Horse Shows Ass'n, Inc., 617 F. Supp. 1058 (S.D.N.Y. 1985) ("Ashley Meadows I"); Ashley Meadows Farm, Inc. v. American Horse Shows Ass'n, Inc., 624 F. Supp. 856 (S.D.N.Y. 1985) ("Ashley Meadows II"). The Designated Defendants cite Ashley Meadows II for the proposition that "when a plaintiff fails to raise any genuine issue of material fact as to past or contemporaneous injury. . . the threat of future harm necessary to support an injunction is lacking." Reply Mem. at 4. This is a fair paraphrase of Ashley Meadows II's language, and appears at first glance to be inconsistent with Cargill, Hayden, and the other cases discussed in the previous section, but it is necessary to examine the history of the Ashley Meadows litigation in order to appreciate the context in which the court's statement was made. Ashley Meadows involved an antitrust action by an operator of horse shows against the American Horse Shows Association, a national organization that set forth guidelines governing horse shows and organized the scheduling of shows for its 40,000 members. The plaintiff alleged that the defendant's "Mileage Rule," which "establishe[d] minimum distances between horse shows recognized by the Association and grant[ed] priority to established recognized shows over other shows" prevented the plaintiff from operating horse shows on the most profitable dates. Ashley Meadows I, 617 F. Supp. at 1061. While discovery was underway, the defendant moved for summary judgment on the ground that the plaintiff lacked antitrust standing because it was unable to demonstrate that it had suffered any injury traceable to the defendant's conduct. The defendant's initial motion

was denied on the basis of the district court's assumption that the plaintiff would introduce its own financial records to demonstrate the financial injury it claimed to have suffered. See id. at 1060 (citing earlier order dated September 20, 1984). However, the plaintiff subsequently sought to voluntarily dismiss its Section 4 claims and responded as follows to an interrogatory requesting that it quantify the amount of financial loss that it sustained as a result of the defendant's allegedly anticompetitive conduct:

> As defendant is aware, plaintiff seeks leave of [the] court to dismiss its damage claims in this action without prejudice. Accordingly, the provision of answers concerning the dollar amount of plaintiff's damages would be unduly burdensome, since the dollar amount of its damages will not lead to the discovery of admissible evidence concerning plaintiff's claims for injunctive relief.

Id. at 1061. The plaintiff further "stated in its responses that it was 'unable' to quantify the amount of damage it had sustained, that it no longer intended to compare at trial any of its shows with any other horse shows, and that it did not intend to call its own expert witness at trial." Id. The district court granted the defendant's motion for summary judgment, but carefully noted that the absence of actual injury does not in all cases deprive a plaintiff of the right to pursue equitable relief against a threatened injury. The court wrote that

> [t]he standard for establishing injury sufficient to support a claim under § 16 of the Clayton Act is more liberal than the standard applied to damage claims under § 4. Section 16 provides a right of action for threatened as well as past injuries, for indirect injuries[,] and in certain circumstances, for injuries which do not strictly threaten the 'commercial interests' of a party.

Id. at 1063 (citations omitted). However, the court further observed that the distinction between the requirements of Section 4 and Section 16 were "largely irrelevant" in the specific circumstances of the case, because the type of injury that the plaintiff claimed to have suffered was "a direct injury to its profitability, a business and commercial interest." Id. Moreover, the court noted that "the actions constituting the basis for the Farm's claim extend back to 1980," observing that "[i]n view of the long-standing nature of alleged injury and in the absence of any change in circumstances, the Farm cannot

claim that it faces the threat of any greater harm than has allegedly occurred in the past." Id. at 1063. The district court therefore concluded that "[u]nder these circumstances. . . it would be inappropriate to allow speculation about possible injury to the Farm. Instead, the Farm's evidence regarding its past and present injury. . . will be determinative as to whether it has standing to bring this antitrust action." Id. Finally, the court recognized that "[t]he Farm need not quantify the damages sustained in order to obtain injunctive relief. . . [but t]he Farm nevertheless must set forth sufficient facts regarding its business operations to demonstrate that it has suffered some injury." Id. at 1064-65. Because the plaintiff's failure to make any showing of actual injury flowing from the defendant's conduct undermined any suggestion of a threat of future antitrust injury, the court held that summary judgment was appropriate as to the Section 16 claim.

In Ashley Meadows II, the district court denied the plaintiff's motion for reargument of the summary judgment motion it granted in Ashley Meadows I. The plaintiff argued that the district court's first opinion had misconstrued the law in several ways, and offered, for the first time, to call expert witnesses to testify in support of its assertion that it was injured by the defendant's Mileage Rule. The district court found the proposed expert testimony to be insufficient, noting that

> [i]t is the Farm's view that it can avoid the complexity of demonstrating that its revenues would increase in the future because it asks only for injunctive relief, having chosen to abandon its damage claims. However, individual injury, whether past or future, remains the crux of a private action, and where a plaintiff is unable "to cite to any contemporaneous damages from which a reasonable inference of future damages could be drawn," the "significant threat" of injury that would entitle it to injunctive relief has not been shown.

624 F. Supp. at 858 (quoting Machovec v. Council for the Nat'l Reg. of Health Serv. Providers in Psych., Inc., 616 F. Supp. 258, 267 (E.D. Va.1985)). In Machovec, the district court granted summary judgment to the defendant in an antitrust action brought by four psychologists who were denied listing in a "National Registry" of

licensed or certified psychologists published by the defendants non-profit organization. The plaintiffs alleged that their exclusion constituted an illegal boycott and concerted refusal to deal in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and sought treble damages under Section 4 of the Clayton Act and injunctive relief under Section 16. The court granted summary judgment on the Section 4 claims on the basis of its determination that the plaintiffs' deposition testimony undermined their allegations regarding actual damages. Turning to the Section 16 claims, the court acknowledged that "to be entitled to injunctive relief, plaintiffs 'need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur' that proximately resulted from defendants' putative antitrust violations ," but concluded that

> [i]n assaying the legal sufficiency of the alleged 'significant threat of injury,' we are persuaded by plaintiffs' inability to cite to any contemporaneous damages from which a reasonable inference of future damages could be drawn. Given plaintiffs' licensure, eligibility for insurance reimbursement, successful private practices, and professional credentials, there is good reason to conclude that a § 16 'significant threat' has not been shown.

616 F. Supp. at 266-67 (quoting Zenith Radio, 395 U.S. at 130). Thus, Ashley Meadows II's statement that an antitrust plaintiff must cite contemporaneous damages in order to establish an inference of future harm is a truncation of Machovec's quotation of Zenith Radio, which made clear that Section 16 is satisfied by a demonstration of contemporary injury or by providing evidence of an impending violation of the antitrust laws likely to cause injury to the plaintiff.

Properly read, Ashley Meadows II is simply a restatement of the principle adopted by Ashley Meadows I and Merit Motors: that where the allegedly anticompetitive conduct has been ongoing for a substantial period of time, the distinction between Section 4's requirement of actual injury and Section 16's more

liberal requirement of threatened injury tends to shrink or disappear.[16] If the plaintiff cannot show itself to have suffered some actual injury of the type the antitrust laws were intended to prevent from a purportedly anticompetitive practice in which the defendant has engaged for a substantial portion of time, the plaintiff is effectively presumed to be unable to establish the existence of a threat of future injury arising from that same conduct in the future, at least absent some plausible explanation why a practice that has not created cognizable injury in the past creates a credible risk of doing so in the future if permitted to continue. The logic behind this principle is both obvious and compelling. While it would be both impractical and unfair to require a plaintiff seeking to enjoin an allegedly anticompetitive practice prior to the commencement of that practice to establish antitrust injury with the same degree of concreteness that would be required of a plaintiff seeking treble damages under Section 4 for an injury it has already suffered, it is fair and reasonable to expect a plaintiff seeking to enjoin an ongoing practice to be able to demonstrate some degree of actual injury that it has suffered from that practice, or, at least, to identify a recent or anticipated change in circumstances that might plausibly cause an antitrust injury to the plaintiff in the future if the practice is not enjoined.

The Designated Defendants are entitled to summary judgment as to the Designated Plaintiffs' Section 16 claims precisely because the Designated Plaintiffs have been unable to make such a showing here, or to identify any changed circumstances that

---

[16] This principle was also recognized in dicta by the Third Circuit in Van Dyk Research Corp. v. Xerox Corp., 631 F.2d 251 (3d Cir. 1980). In that case, the plaintiff, which had been in business for approximately eleven years, approximately seven of which were spent as an aspiring competitor of Xerox in the photocopier market, brought an antitrust action seeking damages and injunctive relief against Xerox which alleged that Xerox's monopolistic control over the relevant market was the ultimate cause of the plaintiff's financial hardships and business misfortunes, which had driven the plaintiff to file for bankruptcy. Following a bench trial, the district court granted judgment for the defendant, finding that because Xerox had "nothing to do" with the plaintiff's failed business relationships and inability to secure adequate financing, the plaintiff could not establish a causal connection between Xerox's alleged violations of the antitrust laws and the plaintiff's alleged injury. Id. at 254. The Third Circuit affirmed the district court's determination, and noted that "although injunctive relief may be appropriate where damages are not, in the circumstances present here, the failure to prove the fact of injury is conclusive as to both forms of relief." Id. at 255 n. 2 (citing Merit Motors, 569 F.2d at 668 n. 2).

would overcome the presumption that their failure to demonstrate actual injury arising from the Designated Defendants' allegedly discriminatory pricing methods indicates an absence of a plausible threat of future antitrust injury. When the Designated Plaintiffs submitted their 1995 Expert Report, the Designated Defendants' purportedly anticompetitive pricing structure had allegedly been in effect for at least 10 years. See In re Brand Name Prescription Drugs Antitrust Litig., No. No. 94 C 897, 1996 WL 167350, at *1 (Kocoras, J.) (N.D. Ill. April 4, 1996) ("Although it is not clear exactly when this cartel was allegedly formed, the plaintiffs claim that the agreements and understandings at issue date back at least as far as the early 1980s."). Yet, despite the longstanding nature of the practice, the Designated Plaintiffs were unable to demonstrate any genuine issue of material fact as to the question of their actual antitrust injury so as to survive the Designated Defendants' motion for summary judgment as to the Section 4 claims, which was granted in the January 25 Order. How, then, is it reasonable to assume that the same practice creates a credible threat of antitrust injury to the Designated Plaintiffs in the future when it has failed to inflict such injury in the past? Neither law nor equity favor granting the Designated Plaintiffs the benefit of such a remote doubt, nor is there any reason to give the Designated Plaintiffs what they are actually seeking in their renewed discovery motion and their opposition to this motion: a second opportunity to carry the evidentiary burden of demonstrating some actual injury caused by the Designated Defendants' conduct, which the Designated Plaintiffs failed to establish in their 1995 Expert Report. Having failed to submit evidence sufficient to demonstrate that they have sustained an actual antitrust injury as a result of the Designated Defendants' alleged price discrimination, the Designated Plaintiffs cannot now seek a second bite at the proverbial apple under the guise of equitable relief.

Though it ultimately chooses to follow the principle expressed by Merit Motors and the cases following it, the Court would be remiss were it not to recognize that some

tension exists between the lines of precedent herein discussed. The interpretive inconsistency of the relationship between Section 4 and Section 16 manifested by, e.g., Hayden, B-S Steel, and American Booksellers on one hand, and Merit Motors and Ashley Meadows on the other, provides scant guidance to this Court in arriving at a resolution of this motion. In the final analysis, the Court is persuaded by its reading of Cargill.

In footnote 8, the Cargill Court makes reference to an excerpt from a description of Section 16 by Representative McGillicuddy, a member of the House Judiciary Committee, who stated, in part:

> Under the present law any person injured in his business or property by acts in violation of the Sherman antitrust law may recover his damage. . . . There is no provision under the present law, however, to prevent threatened loss or damage even though it be irreparable. The practical effect of this is that a man would have to sit by and see his business ruined before he could take advantage of his remedy. In what condition is such a man to take up a long and costly lawsuit to defend his rights? The proposed bill solves this problem for the person, firm, or corporation threatened with loss or damage to property by providing injunctive relief against the threatened act that will cause such loss or damage. Under this most excellent provision a man does not have to wait until he is ruined in his business before he has his remedy. Thus the bill not only protects the individual from loss or damage, but it relieves him of the tremendous burden of long and expensive litigation, often intolerable.

Cong. Rec. 9261 (1914), quoted in Cargill, 479 U.S. at 112. As that understanding of Section 16 reveals, it was designed to complete, to supply what was missing, in the remedy provided by Section 4. The Cargill Court understood that to be the objective of Section 16 as well by observing that "Sections 4 and 16 are thus best understood as providing complimentary remedies for a single set of injuries." Cargill, 479 U.S. at 113. The phrase "single set of injuries," in that context, must surely refer to two antitrust injuries, one already suffered and vindicated under Section 4 and one antitrust injury that is inchoate, threatened to be suffered in the future. The sentence following the one quoted confirms that reading: "[a]ccordingly, we conclude that in order to seek injunctive relief under § 16, a private plaintiff must allege a threatened loss or damage

'of the type the antitrust laws were designed to prevent and that flows from that which make the defendant's acts unlawful.'" Id. (quoting Brunswick, 429 U.S. at 489).

A critical reading of the foregoing supports the view that where the "man [did not] wait until he is ruined in his business before he [had] his remedy," but, claiming that his business was ruined by the defendant's alleged antitrust violation, took advantage of his remedy under Section 4 and failed to succeed, "[i]t would be anomalous, we think, to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he [was not] entitled to compensation if the injury actually occurred." Cargill, 479 U.S. at 112.

## CONCLUSION

For the reasons stated above, the defendants' pending motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) is GRANTED. The plaintiffs' motion pursuant to Rule 59(e) to amend the January 25 Order is also GRANTED.

SO ORDERED.

Dated: December 20, 2007
Brooklyn, New York

________/s/__________
I. Leo Glasser
United States District Judge

**Counsel for the Plaintiffs**

Mary McInnis Boies
Mary Boise & Associates
Empire Building
P.O. Box Drawer 67
Suite 5
Bedford, NY 10506

William Duker
Boies Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022

Nicholas A. Gravante
Boies, Schiller & Flexner LLP
575 Lexington Avenue
7th Floor
New York, NY 10022

Steven I Froot
Boies Schiller& Flexner LLP
570 Lexington Avenue
16th Floor
New York, NY 10022

Kirk E. Chapman
Milberg Weiss Bershad & Shulman LLP
One Pennsylvania Plaza
New York, NY 10119

**Counsel for the Defendants**

Wayne A. Cross
White & Case LLP
1155 Ave Of The Americas
New York, NY 10036

Michael J Gallagher
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036

Robert A. Milne
White & Case
1155 Avenue of the Americas
New York, NY 10036-2787

Victoria L. Oswald
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036

Robert M. Grass
Kaye, Scholer, Fierman, Hays & Handler
425 Park Avenue
New York, NY 10022

John Treece
Sidley, Austin, Brown & Wood
Bank One Plaza
10 S. Dearborn Street
Chicago, IL 60603

Saul Morgenstern
Kay Scholer LLP
425 Park Avenue
New York, NY 10022

David S. Copeland
Kaye, Scholer, Fierman, Hays & Handler
425 Park Avenue
New York, NY 10022

Mark S. Stewart
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103

Leslie Ellen John
Ballard Spahr Andrews & Ingersoll
1735 Market Street
51st floor
Philadelphia, PA 19103

Stephen Joel Kastenberg
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

James C. Egan
Clifford, Chance, Rogers & Wells LLP
2001 K Street, N.W.
Washington, DC 20006

Paul E. Slater
Sperling E. Slater, P.C
55 West Monroe Street
Suite 3200
Chicago, IL 60603

John C. Dodds
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

Scott Alan Stempel
Morgan, Lewis & Bockius
1111 Pennsylvania Ave., N.W.
Washington, DC 20004

Victoria Lee Smith
Stinson, Morrison, Hecker, LLP
1201 Walnut
Suite 2900
Kansas City, MO 64106

William F. Cavanaugh
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DRUG MART PHARMACY CORP., et al.,

Plaintiffs,

-against-

AMERICAN HOME PRODUCTS CORP., et al. ,

Defendants.

MEMORANDUM & ORDER
93-CV-5148 (ILG)

GOLD, STEVEN M., U.S.M.J.:

Now pending before the Court is a motion for summary judgment brought by defendants seeking dismissal of Robinson-Patman Act claims asserted by twenty-eight plaintiffs. Docket Entry 677. The parties have consented to have defendants' motion decided by the undersigned Magistrate Judge. Docket Entry 683. For the reasons stated below, defendants' motion is granted.

This complex, long-pending antitrust litigation has been the subject of numerous written decisions by various courts. A sampling of those decisions is listed in *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 390 (E.D.N.Y. 2007).[1] Accordingly, familiarity with the facts and procedural background of the case is presumed, and is reviewed here only briefly.

In short, plaintiffs are a number of individually-owned retail pharmacies.[2] Plaintiffs allege that defendants, five manufacturers of brand name prescription drugs ("BNPDs"), offered

---

[1] *See also Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 378 F. Supp. 2d 134 (E.D.N.Y. 2005); *In re Brand-Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d 1372 (Jud. Pan. Mult. Lit. 2003); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1997); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 240537 (N.D. Ill. May 27, 1994).

[2] Plaintiffs originally consisted of 3,700 retail pharmacies operating at 3,987 locations. Def. R.56.1 ¶ 9, Docket Entry 679; Pl. R.56.1 ¶ 9, Docket Entry 685. As of March, 2010, 894 retail pharmacies remained as plaintiffs

discounts and rebates to plaintiffs' competitors but not to plaintiffs, and that this constitutes price discrimination in violation of the Robinson-Patman Act.

**BACKGROUND**

*A. Early Procedural History*

At the beginning of this case, a variety of plaintiffs including chain stores as well as individually-owned retail pharmacies brought antitrust claims under both the Robinson-Patman Act, 15 U.S.C. § 13, and the Sherman Act, 15 U.S.C. § 1. The case was consolidated for all pretrial purposes as a multi-district litigation in the Northern District of Illinois. Def. R.56.1 ¶ 10. *See also In re Brand-Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d 1372 (Jud. Pan. Mult. Lit. 2003).

Each of the chain store plaintiffs settled its claims years ago. A Sherman Act class of individually-owned retail pharmacies was certified in 1994. *In re Brand-Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d at 1374. The plaintiffs in this action opted out of the class. The Sherman Act class plaintiffs settled their claims against several of the defendants and proceeded to trial before United States District Judge Kocoras in the Northern District of Illinois against the others. The Court entered a directed verdict in defendants' favor after trial. *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 WL 639173, at *2 (N.D. Ill. Aug. 17, 1999); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 WL 33889 (N.D. Ill. Jan. 19, 1999) (granting defendants judgment as a matter of law).

---

pursuing damages. Docket Entry 615. In June 2010, plaintiffs stipulated to the dismissal of claims by 3,101 pharmacy locations. Docket Entry 626.

The five defendants remaining in the action are (1) Abbott Laboratories, (2) Johnson & Johnson, (3) Novartis Pharmaceuticals Corp. (formerly Ciba-Geigy and Sandoz), (4) Pfizer Inc. (including two indirect wholly-owned subsidiaries: G. D. Searle LLC, formerly known as G. D. Searle & Co., and Pharmacia & Upjohn Company LLC, formerly known as Pharmacia & Upjohn Company), and (5) Rhone-Poulenc Rorer, Inc. ("RPR") and Hoechst Marion Roussel, Inc., ("HMR"), whose parent companies merged in 1999. Def. Mem. 1 n.1, Docket Entry 678.

On April 21, 1995, Judge Kocoras issued a case management order referred to as Pretrial Order No. 5 ("PTO 5"). This Order called upon the parties to identify twenty of the retail pharmacies that had opted out of the class action and five of the defendants to serve as representative or "Designated Parties." Pursuant to the terms of the Order, discovery was stayed as to the non-designated parties until the conclusion of the first trial of a designated plaintiff's Robinson-Patman claim; upon the expiration of the stay, the non-designated plaintiffs would have eight months to complete fact and expert discovery on their Robinson-Patman Act claims. PTO 5 ¶ 5.

Both the Sherman and Robinson-Patman Act claims of the individual retail pharmacies that opted out of the class were remanded and consolidated before this Court sometime after the entry of Pretrial Order No. 5. In 2005, the parties settled their Sherman Act claims, leaving only plaintiffs' Robinson-Patman claims pending. Docket Entry 519. Apparently anticipating this possibility, Pretrial Order Number 5 provides that any damages recovered by a plaintiff who proceeds to trial on a Robinson-Patman Act claim must be reduced by any portion of those damages previously recovered in connection with the resolution of the plaintiffs' Sherman Act claims. PTO 5 ¶ 11.

*B. Dismissal of Designated Plaintiffs' Robinson-Patman Act Claims*

When the claims of the individual retail pharmacies were first transferred here, discovery had proceeded, as provided by PTO 5, only with respect to the designated parties. Once the Sherman Act claims of all of the remaining parties were settled, the designated defendants moved for summary judgment on the Robinson-Patman Act claims of the designated plaintiffs.

In 2007, Senior United States District Judge I. Leo Glasser granted defendants' motion for summary judgment "relating to the [seventeen] representative plaintiffs' claims under the

Robinson-Patman Act . . . on the ground that plaintiffs have failed to show they are entitled to damages." *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 420-21 (E.D.N.Y. 2007) ("*Drug Mart II*").[3] At that time, the designated plaintiffs were relying on an expert report that calculated damages based in part on the fact that plaintiffs paid more for BNPDs than favored purchasers did, and on generalized evidence indicating that the share of the market for BNPDs served by favored purchasers had grown while at the same time individual retail pharmacies had lost market share. Judge Glasser rejected plaintiffs' reliance on the fact of a price differential "[b]ecause damages may not be based on the pricing margin caused by the discrimination, but [should be calculated based] on the estimates of plaintiffs' sales absent the discrimination." *Id.* at 427. With respect to plaintiffs' evidence of lost market share, Judge Glasser held that "[u]nder the Robinson-Patman Act, plaintiffs must carry their burden of proof to demonstrate that they *individually* suffered damages. . . . [H]ere, plaintiffs have failed to proffer evidence that specific plaintiff pharmacies lost sales of BNPDs manufactured by defendants to any specific favored purchaser." *Id.* at 429 (emphasis added).

Having obtained summary judgment with respect to damages, defendants next sought dismissal of the designated plaintiffs' claims for injunctive relief. Judge Glasser granted defendants' motion for summary judgment, reasoning that, under the particular circumstances presented here, plaintiffs' failure to establish damages was fatal to their injunctive relief claims. *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007) ("*Drug Mart III*").

*C. Discovery Proceedings Culminating in the Pending Motion*

Pretrial Order No. 5 provides that judgments entered after trial or other dispositions of the claims of designated parties do not have res judicata or collateral estoppel effect on the claims of

[3] "*Drug Mart I*," a decision not directly relevant here, is reported at 378 F. Supp. 2d 134 (E.D.N.Y. 2005).

non-designated parties. PTO 5 ¶ 12. Thus, while Judge Glasser's rulings with respect to the designated plaintiffs are uniquely relevant and highly persuasive precedent, they neither bar nor resolve the claims of the non-designated plaintiffs.

After Judge Glasser dismissed the claims of the designated parties, approximately 3,700 individual retail pharmacy plaintiffs remained. Def. R.56.1 ¶ 19. Confronted with Judge Glasser's decision, these remaining plaintiffs devised a plan to gather evidence in discovery that might show "that specific plaintiff pharmacies lost sales of BNPDs manufactured by defendants to any specific favored purchaser." *Drug Mart II*, 472 F. Supp. 2d at 429. Pursuant to this plan, which came to be known as the "matching process," plaintiffs compiled lists of specific BNPD customers who no longer purchased drugs from them, and then searched the databases of non-party favored purchasers (and one favored purchaser who is a party) to see whether those same individuals were obtaining the same BNPDs from those favored purchasers. The significance of the data developed by the matching process is at the heart of the pending summary judgment motion.

The precise contours of the matching process evolved over time. Indeed, although as noted above Pretrial Order No. 5 contemplated that the non-designated parties would complete fact and expert discovery within eight months, the matching process took considerably longer than that; the process was not completed until May, 2011. Docket Entry 666-1 ¶ 3.

The first conference at which the matching process was discussed in any detail was held on March 4, 2009. At that time, I pressed plaintiffs to explain how they intended to prove that they sustained damages or injury as a result of defendants' price discrimination:

> [I]f you're not going to have a patient-specific theory, then I think you need to say so, live with it, and let the defendants test it if they want to. If you are going to have a patient-specific theory, then identify the patients and ask the third parties what records they have of those patients and

> produce your list of patients in an electronic form that's compatible with the third parties from whom you're seeking discovery so that they can cheaply and efficiently tell you which of your former patients are now patients of theirs.

3/4/09 Tr., Docket Entry 586, at 10. In response, plaintiffs represented that they would base their case upon evidence that specific customers were lost to particular favored purchasers:

> [W]e are not suggesting that we would do anything other than put forth patient-specific information. And we're not proposing any kind of extrapolations or use of aggregate data or anything like that. . . . As a pharmacist sits in his pharmacy as a plaintiff in this case, he is able to identify a certain universe of patients who he reasonably believes, based on his own personal knowledge and his own business records, is a lost customer in the sense that we mean it in this litigation, because he knows that that particular patient was getting a long-term maintenance drug from him for a period of years, and that patient is now in a plan where there is a mail-order pharmacy option, and the patient is now getting his maintenance drugs, or some of them at least, filled by the mail-order pharmacy.

*Id*. at 13-14.

Several court conferences were held to address the details of the matching process and how it would be executed. One such conference was held on November 13, 2009. At that time, plaintiffs reported that they had identified 1.2 million customers who had been purchasing specific BNPDs from 500 plaintiffs but were no longer doing so. Based on that preliminary data, plaintiffs surmised that "at the end of the day we're going to have some material number that isn't going to be three for a pharmacy, or five for a pharmacy." 11/13/09 Tr., Docket Entry 604, at 16.

Yet another conference was held on March 24, 2010. Plaintiffs' counsel reported that it had now become clear that only 894 of the original 3,700 retail pharmacy plaintiffs would be able to identify customers they believed they had lost to favored purchasers. 3/24/10 Tr., Docket Entry 616, at 4. Counsel predicted at that time that these 894 retail pharmacies would

demonstrate, through the matching process, that they had lost millions of transactions to favored purchasers. *Id.* at 6. In June 2010, the claims of 3,101 pharmacy locations were dismissed with prejudice by stipulation. Def. R.56.1 ¶ 59; Stipulation of Dismissal, Docket Entry 626.

Another court conference was held after the matching process data had been analyzed and before defendants brought this motion for summary judgment. At that time, plaintiffs raised the possibility that they would seek additional discovery before the motion was made. 8/11/11 Tr., Docket Entry 667, at 26. Although I afforded plaintiffs an opportunity to apply to take additional discovery, *id.*at 26-27, they never did so.

*1. The Matching Process*

The parties ultimately entered into a stipulation that states in pertinent part that,

> after compiling a database of potential lost customers from their data, Plaintiffs have undertaken a so-called 'matching process' to identify which of those potential lost customers may have filled prescriptions at one of five so-called favored purchasers: Caremark, AdvancePCS, Express Scripts, and Medco (collectively, the "PBMs"), and Omnicare, a long-term care pharmacy. ***The matching process was designed to determine the universe of potential lost customers that Plaintiffs claim they lost as a result of the pricing practices of Defendants*** and was subject to the following limitations: (i) the universe of so-called favored purchasers was limited to the four PBMs and Omnicare; (ii) the universe of BNPDs was limited to manufacturer Defendants' top-selling maintenance drugs; and (iii) the time periods searched were limited to data currently maintained by the PBMs and the Plaintiffs.[4]

Stipulation ¶ 1, Docket Entry 666-1 (emphasis added).

In April, 2010, plaintiffs produced a list of potential lost customers from 831 pharmacy locations.[5] Def. R.56.1 ¶ 58. In light of the voluminous data involved and the expense of comparing plaintiffs' lists with those of the favored purchasers, a subset of thirty plaintiffs was randomly selected to participate in the first round of the matching process. Def. R.56.1 ¶ 62.

[4] "PBMs" are pharmacy benefit managers. Def. R.56.1 ¶ 39.
[5] Plaintiffs had previously produced a list of approximately 2,770,426 potential lost customers for 500 pharmacies. Def. R.56.1 ¶ 50.

Two of the thirty plaintiffs subsequently dismissed their claims, leaving twenty-eight pharmacies involved in the matching process. Def. R.56.1 ¶¶ 63, 64. These plaintiffs then compared their database of lost customers with electronically stored customer lists, some going back as far as 1998, from the five favored purchasers whose data were examined as part of the matching process. Def. R.56.1 ¶¶ 40, 66. The matching process employed the following criteria:

> If the alleged favored purchaser's data showed a mail order fill of the same drug (say, drug x) for a matched patient within six months of the last fill at the Plaintiff pharmacy, the transaction was . . . counted as a match. Any subsequent prescriptions for drug x, or a therapeutic alternative, were . . . counted as matches against the manufacturer of drug x as well.

Def. R.56.1 ¶ 67.

When the matching process was finally completed, the results were considerably less impressive than plaintiffs had anticipated. *See* 3/23/12 Tr., Docket Entry 700, at 53 (plaintiffs' counsel's acknowledgement that they expected to see more matches). As stated by defendants, the twenty-eight pharmacies participating in the matching process had identified from their own records approximately 164,501 potential lost customers for 168 BNPDs over a twelve-year time frame from 1998 to 2010.[6] Def. R.56.1 ¶ 65. *See also* Plaintiffs' Letter dated 5/29/09, Docket Entry 594 (identifying 168 BNPDs and a time frame applicable to each). When plaintiffs' data was compared to the data of the five favored purchasers, approximately 5,500 matched potential lost customers and 17,346 matched potential lost transactions were identified.[7] Def. R.56.1 ¶¶ 79, 80 (identifying 5,515 matched customers); *id.* ¶ 89 (identifying 5,454 matched customers);

---

[6] For purposes of statistical analysis, defendants point out that the equivalent of ten years of data was collected and analyzed. Herscovici Decl. ¶ 13. Plaintiffs originally identified thirteen favored purchasers and three distributors. Tietjen Decl. Ex. 6, Docket Entry 686. Three of the favored purchasers were able to produce data beginning from 1998. Pl. R.56.1 ¶ 66. Express Scripts matched data beginning from January, 2002; Advance PCS collected data from January, 2006. *Id.* Plaintiffs contend that Express Scripts, Medco and CVS/Caremark currently account for 50% of the PBM marketplace. Pl. Opp. at 7 n.19, Docket Entry 684.

[7] Although defendants challenge several aspects of the results of the matching process as calculated by plaintiffs, I rely – as do defendants in large part – on plaintiffs' tabulations of matched lost customers for purposes of deciding the pending motion.

Herscovici Decl. ¶ 5 & n.3.[8] Plaintiffs further refined the results of the matching process, and by the time they submitted their opposition to defendants' summary judgment motion, plaintiffs had calculated a total of 5,147 lost customers and 15,043 lost transactions. Plaintiffs' Memorandum in Opposition ("Pl. Opp."), Docket Entry 684, at 22.

Some plaintiffs could not identify any matched customers at all with respect to BNPDs manufactured by one or more defendants, and those plaintiffs voluntarily dismissed their corresponding claims. Stipulation and Order of Dismissal, Docket Entry 697; Pl. Opp. 22 (identifying individual pharmacies with zero matching results). *See also* 3/23/12 Tr. at 60. In addition, each of the more than 800 remaining plaintiffs has voluntarily dismissed its claims against defendant Hoffman La Roche as a result of the minimal number of matches with respect to this defendant by the twenty-eight plaintiffs. Docket Entry 694.

As demonstrated by these results, only approximately 3% (5,147 of 164,501) of the potential lost customers plaintiffs culled from their own records could be "matched" to a customer who subsequently filled the same prescriptions with one or more favored purchasers. This implies, of course, that 97% of the customers plaintiffs identified as lost based upon their own records could not be found in the databases of favored purchasers searched during discovery. Moreover, even these figures are substantially reduced if the 2,586 lost customers claimed by plaintiff Pharma-Card are excluded; as discussed below, Pharma-Card's results include a large number of customers claimed by plaintiffs but not identified by the matching process.

The results are even less significant when considered in context. Defendants, relying on data reported by the National Community Pharmacists Association, point out that independent

[8] "Herscovici Decl." refers to the Declaration of Steven Herscovici, Ph,D., submitted in support of defendants' motion for summary judgment, Docket Entry 681.

retail pharmacies filled between 22,000 and 28,000 BNPD prescriptions per year during the period of time relevant to the matching process.[9] In contrast, the data from the matching process reveals that, on average, each plaintiff pharmacy lost less than 200 (5,147/28) customers and only approximately 537 (15,043/28) transactions over the entire period examined by the matching process, or approximately 18 customers and 54 transactions per year. Pl. Opp. 22-24. This average loss of 54 transactions per year is only about one quarter of one per cent of the more than 20,000 BNPD transactions conducted per year by the average retail pharmacy.

The de minimus nature of these results is further illustrated when they are broken down and analyzed by defendant. According to defendants, when examined in this manner, the results are that approximately 88% of plaintiffs' claims against particular defendants are based on five or fewer lost customers per year. Joint Memorandum of Law in Support of Individual Defendants' Motions for Summary Judgment," Docket Entry 678 ("Def. Mem.") at 3.[10] On the other hand, plaintiffs calculate that, excluding the dismissed claims, approximately 31% of plaintiffs' remaining claims against particular defendants are based on five or fewer lost customers per year. Pl. Opp. at 22.

Many pharmacies lost no more than ten customers per defendant over the relevant twelve-year time period, or less than one customer per year. For example, 19 of the 28 pharmacy plaintiffs could identify only ten or fewer matched Novartis (formerly Ciba-Geigy and Sandoz) customers over the entire ten-plus year period, or less than one lost customer per year. Pl. Opp.

[9] Although plaintiffs note that the five favored purchasers that were searched as part of the matching process account for only 50% of the PBM marketplace, and that only the most common prescription drugs were included in the search protocol, plaintiffs offer no alternative base figure for comparison.

[10] After defendants submitted their summary judgment motion, plaintiffs further refined their results and dismissed some of their claims. Defendants then filed an amended memorandum of law to reflect plaintiffs' changes to the matching results. Docket Entry 698. In the amended memorandum, defendants calculate that 87% of plaintiffs' claims are based on five or fewer lost customers per year. Docket Entry 698-1 at 10.

at 22. The following chart summarizes the de minimus number of lost customers with respect to each of the defendants:

| **Defendant** | **No. of pharmacies with 10 or less lost customers total** | **Percentage of pharmacies with 10 or less lost customers** | **No. of pharmacies that lost only 1 customer total** | **No. of dismissed claims for zero matches** |
|---|---|---|---|---|
| Abbott | 16 | 57% | 5 | 3 |
| Novartis | 19 | 68% | 3 | 1 |
| Johnson & Johnson | 18 | 64% | 6 | 4 |
| Upjohn/Pfizer | 4 | 14% | 0 | 1 |
| Hoechst Marion Roussel (Marion Merrell Dow)/Rhone Poulenc Rorer (“HMR (MMD)/RPR”) | 12 | 43% | 2 | 2 |
| **Total** | 69 | 49% | 16 | 11 |

Pl. Opp. at 22. Excluding Upjohn, the defendant that consistently had the highest number of matches, and Pharma-Card, which I conclude for reasons discussed below has substantially overstated its results, none of the plaintiff pharmacies lost more than 50 total customers per defendant over the relevant twelve-year time period, or less than five customers per year per defendant. *Id.*

When examined on a per-plaintiff basis – again, with the arguable exception of plaintiff Pharma-Card – similarly insignificant results are obtained. Even Klein’s Pharmacy, the plaintiff with the highest number of lost transactions identified by the matching process, lost a total of only 2,521 transactions, or approximately 252 transactions per year. Pl. Opp. at 23. This

amounts to only slightly more than 1% of the total BNPD transactions conducted by an average retail pharmacy during any one year (252/22,000).

In short, no matter how analyzed, the matching process identified only a de minimus number of lost customers and transactions.

*2. Plaintiff Pharma-Card Prescription Services*

As noted above, plaintiff Pharma-Card claims to have lost a large number of customers other than those identified by the matching process. More specifically, Pharma-Card asserts that it lost approximately 2,586 customers as a result of defendants' price discrimination, or nearly half of the 5,500 lost customers claimed by all 28 of the plaintiffs.[11] Def. R.56.1 ¶ 89. Most of these customers, however, were not identified by the matching process, but were instead added to the results manually by plaintiffs based upon the belief held by Pharma-Card's employees that certain customers were lost to favored purchasers because of defendants' price discrimination. *Id.* ¶ 85(a) (denied by plaintiffs); *see* Pl. Opp. at 17-19. Almost 2,000 of these customers were submitted for matching, but only five were identified in the records of the favored purchasers as having filled subscriptions for BNPDs with them. Def. R.56.1 ¶¶ 90-91; Def. Mem. at 28-29. Moreover, at least during part of the twelve-year period covered by the matching process, Pharma-Card operated at fourteen separate retail locations. Pl. Opp. at 17. Even if all 2,586 customers were properly included in the matching process results, it would show only that approximately 184 customers were lost per retail location, or that Pharma-Card lost only about 18 customers per year at each of its locations.[12]

[11] In their memorandum in opposition to summary judgment, plaintiffs contend that Pharma-Card lost 2,773 customers. Pl. Opp. at 22.

[12] Pharma-Card identified a total of 1,669 lost transactions through the matching process. Pl. Opp. at 23. I presume that the number of claimed lost transactions is smaller than the number of lost customers because lost transactions were determined solely from the matching process and not manually supplemented. Even if Pharma-Card operated at a single retail location, this would amount to approximately 160 lost transactions per year, a tiny sum when compared to the more than 22,000 BNPD transactions conducted annually by the average retail pharmacy.

*3. Other Evidence of Damages*

Finally, plaintiffs seek to rely on their own affidavits in which they claim to have lost customers and transactions in addition to those identified through the matching process. Teitjen Decl., Docket Entry 686, Exs. 20-48. These affidavits are not properly considered as evidence of plaintiffs' lost sales for at least two reasons. First, plaintiffs offer no convincing explanation for the failure of the matching process to identify the lost customers referenced in these affidavits.[13] Second, and perhaps most significantly – and this applies with equal force to those Pharma-Card customers that were manually added to the matching process results – plaintiffs entered into a stipulation, filed with the Court on August 8, 2011, explicitly providing that the matching process would "determine ***the universe*** of potential lost customers that Plaintiffs claim they lost as a result of the pricing practices of Defendants."[14] Stipulation ¶ 1, Docket Entry 666-1 (emphasis added).

## DISCUSSION

*A. Standards Governing Summary Judgment*

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In reaching a summary judgment determination, the court must resolve ambiguities and draw reasonable inferences in favor of the nonmoving party. *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

---

[13] Plaintiffs do contend that some customers were lost to favored purchasers other than those whose data was used in the matching process. Pl. Opp. at 15, 19. It was plaintiffs, though, who selected the favored purchasers whose data would be included.

[14] In addition, reports of customers as related by pharmacy employees are arguably hearsay. *See, e.g.*, Teitjen Decl. Ex. 20, Tallman Aff. ¶ 8 & Ex. B at 4; *id.* Ex. 23, Mouret Aff. ¶ 10; *id.* Ex. 29, Ellison Aff. ¶ 10. However, the Second Circuit has explicitly permitted testimony of the same type pursuant to Federal Rule of Evidence 803(3) when offered in antitrust cases to prove customers' motives. *Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs, Inc.*, 635 F.2d 118, 128 (2d Cir. 1980); *Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 914 (2d Cir.), *cert. denied*, 369 U.S. 865 (1962).

Two additional principles inform my review of defendants' motion. First, the Second Circuit has held that "summary judgment is particularly favored [in antitrust cases] because of the concern that protracted litigation will chill pro-competitive market forces." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002) (citing *Tops Mkts, Inc. v. Quality Mkts, Inc.*, 142 F.3d 90, 95 (2d Cir. 1998)). *See also Am. Banana Co., Inc. v. J. Bonafede Co., Inc.*, 407 Fed. App. 520, 522 (2d Cir. 2010). The Circuit stressed in *Pepsico* that a party may demonstrate that it is entitled to summary judgment by pointing to an absence of evidence to support the nonmoving party's case. *PepsiCo*, 315 F.3d at 105.

Second, the Supreme Court, in its most recent decision addressing the Robinson-Patman Act, urged lower courts to construe the Act narrowly.[15] *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 181 (2006). The Court cited its much earlier decision in *Automatic Canteen Co. of America v. FTC*, 346 U.S. 61, 63 (1953), which it described as "cautioning against Robinson-Patman constructions that extend beyond the prohibitions of the Act and, in doing so, help give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation." *Id.* at 181. Even Justice Stevens, who dissented in *Volvo*, noted that the Act "may well merit [noted antitrust law scholar] Judge [Robert] Bork's characterization as 'wholly mistaken economic theory.'" 546 U.S. at 187. *See also Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 227 (3d Cir. 2008) (describing the Supreme Court's decision in *Volvo* as narrowly construing the Robinson-Patman Act).

[15] The Court has, on other occasions, stated that the Robinson-Patman Act should be construed liberally and "broadly to effectuate its purpose." *Abbott Labs. v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1, 11 (1976), *quoted in Jefferson Cnty. Pharm. Ass'n, Inc. v. Abbott Labs.*, 460 U.S. 150, 159 (1983). Although *Volvo* does not disavow these prior decisions, the *Volvo* decision does seem to place more emphasis on the possible anti-competitive effects of the Robinson-Patman Act than prior decisions. At least one scholar has noted that the Robinson-Patman Act has "come into disfavor" during the last quarter century. Daniel J. Gifford & Robert T. Kudrle, *The Law and Economics of Price Discrimination in Modern Economies: Time for Reconciliation?*, 43 U.C. DAVIS L. REV. 1235, 1269 (2010).

With this guidance in mind, I now consider whether plaintiffs' evidence, revealing as it does that plaintiffs lost only a trivial number of customers and sales to favored purchasers, is nevertheless sufficient to support a Robinson-Patman Act claim. For the reasons explained below, I conclude that it is not.

*B. The Robinson-Patman Act*

Section 2(a) of the Robinson-Patman Act (the "Act"), an amendment to the Clayton Act, renders it

> unlawful for any person engaged in commerce, . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).[16]

To succeed on a Robinson-Patman claim, a plaintiff must establish: "(1) that seller's sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 141 (2d Cir. 1998). As is frequently the case, only the fourth element – proof of what is referred to as "competitive injury" – is at issue here.[17] Indeed, as the Second Circuit has stated,

> [t]he language in Section 2(a) relating to injury to competition is the key to the legality of most differential pricing practices and has engendered significant legal authority as courts have struggled to determine what

[16] Plaintiffs also assert claims pursuant to Sections 2(d) and 2(f) of the Robinson-Patman Act, discussed *infra*.
[17] Defendants do not contest, for purposes of the pending motion, plaintiffs' allegations of discriminatory pricing. Indeed, the Seventh Circuit, ruling on appeal from a grant of judgment as a matter of law against the plaintiff class, stated that "the manufacturers of brand name prescription drugs engage in price discrimination . . . . Everyone knows this." *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 786 (7th Cir. 1999).

> degree and type of market consequences will constitute the proscribed statutory effect on competition in various commercial situations.

*George Haug Co.*, 148 F.3d at 141.

A plaintiff seeking damages under the Act must not only demonstrate a competitive injury as required by the Act itself, but must also satisfy Section 4 of the Clayton Act, 15 U.S.C. § 15, by establishing an "antitrust injury." *Id.* at 422-24. That is because the Robinson-Patman Act does not provide for a private right of action; instead, "the private right of action for a § 2(a) Robinson-Patman Act claim, as for all private plaintiff antitrust rights of action, is provided by § 4 of the Clayton Act." *Drug Mart II*, 472 F. Supp. 2d at 422. The "antitrust injury" requirement "compels plaintiffs to show that they were in fact injured by price discrimination, that the injury is of the type the Act was intended to prevent, and that the injury is causally connected with the violation of the Act." *Id.* at 423 n. 44 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977)).

In enacting Robinson-Patman, "Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chainstores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand." *Volvo*, 546 U.S. at 175. The purpose of the Act is to prohibit "price discrimination only to the extent that it threatens to injure competition." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993). The Supreme Court emphasized this point in *Volvo,* where it warned against "interpretation[s of the Act] geared more to the protection of existing *competitors* than to the stimulation of *competition*." 546 U.S. at 181 (emphasis in original).[18]

---

[18] In opposing summary judgment, plaintiffs cite cases suggesting that a showing of injury to a competitor is sufficient to establish competitive injury, even in the face of proof that competition remains healthy. Pl. Opp. at 40 (citing *Chroma Lighting v. GTE Products Corp.*, 111 F.3d 653, 657 (9th Cir. 1997) (referring to "Congressional

The parties' submissions do not directly address whether defendants' pricing practices have had any impact on the competitiveness of the market for BNPDs. For example, neither side has presented any evidence regarding whether or how defendants' discount and rebate programs have affected the availability of BNPDs to patients or the amounts patients, or their health insurance providers, must pay for them. Rather, both sides focus on whether the injury, or lack thereof, sustained by plaintiffs is sufficient to demonstrate competitive or antitrust injury. Because the parties have not addressed the impact on competition generally, and because it is difficult to conceive of an adverse impact on competition absent a significant diversion of sales, I do not separately consider whether defendants' pricing practices have adversely affected competition in the market for BNPDs from a consumer's point of view.

*1. Competitive Injury*

There are "three categories of competitive injury that may give rise to a Robinson-Patman Act claim: primary line, secondary line, and tertiary line." *Volvo*, 546 U.S. at 176. This case, like *Volvo*, involves a secondary line claim, or a claim of "price discrimination that injures competition among the discriminating seller's customers," described as "'favored' and 'disfavored' purchasers."[19] *Id.* "A hallmark of the requisite competitive injury [in a secondary line claim] . . . is the diversion of sales or profits from a disfavored purchaser to a favored purchaser." *Id.* at 177. In other words, and as plaintiffs' commitment to the matching process

intent to protect individual competitors, not just market competition") and *J.F. Feeser, Inc. v. Serv-a-Portion, Inc.*, 909 F.2d 1524, 1535 (3rd Cir. 1990) (holding that "evidence of injury to a competitor may satisfy the component of competitive injury necessary to show a violation of the Robinson-Patman Act")). *See also Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1418 n.6 (11th Cir. 1990) (citing cases and finding that "the legal focus of the competitive injury inquiry is on the competitor, not the consumer"). The language from *Volvo* quoted in the text raises a question about the continued viability of these holdings.

[19] A plaintiff seeking to establish competitive injury in a secondary-line case must prove that it was a disfavored purchaser engaged in actual competition with a favored purchaser(s) at the time of the price differential. *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 (2d Cir. 1987). Defendants apparently do not dispute, at least for purposes of this motion, that plaintiffs and the favored purchasers whose data was used in the matching process were in competition.

reflects, a Robinson-Patman Act claimant may not rely on the effect of price discrimination on the market generally. Rather,

> [t]he plaintiff disfavored purchaser must show that it lost customers or profits because the favored purchaser used its favored advantage either to lower its resale prices or otherwise to attract business. It is for that reason that a plaintiff asserting a claim under the Act must proffer individualized proof of lost customers or profits as against each defendant.

*Drug Mart I*, 378 F. Supp. 2d at 139. *See also O'Connell v. Citrus Bowl, Inc.*, 99 F.R.D. 117 (E.D.N.Y. 1983) (denying plaintiffs' motion for class certification of Robinson-Patman Act claims because each putative class member's proof of competitive injury would be highly individualized).

The Robinson-Patman Act prohibits price discrimination only "where the effect of such discrimination may be substantially to lessen competition." 15 U.S.C. § 13(a). Applying this statutory language, the Supreme Court in *Volvo* held that an automobile manufacturer defendant was entitled to judgment as a matter of law following a jury verdict in favor of a plaintiff car dealer. In *Volvo*, the plaintiff car dealer claimed that, with respect to certain trucks designed to a customer's specifications, defendant Volvo offered other dealers more favorable price concessions than it received. Plaintiff's difficulty in establishing a Robinson-Patman Act violation stemmed from the fact that he rarely competed with other Volvo dealers over the same truck customers. In fact, plaintiff was able to present evidence of only two occasions over five years when it competed against another Volvo dealer for a particular sale, and a "loss of only one sale of 12 trucks that would have generated $30,000 in gross profits." 546 U.S. at 180. While the Court focused primarily on the absence of proof that Volvo dealers simultaneously competed with each other for the same retail customers, it also indicated that the limited evidence of lost sales presented by the plaintiff was insufficient to establish competitive injury, stating that "if

price discrimination between two purchasers existed at all, it was not of such magnitude as to affect substantially competition between [plaintiff] and the 'favored' Volvo dealer." *Id.* *See also United Magazine Co., Inc. v. Curtis Circulation Co.*, 279 Fed. Appx. 14, 17-18 (2d Cir. 2008); *Interstate Cigar Co. Inc. v. Sterling Drug Inc.*, 655 F.2d 29, 31 (2d Cir. 1981) (stating that plaintiffs failed to establish that any price discrimination or discount to a favored purchaser "would tend to lessen competition substantially").

Other courts have similarly rejected Robinson-Patman Act claims for failure to demonstrate a substantial anti-competitive impact. For example, the Fifth Circuit, on remand from the Supreme Court, rejected another car dealer's claim because, among other things, the plaintiff failed to establish that the incentive programs he challenged were likely to have a substantial effect on competition. *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575, 581 (5th Cir. 1982). In words directly applicable to defendants' pending motion, the Fifth Circuit stated:

> In order to show a violation of Section 2(a) of the Robinson-Patman Act a plaintiff must demonstrate the likely effect of the alleged price discrimination was to allow a favored competitor to draw significant sales or profits away from him, the disfavored competitor.

670 F.2d at 580. *See also O'Connell*, 99 F.R.D. at 122 (favorably citing the language from *J. Truett Payne* quoted above). In *Boise Cascade Corp. v. Federal Trade Commission*, 837 F.2d 1127 (D.C. Cir. 1988), a contention of competitive injury was rejected in part because the number of accounts (162) that switched from the disfavored purchasers to the favored purchaser "was quite small." 837 F.2d at 1145. *See also Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1171 (7th Cir. 1978) (dismissing primarily because of a lack of competition between plaintiff and any favored purchaser for the same customers and stating that a plaintiff who "has not alleged that its sales lost due to secondary price discrimination were more than 'de

minimus'" has failed to establish a cognizable competitive injury); *Erickson's Flooring & Supply Co. v. Basic Coatings, Inc.*, 2007 WL 3036747, at *6 (E.D. Mich. Oct. 15, 2007) (finding that "only one instance of discriminatory pricing towards one other distributor in relation to only one customer [was insufficient]. Indeed, Plaintiff's claim is weaker than the one pressed in *Volvo Trucks*, because Plaintiff does not claim that the allegedly lower prices given to Erickson's Decorating even cost it any sales; it alleges that this discrimination hurt its profit margin at only one point in time, in relation to only one customer. . . . Plaintiff has provided no evidence that the alleged price concession might have had anything approaching a "substantial" effect on competition."). Here, the effect of defendants' pricing practices has been carefully measured, and the results undermine any contention that plaintiffs have suffered a significant loss of sales.

The decision in *De Modena v. Kaiser Foundation Health Plan, Inc.*, 743 F.2d 1388 (9th Cir. 1984), *cert. denied*, 469 U.S. 1229 (1985), is of particular interest because it involved, like this case, allegations of price discrimination in the market for prescription drugs. Defendants in *De Modena* operated health plans that provided medical care to their members in return for monthly dues. The services defendants provided to their members included a prescription drug plan. Plaintiffs, retail pharmacies, brought Robinson-Patman Act claims, contending that defendants were able to acquire drugs at discriminatorily low prices. The Court in *De Modena* held that, with respect to drugs provided to their own members, defendants were protected from liability by an exception to the Robinson Patman Act applicable to transactions made by non-profit institutions for their own purposes. The court found, though, that defendants also made sales to "walk-in" customers who were not their members, and that these sales were thus not covered by the "own purposes" exception described above. The district court dismissed plaintiffs' claim despite these walk-in sales on the grounds that they constituted less than one

percent of defendants' total drug sales and were therefore de minimus. The Ninth Circuit reversed, but not on the ground that the district court wrongly concluded that a de minimus number of sales is not actionable; rather, the Ninth Circuit held that whether the sales at issue were de minimus or not should be determined by measuring their effect on competition, not by calculating the portion of defendants' sales they represented. 743 F.2d at 1394-95. Indeed, if a de minimus number of diverted sales were sufficient, it would not matter how they were measured, and the Ninth Circuit would have had no reason to remand.

In this case, of course, the matching process measured the number of customers drawn from plaintiffs to favored purchasers, and defendants in support of their motion seek to examine that number in the context of the BNPD sales volume of a typical retail pharmacy. The reasoning in *De Modena* accordingly supports defendants' position here.

In response to defendants' argument that the limited number of lost sales demonstrated by the matching process precludes their Robinson-Patman Act claims, plaintiffs invoke what has come to be known as the "*Morton Salt*" inference. The inference takes its name from the decision in *FTC v. Morton Salt Co.*, 334 U.S. 37 (1948), where the Supreme Court stated:

> It would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers. This showing in itself is sufficient to justify our conclusion that . . . findings of injury to competition were adequately supported by evidence.

344 U.S. at 49-51. In *Volvo*, the Supreme Court described *Morton Salt* as recognizing that "a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time." 546 U.S. at 177.

Plaintiffs contend, in essence, that the results of the matching process do not preclude their claims because the *Morton Salt* inference provides them with an alternative means of demonstrating likely competitive injury. As a general matter, plaintiffs are correct: a Robinson-Patman plaintiff may typically establish competitive injury in one of two ways: "proof of lost sales or profits, or under the *Morton Salt* test, proof of a substantial price discrimination between competitors over time." *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1535 (3d Cir. 1990) (internal citations omitted).

The problem for plaintiffs is that this is not a typical case. The *Morton Salt* inference is just that – an inference – and it is subject to rebuttal. Thus, as noted above, the Supreme Court in *Volvo* referred to the *Morton Salt* inference as a "permissible" one that "may" arise under certain circumstances. Even before *Volvo*, the Supreme Court had pointed out that, "[i]n the absence of direct evidence of displaced sales," the *Morton Salt* inference "may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits." *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435 (1983). Similarly, in *Boise Cascade*, the Circuit Court held that

> The [*Morton Salt*] inference can . . . be overcome by evidence showing an absence of competitive injury within the meaning of Robinson-Patman. That is to say, a sustained and substantial price discrimination raises an inference, but it manifestly does not create an irrebuttable presumption of competitive injury.

837 F.2d at 1144.

Here, plaintiffs have undertaken an extensive, costly and time-consuming effort to trace the customers they claim to have lost to favored purchasers because of price discrimination, but have essentially come up empty. Moreover, their efforts to point to other evidence of competitive injury fail for several reasons, not the least of which is that they have stipulated that

the results of the matching process would define the "universe of potential lost customers" they would claim they lost as a result of the defendants' pricing practices. Stipulation ¶ 1, Docket Entry 666-1. Under these circumstances, any inference has been rebutted; the assumption that a substantial price difference over time would result in customers leaving plaintiffs for favored purchasers has been carefully tested, but no meaningful evidence of lost sales has been developed.

As plaintiffs contend, there is authority that suggests that the Act has no substantiality requirement. *See*, *e.g.*, *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1020-22 (2d Cir. 1989) (assuming that plaintiff suffered a competitive injury even though plaintiff cited only three instances of lost sales but finding that plaintiff failed to establish a causal connection between any lost sales and alleged Robinson-Patman violations); *Precision Printing Co., Inc. v. Unisource Worldwide, Inc.*, 993 F. Supp. 338, 353 (W.D. Pa. 1998) (finding that plaintiff "raise[d] a genuine issue of material fact on the issue of competitive harm" based on evidence that "at least one customer shifted business away from plaintiff because it was no longer price-competitive" but denying/granting summary judgment because there was no Robinson-Patman violation); *Capital Ford Truck Sales, Inc. v. Ford Motor Co.*, 819 F. Supp. 1555, 1578 (N.D. Ga. 1992) (holding that "[t]he *de minimis* injury doctrine applies only when a plaintiff has no direct evidence of lost sales and adduces proof of competitive injury through evidence of substantial price discrimination over time"); *see also* 3A FED. JURY PRAC. & INSTR. § 150.205 (requiring plaintiff to "show there is a reasonable possibility that the alleged price discrimination may have harmed competition. Plaintiff is not required to show that the alleged price difference actually harmed competition.") (citing *Corn Products Refining Co. v. Fed. Trade Comm'n*, 324 U.S. 726 (1945)); *The Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703,

711 n.9 (2d Cir. 1983) (affirming a jury charge that stated that "the plaintiff must establish by a fair preponderance of the evidence that it suffered a loss of sales and consequently a loss of profit because of the illegal price discrimination . . . . The loss of Bohack may be shown by showing that the price discrimination diverted sales from Bohack that Bohack lost sales and therefore profit. It is not necessary that you find that competition was in fact lessened, injured or damaged, but only that the acts of the defendant may have substantially lessened competition, injured or destroyed some competition."); *Cf. Gen. Auto Parts Co. v. Genuine Parts Co.*, 2007 WL 704121, at *6 (D. Idaho Mar. 5, 2007) (denying summary judgment after finding that there were disputes of fact on whether any price discrimination "might" have substantially lessened competition). However, after reviewing all of the pertinent authorities, and relying in particular on the Supreme Court's most recent pronouncement in *Volvo*, I conclude that a Robinson-Patman claim requires a showing of substantial competitive injury and that the de minimus sales identified by the matching process are insufficient to establish such an injury. 546 U.S. at 180.

For all these reasons, I conclude that plaintiffs have failed to demonstrate sufficient competitive injury to sustain their Robinson-Patman Act claims. Accordingly, defendants are entitled to summary judgment.

*2. Antitrust Injury*

As noted above, a plaintiff seeking to recover damages on a Robinson-Patman claim must establish an antitrust injury. An antitrust injury is an "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)). *See also Dayton Superior Corp. v. Marjam Supply Co.*, 2011 WL 710450 at * 6 (E.D.N.Y. Feb. 22,

2011). Even if plaintiffs' claims were not subject to dismissal for failure to raise a question of fact with respect to competitive injury, I would grant defendants' summary judgment motion because plaintiffs have, largely for the reasons discussed above, also failed to present evidence of antitrust injury.

Price discrimination does not entitle a disfavored purchaser to "automatic damages." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561 (1981). Rather,

> [f]or purposes of Robinson-Patman secondary line cases, antitrust injury is the competitor's unfair competitive edge that is used to attract sales or profits from the plaintiffs. Thus, the injury must be traced to the competitor's competitive use of their price advantage.[20]

*Drug Mart II*, 472 F. Supp. 2d at 424 (citing *Uniroyal , Inc. v. Jetco Auto Serv., Inc.*, 461 F. Supp. 350, 358 (S.D.N.Y. 1978)). In other words, "[i]f the price discrimination . . . was the cause of the plaintiffs' injury, the plaintiffs should be able to match up their losses with gains to the favored competitors." *Id.* at 424-25 (quoting *Hasbrouck v. Texaco, Inc.*, 1980 WL 1843 at *19 (E.D. Wash. Mar. 31, 1980), *aff'd in part, rev'd in part*, 663 F.2d 930 (9th Cir. 1981). Except to the minimal extent described above, plaintiffs here, despite tremendous effort, have been unable to "match up their losses" with gains to the favored purchasers. Plaintiffs have identified less than 3% of their total lost customers as having purchased BNPDs from favored purchasers, undermining any inference that price advantages enjoyed by favored purchasers

---

[20] Judge Glasser discussed the standard to apply in analyzing antitrust injury as follows:

> First, the plaintiffs must prove the fact of antitrust injury; second, they must make a showing regarding the amount of damages in order to justify an award by the trier of fact. . . . [P]laintiffs' burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy. Once causation is established, the jury is permitted to calculate the actual damages suffered using a "'reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.'" The plaintiffs therefore must proffer evidence of some damage, with the recognition that the actual amount need not be proven to the same degree of certainty as proving some quantum of damages.

*Drug Mart II*, 472 F. Supp. 2d at 423-24 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 (1969) and *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).

caused plaintiffs' injury. Where the evidence of lost sales is as de minimus as it is here, it cannot support a finding of a causal connection between lost sales and the alleged price discrimination.

Although there appear to be few precedents on point, the relevant decisions do suggest that a trivial effect on a claimant's sales is insufficient to demonstrate antitrust injury. For example, in *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17 (1st Cir. 1981) (Breyer, J.), the First Circuit rejected plaintiff's claim, holding that because "the affected sales were but a tiny fraction of its total business," plaintiff was unable "to show any significant actual injury." *Id*. at 23. A similar analysis contributed to the dismissal in *Hygrade Milk and Cream Co. v. Tropicana Products, Inc.*, 1996 WL 257581 at *18-19 (S.D.N.Y. May 16, 1996) (rejecting claim of antitrust injury where lost sales were, at best, "insignificant").

Because they are essentially unable to match up a significant number of the customers they lost with those the favored purchasers gained, plaintiffs have failed to demonstrate antitrust injury. *But see U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1377 (2d Cir. 1988) (affirming that an antitrust plaintiff may recover nominal damages under the Clayton Act, albeit in the context of a Sherman Act claim). Defendants are therefore entitled to summary judgment on this ground as well.

*3. Equitable Relief*

Plaintiffs seek equitable relief as well as damages. Injunctive relief "against threatened loss or damage by a violation of the antitrust laws" is available pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. If a Robinson-Patman plaintiff establishes all the elements of its prima facie claim, including competitive injury, injunctive relief may be granted without any showing of antitrust injury.

Although the matter was not explicitly raised by the parties in their motion papers, plaintiffs' claims for equitable relief are foreclosed by Judge Glasser's decision in *Drug Mart III,* 2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007). In that decision, Judge Glasser considered whether his decision granting defendants summary judgment with respect to plaintiffs' damages claims was dispositive of, or even relevant to, plaintiffs' claims for equitable relief. Judge Glasser determined that plaintiffs' equitable relief claims could not survive, and rendered a thorough decision that explained his reasoning in great detail. Little would be served by retracing Judge Glasser's steps here; I therefore simply summarize his decision as follows. Citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986), Judge Glasser recognized that, generally, a plaintiff may obtain equitable relief from price discrimination merely by demonstrating a threat of antitrust injury, and need not establish actual injury and damages. *Id.* at *6. Judge Glasser went on to conclude, however, that

> where the allegedly anticompetitive conduct has been ongoing for a substantial period of time, the distinction between Section 4's requirement of actual injury and Section 16's more liberal requirement of threatened injury tends to shrink or disappear. If the plaintiff cannot show itself to have suffered some actual injury of the type the antitrust laws were intended to prevent from a purportedly anticompetitive practice in which the defendant has engaged for a substantial portion of time, the plaintiff is effectively presumed to be unable to establish the existence of a threat of future injury arising from that same conduct in the future, at least absent some plausible explanation why a practice that has not created a cognizable injury in the past creates a credible risk of doing so in the future if permitted to continue.

*Drug Mart III*, 2007 WL 4526618, at *13 (relying on *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666 (D.C. Cir. 1977), *Ashley Meadow Farms, Inc. v. Am. Horse Shows Ass'n, Inc.*, 617 F. Supp. 1058 (S.D.N.Y. 1985), and *Machovec v. Council for the Nat'l Register of Health Serv. Providers in Psych., Inc.*, 616 F. Supp. 258 (E.D. Va. 1985)).

Accordingly, Judge Glasser granted summary judgment to the designated defendants with

respect to the designated plaintiffs' claims for equitable relief. Because plaintiffs have failed to demonstrate competitive injury, Judge Glasser's decision controls here, and it requires dismissal of plaintiffs' claims for injunctive relief.

*4. Section 2(d) and 2(f) Claims*

Plaintiffs also bring claims pursuant to Sections 2(d) and 2(f) of the Act. 15 U.S.C. §§ 13(d), (f).[21] Because 2(f) claims are derivative in nature and I find that plaintiffs failed to establish their 2(a) claims, defendants' motion for summary judgment with respect to the 2(f) claims is granted. *See Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*, 88 F. Supp. 2d 133, 137 (S.D.N.Y. 2000). Section 2(d) does not require plaintiffs to establish competitive injury, *Blue Tree Hotels*, 369 F.3d at 219 (citing *FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 65 (1959)); *Hygrade Milk & Cream Co.*, 1996 WL 257581, at *13; under the Clayton Act, however, plaintiffs must establish antitrust injury. Because I find that plaintiffs have failed to establish antitrust injury, defendants' motion for summary judgment with respect to the 2(d) claims is also granted.

---

[21] Section 2(d) prohibits

> any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d). Section 2(f) provides that it is "unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." *Id.* § 13(f).

**CONCLUSION**

For all these reasons, defendants' motion for summary judgment is granted.

SO ORDERED.

Dated: Brooklyn, New York
August 16, 2012

/s/
STEVEN M. GOLD
United States Magistrate Judge

*U:\eoc 2012\drug mart\m&o final.docx*

| | | |
|---|---|---|
| 11/13/2012 | | PARTIAL FINAL JUDGMENT: Judgment is hereby entered in favor of Defendants Abbott Laboratories, Ciba-Geigy Corporation, Sandoz Pharmaceuticals Corporationnow merged into Novartis Pharmaceuticals Corporation), Hoechst Marion Roussel, Inc., Pfizer Inc. and G.D. Searle & Co and Pharmacia & Upjohn Co. (both now erged with Pfizer Inc.), Rhone-Poulenc Rorer, Inc., Thrift Drug, Inc., Johnson & Johnson, and Caremark R)( Inc. and against Plaintiffs Ackal's Iberia Pharmacy, Inc. d/b/a Ackal's Pharmacy, Cash & Henderson Drugs, Inc. d/b/a Cash & Henderson Drugs, Collinwood Drugs, Creech Drug Co., Inc., David W. Garber d/b/a Fishburne Pharmacy, Dee-Car Inc. d/b/a Medical III Pharmacy, Discount Drugs of Ellijay, GA.,Inc. d/b/a Valu-Rite Discount Pharmacy, formerly d/b/a Wal-Mart, Family Prescription Center, Inc., Feldman, Inc. d/b/a Drug Center of Newtown, Graves Drug Store Emporia, Inc. d/b/a Graves Drug Store, Harrah Pharmacy, Inc. d/b/a Harrah Pharmacy, J.T. Lindsey d/b/a Omega Pharmacy, Klein's Pharmacy & Orthopedic Appliances d/b/a Klein's Pharmacy, Lively Drug Co., Inc., Maple Avenue Pharmacy, Inc. d/b/a Maple Avenue Pharmacy, Marjorie H. Lamar d/b/a Madison Drug Company, Matthew E. Leon d/b/a West End Pharmacy, Miller Drugs, Inc. d/b/a Miller Drugs, Monroe Pharmacy, Inc. d/b/a Monroe Pharmacy, Northpark Pharmacy, Ltd d/b/a Acadania East Pharmacy, Pelta Drug, Inc. d/b/a James Pharmacy, Pharma-Card, Inc. d/b/a Pharma-Card Prescription Services, R.H. Moore Drug Company of Franklin, Rickman & Haile, Inc. d/b/a Perkins Drugs, Thrifty Drug Store, Inc. d/b/a Thrifty Drug, Triangle Pharmacy, Inc., Troutman Drug Co., and Washeko's Pharmacy, Inc.. Ordered by Michele Gapinski Chief Deputy Clerk of Court on 11/5/2012. Associated Cases: 1:93-cv-05148-ILG-SMG et al. (Marziliano, August) (Entered: 11/13/2012) |