# 12-4689-cv

# United States Court of Appeals

*for the*

# Second Circuit

DRUG MART PHARMACY CORPORATION, *et al.*,

*Plaintiffs,*

CASH & HENDERSON DRUGS, INC., OMEGA PHARMACY, LLC, DISCOUNT DRUGS OF ELLIJAY, GA, INC., KLEIN'S PHARMACY & ORTHOPEDIC APPLIANCES, INC., MONROE PHARMACY, INC.,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

DURETTECRUMP PLC
WYATT B. DURRETTE, JR.
KENNETH D. MCARTHUR
1111 E. Main Street, 20th Floor
Richmond, VA 23219
(804) 775-6900

BOIES, SCHILLER & FLEXNER LLP
NICHOLAS A. GRAVANTE, JR.
STEVEN I. FROOT
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

MICHAEL I. ENDLER
ROBERT C. TIETJEN
BENJAMIN D. BATTLES
30 South Pearl Street
Albany, NY 12207
(518) 434-0600

*Attorneys for Plaintiffs-Appellants*

TRIANGLE PHARMACY, INC., THE TROUTMAN DRUG CO.,
GRAVES DRUG STORE EMPORIA, INC., R.H. MOORE DRUG COMPANY
OF FRANKLIN, INC., PELTA DRUG, INC., ACKAL'S IBERIA PHARMACY,
INC., NORTHPARK PHARMACY, LTD., MILLER DRUGS, INC.,
RICKMAN & HAILE, INC., COLLINWOOD DRUGS, THRIFTY DRUG
STORE, INC., PHARMA-CARD, INC., CREECH DRUG CO., INC.,
FELDMAN, INC., FAMILY PRESCRIPTION CENTER, INC.,
HARRAH PHARMACY, INC., DAVID W. GARBER,
MARJORIE H. LAMAR and LIVELY DRUG CO., INC.,

*Plaintiffs-Appellants,*

– v. –

JOHNSON & JOHNSON, CAREMARK L.L.C.
and EXPRESS PHARMACY SERVICES OF PA, L.L.C.,

*Defendants-Appellees,*

AMERICAN HOME PRODUCTS CORP., *et al.*,

*Defendants.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......... 1

ARGUMENT .......... 3

I. THE DISTRICT COURT IMPLEMENTED THE DISCOVERY PROCESS IN THIS CASE IN RESPONSE TO ITS EARLIER RULING ON THE PROOF REQUIRED TO ESTABLISH ANTITRUST INJURY AND DAMAGES .......... 3

A. Pretrial Order No. 5 Established that the Designated Party Litigation Could Not Bind the Non-Designated Parties .......... 4

B. The Matching Process Was Designed to Test Defendants' Assertion that Many Plaintiffs Could Not Identify a Single Lost Customer and Thus Could Not Make a Threshold Showing of Damages under the Standard Set Forth in the Damages Ruling .......... 5

II. THE DISTRICT COURT HAD NO BASIS TO REJECT PHARMA-CARD'S INTERROGATORY RESPONSES .......... 10

III. PLAINTIFFS' EVIDENCE OF ANTIRUST INJURY PRECLUDES SUMMARY JUDGMENT .......... 13

A. Defendants' Statutory Arguments Are Meritless .......... 13

B. Defendants Misread the Relevant Case Law .......... 17

IV. PLAINTIFFS' EVIDENCE OF COMPETITIVE INJURY PRECLUDES SUMMARY JUDGMENT .......... 21

A. Defendants Have Conceded All the Facts Necessary to Establish the *Morton Salt* Inference .......... 21

B. The Results of the Matching Process Do Not Rebut the *Morton Salt* Inference .......... 22

C. There Is No Requirement that a Robinson-Patman Plaintiff Show Substantial Lost Sales to Survive Summary Judgment ........................... 25

V. PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF AND UNDER 2(d) AND 2(f) SHOULD SURVIVE SUMMARY JUDGMENT ........................... 28

CONCLUSION ........................... 29

CERTIFICATE OF COMPLIANCE ........................... 30

## TABLE OF AUTHORITIES

**Cases** **Page**

*Allen Pen Co. v. Springfield Photo Mount Co.*,
653 F.2d 17 (1st Cir. 1981) ........ 18-19

*Allied Sales & Serv. Co. v. Global Indus. Techs., Inc.*,
No. CIV. A. 97-0017, 2000 WL 726216 (S.D. Ala. May 1, 2000) ........ 24

*Assoc. Gen. Contractors of California, Inc. v. California St. Council of Carpenters*,
459 U.S. 519 (1983) ........ 15-17

*Blue Shield of Virginia, Inc. v. McCready*,
457 U.S. 465 (1982) ........ 15-17

*Boise Cascade Corp. v. FTC*,
837 F.2d 1127 (D.C. Cir. 1988) ........ 24

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ........ 28

*Camarda v. Snapple Dists.*,
346 F. App'x 690 (2d Cir. 2009) ........ 18

*Chroma Lighting v. GTE Prods. Corp.*,
111 F.3d 653 (9th Cir. 1997) ........ 25

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
79 F.3d 182 (1st Cir. 1996) ........ 23, 27

*Crimpers Promotions, Inc. v. Home Box Office, Inc.*,
724 F.2d 290 (2d Cir. 1983) ........ 17

*Falls City Indus., Inc. v. Vanco Beverage, Inc.*,
460 U.S. 428 (1983) ........ 9-10, 23, 27

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
394 U.S. 495 (1969) ........ 28

*FTC v. Morton Salt*,
334 U.S. 37 (1948) ........ 10, 21-25, 28

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C*,
711 F.3d 68 (2d Cir. 2013) .......................................................... 14, 15

*George Haug Co. v. Rolls Royce Motor Cars Inc.*,
148 F.3d 136 (2d Cir. 1998) ..........................................................29

*Great Atlantic & Pacific Teac Co. v. FTC*,
440 U.S. 69 (1979)..........................................................................1

*Hanson v. Pittsburgh Plate Glass Indus.*,
482 F.2d 220 (5th Cir. 1973) ..........................................................28

*Hygrade Milk & Cream Co. v. Tropicana Prods., Inc.*,
No. 88 Civ. 2861, 1996 WL 257581 (S.D.N.Y. May 16, 1996) ........... 18, 19-20

*In re Brand Name Prescription Drugs Antitrust Litig.*,
186 F.3d 781 (7th Cir. 1999) ..........................................................22

*Penn R. Co. v. Chamberlain*,
288 U.S. 333 (1933)..........................................................................24

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
507 F.3d 117 (2d Cir. 2007) .......................................................... 14-15

*Precision Printing Co. v. Unisource Worldwide, Inc.*,
993 F. Supp. 338 (W.D. Pa. 1998)........................................................ 12, 27-28

*Reeder-Simco GMC, Inc. v. Volvo GM Heavy Truck Corp.*,
374 F.3d 701 (8th Cir. 2004) ..........................................................23

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
530 F.3d 204 (3d Cir. 2008) ..........................................................27

*U.S. Football League v. Nat'l Football League*,
842 F.2d 1335 (2d Cir. 1988) .......................................................... 17-18

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
546 U.S. 164 (2006)........................................................ 2, 21, 25, 26-27

*W. Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.*,
No. 11-CV-01611, 2013 WL 4775894 (D. Colo. Sept. 5, 2013) .......................25

*Whitaker Cable Corp. v. FTC*,,
239 F.2d 253 (7th Cir. 1956) ........................................................................28

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 110 (1969)...........................................................................................20

**Statutes**

15 U.S.C. § 13 .........................................................................................................25

15 U.S.C. § 15 .........................................................................................................13

**Other Authorities**

Earl W. Kinter and Joseph P. Bauer, Federal Antitrust Law (1983) .......................28

## PRELIMINARY STATEMENT

Defendants' brief begins with the remarkable concession that for decades mail-order pharmacies owned by large corporate pharmacy benefit managers ("PBMs")—including Defendant Caremark, L.L.C. ("Caremark)—have been "able to extract rebates and discounts from brand-name prescription drug ("BPND") manufacturers," including Defendant Johnson & Johnson ("J&J"), but independent retail pharmacists such as Plaintiffs have not. (Opp. 2, 4-5.)[1] Defendants also do not dispute that, during this same period, retail pharmacy's market share has been decimated, and thousands of retail pharmacies have gone out of business, including hundreds of the plaintiffs originally involved in this litigation. These concessions relate precisely to the evil that caused Congress to enact the Robinson-Patman Act. *See Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 75-76 (1979) (Robinson-Patman Act intended to combat "the increased market power and coercive practices of chainstores and other big buyers that threatened the existence of small independent retailers."). Nonetheless, and even though Plaintiffs had not yet had any discovery from Defendants on their Robinson-Patman claims, the District Court granted summary judgment against Plaintiffs based on a mistaken understanding of the procedural history of this litigation, a cramped interpretation

[1] Citations to "Opp." refer to the Brief for Defendants-Appellees and citations to "Br." refer to the Brief for Plaintiffs-Appellants.

of the Supreme Court's decision in *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006), and the court's own irrelevant view of the Robinson-Patman Act's flaws.

Defendants' arguments for affirming the District Court's decision are misguided, and this Court should reverse the dismissal of Plaintiff's claims.

*First*, Defendants incorrectly suggest that Plaintiffs proposed the Matching Process as the exclusive means to prove their Robinson-Patman claims. In truth, the parties and the District Court designed the Matching Process in response to the District Court's 2007 summary judgment ruling that articulated a standard for making a threshold showing of antitrust injury and damages (the "Damages Ruling"). It was never intended nor agreed that the Matching Process would replace other relevant evidence in this case.

*Second*, Defendants argue that Pharma-Card's evidence was properly excluded. But Defendants do not dispute that Pharma-Card specifically identified thousands of lost customers in response to Defendants' interrogatories, that those responses pre-dated the Matching Process, and that Plaintiffs never agreed to disregard those responses.

*Third*, Defendants ask this Court to engraft a requirement on Section 4 of the Clayton Act that a plaintiff may only have antitrust standing if it can specifically

identify a "substantial" number of customers lost to a favored purchaser. Neither the statute, nor any case that Defendants cite, supports that position.

*Fourth*, Defendants concede that Plaintiffs were the victims of significant price discrimination over a substantial period of time. That alone entitles Plaintiffs to an inference of competitive injury. Defendants cannot rebut that inference solely through evidence that Plaintiffs purportedly lost only a limited number of sales to the Favored Purchasers involved in the Matching Process. In any event, there is no legal support for Defendants' position that a Robinson-Patman plaintiff must specifically identify a substantial number of lost sales to survive summary judgment on the issue of competitive injury.

*Finally*, Defendants fail to present any independent arguments with respect to Plaintiffs' claims for equitable relief and under Section 2(d) and 2(f) of the Robinson-Patman Act. Accordingly, those claims also should be reinstated.

## ARGUMENT

### I. THE DISTRICT COURT IMPLEMENTED THE DISCOVERY PROCESS IN THIS CASE IN RESPONSE TO ITS EARLIER RULING ON THE PROOF REQUIRED TO ESTABLISH ANTITRUST INJURY AND DAMAGES

Defendants deliberately mischaracterize the nature of the proceedings that followed remand of this action from the Northern District of Illinois to the Eastern District of New York. Defendants, for example, assert that following the Damages Ruling against the Designated Plaintiffs, the remaining plaintiffs "rejected the

premise that the test cases should serve as a guide to resolve the remaining cases, which was clearly the purpose behind Pretrial Order No. 5," and instead "embarked on a new approach contending that they would show harm to each RP plaintiff." (Opp. 8.) That is simply false. In fact, even though Pretrial Order No. 5 expressly provided that any ruling with respect to the Designated Parties would have no preclusive effect on any non-designated party, Plaintiffs agreed to undertake the Matching Process in order to test Defendants' assertion they could "not even identify a single customer that was lost as a result of the alleged price discrimination," (A-409), and thus could not make a threshold showing of antitrust injury and damages under the standard articulated in the Damages Ruling.

### A. Pretrial Order No. 5 Established that the Designated Party Litigation Could Not Bind the Non-Designated Parties

Defendants ignore that all parties agreed the resolution of the Designated Plaintiffs' claims could not bind any non-designated party. Under Pretrial Order No. 5—the terms of which were stipulated to by the parties, including the Defendants here—the claims of certain "Designated Plaintiffs" against certain "Designated Defendants" were chosen to proceed, while all other claims were stayed. (A-62-88.) The order expressly stated that any disposition of any claim for or against any Designated Party "shall have no res judicata or collateral estoppel effect (as to any matter of law or fact) in any action or with respect to any claim or defense against any" non-designated party. (A-69-70.) Pretrial Order No. 5 was

intended to advance the litigation by reducing "the number of parties to a manageable group" that was still "sufficiently broad, both in terms of the parties and the issues . . . to afford, if you will, some pattern or some prediction of what might happen if these other cases went to trial." (A-405-06.) Thus, the Designated Party litigation represented a mechanism to resolve a subset of claims and potentially provide a blueprint, albeit non-binding, for resolving the remaining claims.

### B. The Matching Process Was Designed to Test Defendants' Assertion that Many Plaintiffs Could Not Identify a Single Lost Customer and Thus Could Not Make a Threshold Showing of Damages under the Standard Set Forth in the Damages Ruling

Following the post-MDL remand back to the Eastern District of New York, the Designated Defendants moved for summary judgment against the Designated Plaintiffs on four bases[2] but, notably, not on the issue of competitive injury. (SPA-1-3.) On January 25, 2007, Judge Glasser denied most aspects of the motion, but granted summary judgment against the Designated Plaintiffs on the issue of damages. Specifically, Judge Glasser ruled that the Designated Plaintiffs' expert report on damages "failed to proffer evidence that specific pharmacies lost sales of

[2] Designated Defendants argued that: (i) the Designated Plaintiffs and the Favored Purchasers purchased BNPDs from different sellers; (ii) no competition existed between the Designated Plaintiffs and certain Favored Purchasers; (iii) certain Favored Purchasers never took title to, resold, or dispensed the Designated Defendants' BNPDs; and (iv) the Designated Plaintiffs could not show that they suffered damages stemming from an antitrust injury under the Clayton Act. (SPA-1-3.)

BNPDs manufactured by defendants to any specific favored purchaser." (SPA-74-75.)

Following the Damages Ruling, thousands of non-designated plaintiffs remained in the case that had not yet had *any* Robinson-Patman related discovery from the Defendants on their claims. Defendants laid the groundwork for the Matching Process when they wrote to the District Court in July 2008 to "outline [their] proposed approach for moving forward with the remaining Robinson-Patman Act claims." (A-408.) Defendants argued that:

> The Orders[3] . . . establish the following ground rules: in order to prevail under the Robinson-Patman Act, each Plaintiff must show that he (i) lost sales from a customer of a Defendant's [BNPD]; (ii) to a favored purchaser who received a discount for that BNPD from the Defendant manufacturer; and (iii) the Plaintiff suffered antitrust injury, that is, the reason for the lost sale was the lower price offered by the favored purchaser made possible by the Defendant's discount or the Plaintiff reduced his price on the BNPD to avoid losing the sale. Judge Glasser's Orders also hold unequivocally that the 17 Designated Plaintiffs failed to make this required showing. In fact, the Designated Plaintiff's Complaints ***do not even identify a single customer*** that was lost as a result of the alleged price discrimination. No doubt, this threshold failure of proof is a pervasive problem among the rest of the Plaintiff's in this case.

(A-409) (emphasis added.) Defendants then proposed that the remaining Plaintiffs:

> must establish an entitlement to proceed to discovery by responding to interrogatories and document requests which seek the threshold information from Plaintiffs that is required by the Orders and

[3] "Orders" refers to the Damages Ruling, discussed above, and Judge Glasser's December 20, 2007 decision (SPA-84-117), which granted summary judgment as to the Designated Plaintiffs' equitable claims under Section 16 of the Clayton Act. (*See* SPA-408.)

> *Twombly*. . . . These interrogatories could reveal thousands of Plaintiffs who simply cannot satisfy the requirements of antitrust injury established by Judge Glasser's Orders. They could also reveal some viable claims, but not against all the manufacturers remaining in this case. Defendants submit that it would be wasteful and inefficient to proceed to discovery without first making this threshold determination.

(A-410.) Not surprisingly given the limited scope of the Damages Ruling, Defendants' letter did not address the issue of competitive injury nor did it argue that identification of "substantial" number of lost sales was necessary to create an issue of fact as to antitrust injury.

At a hearing several days later, Defendants further explained their view of what Plaintiffs needed to show in order to make a "threshold" showing of antitrust injury under Judge Glasser's standard:

> What we've said in my letter is, we're entitled to know if we have a plaintiff. . . . We have seventeen plaintiffs who you ruled are not plaintiffs. That's all we know about this case. We're entitled to know, before we go forward and start opening up mail-order files and opening up HMO files and third-party discovery, to know whether we have a plaintiff. That shouldn't be that hard to do. They either know they lost sales of a [Manufacturer Defendants'] drug to some other entity because they were charging a lower price. Come forward and tell us that. If you come forward and tell us, Mr. Cross, we lost a [Manufacturer Defendants'] customer to another customer, then we'll move forward.

(A-1593.) The District Court ultimately accepted Defendants' proposal to stay all discovery until Plaintiffs responded to Defendants' interrogatories and identified

the customers they believed they had lost as a result of price discrimination, as well as the discovery they hoped to obtain from Defendants. (A-1597, 1604.)

Accordingly, in January 2009, Plaintiffs answered interrogatories and produced documents, although many plaintiffs noted that discovery was necessary to determine which specific customers were lost to Favored Purchasers. (*E.g.*, A-1736-37.) Nonetheless, and even without that information, more than 550 plaintiffs—including Plaintiff Pharma-Card—did identify specific customers lost as a result of Defendants' discriminatory pricing scheme. (*E.g.*, A-1735, 1740-50; *see also* A-415.) In April 2009, Plaintiffs made clear that they would rely on this and other evidence to establish antitrust injury, but would need additional discovery from Defendants and third-parties "to fully present their case." (A-471.)

The parties thereafter agreed, following extensive negotiations and with the District Court's direction (*e.g.*, A-1622-24), to undertake the Matching Process in order to supplement—not replace—Plaintiffs' interrogatory responses. In an effort to streamline the litigation, Plaintiffs agreed to significantly limit the "universe" of potential lost customers for which they would seek damages to those who purchased the Manufacturer Defendants' top-selling maintenance drugs from five identified Favored Purchasers during an approximately 10-year period. (A-312.) Plaintiffs were willing to forego a larger potential damages recovery because their primary concern has always been with obtaining injunctive relief and ending

Defendants' discriminatory pricing practices. The Matching Process thus was designed to test which individual plaintiffs could make a threshold showing of damages, based on a limited universe of lost customers, under the standard articulated in the Damages Ruling. (*See* Br. 8-9.)

Plaintiffs, however, never agreed to ignore all of the other relevant evidence they already had amassed. Defendants cite nothing in the record, for example, suggesting Plaintiffs intended to limit their proof of competitive injury to the results of the Matching Process.[4] Notably, the Damages Ruling expressly stated that competitive injury was not then being contested. (SPA-63 ("To establish competitive injury, plaintiffs are not required to show that the discrimination harmed competition, but only 'a reasonable possibility that a price difference may harm competition.' For purposes of this motion, defendants assume that plaintiffs have satisfied their prima facie case and thus the competitive injury requirement as well.") (quoting *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434-35 (1983)); *see also* A-470 ("The Designated Defendants chose, with good

[4] Defendants misleadingly argue that "throughout the two-and-a-half year matching process, the district court repeatedly instructed [Plaintiffs] to gather all of the evidence upon which they intended to rely in order to make out their *prima facie* case." (Opp. 12-13, 21, 28.) In support of that position, however, Defendants rely entirely on the transcript of an August 11, 2011 teleconference—held after the Matching Process was completed—at which the parties discussed whether additional discovery from third-parties was necessary to make a threshold showing of damages. Plaintiffs made clear at that conference their understanding that they would not be limited to the matching numbers for "resolution of issues regarding competitive injury and our ability to prove antitrust injury." (A-336.)

reason, to concede this point in their summary judgment motions.”).) Moreover, as early as April 1, 2009—well before the Matching Process was completed—Plaintiffs made clear that to “satisfy the element of competitive injury, Plaintiffs will properly rely on the [*Morton Salt*] inference.” (A-470.)

## II. THE DISTRICT COURT HAD NO BASIS TO REJECT PHARMA-CARD’S INTERROGATORY RESPONSES

The District Court should have considered Plaintiff Pharma-Card’s evidence of lost sales, which was relevant and admissible. Fully cognizant of the ramifications of that evidence to their position, Defendants argue it should be rejected because (i) it represents an unjustified “manual supplementation” of the Matching Process results; (ii) it cannot as a matter of law create an issue of fact; and (iii) “Pharma-Card claims that is not only a retail pharmacy, but also a PBM, which introduces an entirely new theory into the case about one PBM losing customers to other PBMs, which is outside the scope of its complaint.” (Opp. 31 (citations omitted).) These contentions are meritless.

*First*, Pharma-Card’s evidence is proper and admissible and constitutes indisputable evidence of antitrust injury. As described above, the Damages Ruling held that, to pursue damages, a plaintiff had to identify specific sales lost to a Favored Purchaser. In response to Defendants’ interrogatories, Pharma-Card identified 39 corporate accounts, each representing numerous individual customers lost as a result of the Manufacturer Defendants’ price discrimination, and

submitted documents identifying those specific employees. (A-2052-2131.) The Matching Process was undertaken because many *other* pharmacy plaintiffs were not able to determine what became of their lost customers in the absence of discovery from Defendants and third-parties. In other words, the Matching Process was designed to supplement the 2009 interrogatory responses, not *vice versa*.

Moreover, as Defendants acknowledge (Opp. 30-31), the reason many of Pharma-Card's lost customers did not appear in the matching results was that they were lost to a PBM that was not included in the streamlined Matching Process. As described above, however, inclusion in the matching results was not a prerequisite for admissibility of lost customer evidence and Pharma-Card's interrogatory responses clearly meet the standard set forth in the Damages Ruling.

*Second*, Defendants assertion that Pharma-Card's evidence is insufficient as a matter of law is completely unsupported. Defendants do not dispute that Pharma-Card has submitted sworn testimony on its own behalf, as well as the sworn testimony of a third party with no interest in this litigation, that (i) Pharma-Card lost at least several thousand specific BNPD customers, which represented the overwhelming majority of its overall business; (ii) those customers were lost to specific Favored Purchasers; and (iii) the loss was directly related to discounts and rebates granted by Defendants to the Favored Purchasers to whom the business was lost. (Br. 55; A-2026-2131, 2547-70.) Nor can Defendants dispute that other

courts have found comparable evidence sufficient to create an issue of fact. *E.g.*, *Precision Printing Co. v. Unisource Worldwide, Inc.*, 993 F. Supp. 338, 353 (W.D. Pa. 1998) (holding that "testimony, in the form of a customer's affidavit, that at least one customer shifted business away from [plaintiff] because it was no longer price-competitive" sufficed "to raise a genuine issue of material fact on the issue of competitive harm").

*Third*, Defendants argue that Pharma-Card's evidence should be disregarded because Pharma-Card purportedly functions as a PBM, "which introduces an entirely new theory into the case." (Opp. 31.) That is bold criticism—raised for the first time before this Court—given that Defendants have long justified their price discrimination by arguing that PBMs provide services which retail pharmacies cannot; for example, by denying a manufacturer access to a PBM's formulary. (*See* Opp. 5.) Thus a comparison of the services provided by individual retail pharmacies *vis-à-vis* PBMs has always been a central issue in this case. Moreover, to the extent plaintiffs like Pharma-Card can provide comparable services as PBMs, Defendants' purported justification for differential pricing is revealed to be a fabrication. At most, Defendants' argument about the nature of

Pharma-Card's business creates an issue of fact for the jury; it hardly provides a basis for granting summary judgment.[5]

## III. PLAINTIFFS' EVIDENCE OF ANTITRUST INJURY PRECLUDES SUMMARY JUDGMENT

Neither the text of the Clayton Act, nor any case law interpreting that Act, requires a Robinson-Patman plaintiff to show that it lost a substantial number of specifically identifiable sales to a favored purchaser in order to establish antitrust injury. In any event, Plaintiffs have presented more than enough evidence to satisfy even the District Court's invented "substantiality" requirement. (Br. 43-52.) Defendants' arguments to the contrary are unavailing.

### A. Defendants' Statutory Arguments Are Meritless

Defendants do not dispute that Section 4 of the Clayton Act provides standing "without respect to the amount in controversy," so long as the fact of an antitrust injury is established, *see* 15 U.S.C. § 15(a), nor do they cite any authority that suggests that provision does not mean what it says. Instead, Defendants incorrectly assert that Plaintiffs somehow seek to "excuse[] or soften" their burden of showing antitrust injury, and argue that this Court has "specifically rejected" Plaintiffs' interpretation of the Clayton Act.

[5] Likewise, Defendants' arguments concerning the reasons why Plaintiffs lost customers (Opp. 2, 11-13, 20) at most serve to create issues of fact.

Plaintiffs have never disputed that they must show antitrust injury. The text of the Clayton Act, however, establishes that antitrust injury may be demonstrated without proof of substantial damages. Plaintiff's own cases make this clear. For example, in *Gatt Communications, Inc. v. PMC Associates, L.L.C.* (Opp. 47), this Court explained that in order to establish antitrust injury, a plaintiff need only: (i) "identify the practice complained of and the reasons such a practice is or might be anticompetitive"; (ii) identify an "actual injury," which requires the Court "to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct"; and (iii) "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges" to establish that "its injury is of the type the antitrust laws were intended to prevent and flows from that which makes or might make defendants' acts unlawful." 711 F.3d 68, 76 (2d Cir. 2013) (quotations and alterations omitted). Plaintiffs easily meet that standard. Notably absent from *Gatt* is any requirement that a plaintiff identify a "substantial" number of actual injuries in order to have antitrust standing.

There is also no merit to Defendants' argument that this Court "has specifically rejected" reading the Section 4's "amount in controversy" language to mean what it says. (Opp. 53.) Defendants cite only *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, which, according to Defendants, held that, notwithstanding Section 4's "broad language," courts have "'carefully parsed

antitrust standing' and have required a showing of antitrust injury." (*Id.* (quoting 507 F.3d 117, 121 (2d Cir. 2007).) But that decision does not address the quantum of loss required to establish antitrust injury. In fact, that decision does not even consider the relevant statutory text. The "broad language" cited by this Court was Section 4's grant of antitrust standing to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." *See* 507 F.3d at 121. And the "careful parsing" referred to was merely the requirement that a plaintiff show antitrust injury, which as this Court subsequently explained in *Gatt*, does not require a showing of a substantial number of separate injuries. *See id.* at 121-22; *Gatt*, 711 F.3d at 76.

Defendants' reliance (Opp. 53-54) on the Supreme Court's *Associated General Contractors* decision is equally misplaced. In the portion of the opinion Defendants cite, the Court was quoting from its earlier opinion in *Blue Shield of Virginia, Inc. v. McCready*, 457 U.S. 465 (1982). *See Assoc. Gen. Contractors of California, Inc. v. California St. Council of Carpenters*, 459 U.S. 519, 535 (1983) ("Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages to his injury or property.") (quoting *McCready*, 457 U.S. at 477)). But *McCready* made clear that courts should not "engraft artificial limitations on the § 4 remedy," and that "in the absence of some articulable consideration of statutory policy suggesting a

contrary conclusion in a particular factual setting," courts should apply "§ 4 in accordance with its plain language and broad remedial and deterrent objectives." *McCready*, 457 U.S. at 472-73. Nonetheless, *McCready* acknowledged two permissible types of limitations on Section 4 based on "statutory policy": a prohibition on antitrust claims by indirect purchasers, designed to prevent double recovery; and a requirement that the alleged harm not be "too remote" from the alleged antitrust violation, *i.e.*, that the alleged injury was among "those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *Id.* at 473-78. It was those situations, neither of which exists in this case, that the Court was referring to in the language cited by Defendants.

Here, Plaintiffs—small independent businesses—have identified specific customers they individually lost as a result of the Manufacturer Defendants' price discrimination in favor of Plaintiffs' larger competitors. In addition, Plaintiffs came forward with undisputed evidence regarding the impact of discriminatory pricing on the retail class of trade and the concomitant increase of market share obtained by mail-order pharmacies. (*See* Br. 5, 26.) This is precisely the type of harm the Robinson-Patman Act was designed to prevent, regardless of whether the number of lost customers identified meets Defendants' proffered definition of "substantial." "Indeed, if we should free ourselves from the miasma of adjectives

that has accumulated around the words of § 4, this case would seem to be a paradigm of standing." *See Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 297 (2d Cir. 1983) (Friendly, J.) (rejecting arguments that *McCready* and *Associated General Contractors* limited Section 4 standing).

### B. Defendants Misread the Relevant Case Law

Defendants concede that a plaintiff may establish antitrust injury even if it is only entitled to nominal damages. (Opp. 54-55.) In Defendants' view, that is still consistent with a "substantiality" requirement because "[o]nce a plaintiff has shown antitrust injury, nominal damages might be permissible where, for example, the trier of fact is unable to separate out the losses caused by the wrongful act from other potential causes." (Opp. 54.) But that argument directly contradicts Defendants' position—stated just pages earlier—that Plaintiffs' cannot establish antitrust injury because their identification of lost sales purportedly failed to "account for consumer preference for the convenience of mail-order pharmacies, customers changing pharmacies as a result of a move or a change in jobs, or a myriad of other possible reasons that customers may change where they fill their prescriptions." (Opp. 50.) Defendants cannot have it both ways. In any event, this Court has confirmed that a plaintiff "is not required to show that the defendants' acts were a greater cause of the injury than other factors" in order to establish antitrust injury, but instead "need only show that their injury to ***some*** degree

resulted from defendants' violation." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) (emphasis in original); *accord Camarda v. Snapple Dists.*, 346 F. App'x 690, 692 (2d Cir. 2009).

Defendants also argue (Opp. 48-53) that the existence of a substantiality requirement is supported by *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17 (1st Cir. 1981), and *Hygrade Milk & Cream Co. v. Tropicana Products, Inc.*, No. 88 Civ. 2861, 1996 WL 257581 (S.D.N.Y. May 16, 1996). As described in detail in Plaintiffs' opening brief, those authorities do not support entry of summary judgment in this case. (Br. 49-52.) Defendants' arguments to the contrary fall flat.

For example, Defendants concede that the District Court misread the First Circuit's decision in *Allen Pen* by interpreting "affected sales" as meaning the number of sales that the plaintiff Allen Pen lost to a favored purchaser instead of the portion of Allen Pen's total sales that were purchased from the defendant Springfield. Incredibly, Defendants argue (Opp. 49) that "distinction is immaterial," notwithstanding that the District Court's misinterpretation formed the basis for its ruling that Plaintiffs could only establish antitrust injury by "match[ing] up a significant number of the customers they lost with those the favored purchasers gained." (SPA-143.) Indeed, the District Court never even

considered what portion of Plaintiffs' total sales were of the Manufacturer Defendants' products.

In any event, the First Circuit held it was not an "indispensable prerequisite" to demonstrate that price discrimination affected more than a "tiny fraction" of the total products sold, or even to demonstrate a drop in total sales, unless the plaintiff also fails "to provide any coherent theory" causally linking the defendant's violations with the plaintiff's injury. *Allen Pen*, 653 F.3d at 23; *see also id.* at 22 (noting that, even after a full trial, the record revealed *no* evidence that "even tends to show that any competitor drew either profits or sales away from Allen Pen"). That is not the situation here. At the very least, Defendants completely fail to explain how *Allen Pen* mandates that a Robinson-Patman plaintiff must specifically identify a substantial number of lost sales in order to survive summary judgment on the issue of antitrust injury.

Defendants' discussion of the Southern District's *Tropicana* decision is equally misguided. The "speculative and insignificant loss of sales" referred to in that decision was merely the claimed loss of *a single customer* to a favored purchaser, which by itself did not establish antitrust injury. Defendants do not dispute that fact. (*See* Br. 50-51.) Nor do Defendants dispute that another plaintiff in *Tropicana* created "a question of fact as to causation"—notwithstanding uncertainty as to which sales were lost because of price discrimination—through

evidence comparable to what Plaintiffs have presented here, namely, market share data and an affidavit from a representative of a large account asserting that it switched from plaintiff to a Favored Purchaser on account of price. (*See* Br. 51.)

Finally, Defendants suggest that Judge Glasser's statement in the Damages Ruling that a plaintiff need only provide evidence of "some damage" in order to prove antitrust injury is irrelevant because Judge Glasser ultimately ruled on the issue of damages, not antitrust injury. (Opp. 52-53.) That is nonsense. Even if Judge Glasser's explanation of antitrust injury is *dicta*, it nonetheless accurately described the Supreme Court's holding in *Zenith Radio Corp. v. Hazeltine Research, Inc.*:

> [A plaintiff's] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful [conduct]; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4.

395 U.S. 110, 114 n.9 (1969); *see* SPA-64 ("As the Supreme Court explained in *Zenith Radio* . . . plaintiffs' burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy.").

Accordingly, Plaintiffs' evidence more than suffices to create an issue of fact as to antitrust injury.

## IV. PLAINTIFFS' EVIDENCE OF COMPETITIVE INJURY PRECLUDES SUMMARY JUDGMENT

Plaintiffs' evidence of competitive injury also is sufficient to survive summary judgment (Br. 21-43), and Defendants argument that the Matching Process demonstrated the absence of competitive harm and rebutted any inference of competitive harm under *Morton Salt* as a matter of law is wrong. The undisputed facts of this case establish that Plaintiffs are entitled to an inference of competitive injury under *FTC v. Morton Salt*, 335 U.S. 37 (1948), and the parties never agreed—nor is there any authority to support the proposition—that a valid inference of competitive injury can be rebutted by the results of the Matching Process, which, as discussed above, was a narrow mechanism designed for an entirely different purpose. In any event, substantial lost sales are not required to show competitive injury.

### A. Defendants Have Conceded All the Facts Necessary to Establish the *Morton Salt* Inference

A Robinson-Patman plaintiff may establish the requisite threat of competitive injury by establishing "that a favored competitor received a significant price reduction over a substantial period of time." *Volvo*, 546 U.S. at 177 (citing *Morton Salt*, 334 U.S. at 49-51). Here, Defendants concede that for decades, Favored Purchasers, including Caremark, have been "able to extract rebates and discounts from" BNPD manufacturers, including Johnson & Johnson, but

independent retail pharmacists such as Plaintiffs have not. (Opp. 2, 4-5.); *see also In re Brand Name Prescription Drugs Antitrust Litig.,* 186 F.3d 781, 186 (7th Cir. 1999) (Posner, J.) ("[T]he manufacturers of [BNPDs] engage in price discrimination . . . . Everyone knows this."). Nothing more is required to entitle Plaintiffs to an inference of competitive injury under *Morton Salt*.[6]

### B. The Results of the Matching Process Do No Rebut the *Morton Salt* Inference

Defendants do not dispute the *Morton Salt* inference applies, but they assert it was "conclusively rebutted" by the Matching Process. (Opp. 43.) Neither the record in this case, nor the authorities that Defendants cite, supports that position.

*First*, as discussed above, absolutely nothing in the record suggests the parties ever agreed to limit Plaintiffs' proof of competitive injury to the results of the Matching Process, much less that Defendants would be permitted to rebut a *Morton Salt* inference by viewing those results in isolation. The Matching Process was a streamlined mechanism designed to test whether a limited group of Plaintiffs could identify specific customers lost to a limited group of Favored Purchasers in order to make a threshold showing of damages. The parties never agreed that the results of that narrowly tailored mechanism could negate a properly established inference of competitive injury under *Morton Salt.*

[6] For the purposes of this appeal and the summary judgment motion before the District Court, all parties have assumed that Plaintiffs and Favored Purchasers compete with each other with respect to the sale of the Manufacturer Defendants' BNPDs. (*See* Opp. 43 n.24.)

*Second*, Defendants have identified no legal authority that supports their position that a valid *Morton Salt* inference may be rebutted solely through direct evidence of a purportedly limited number of lost sales. To the contrary, the Supreme Court has stated that the *Morton Salt* inference may only be overcome by evidence breaking the chain of causation between a price differential and lost sales or profits "***in the absence of direct evidence of displaced sales***." *Falls City*, 460 U.S. at 435 (emphasis added); *cf. Reeder-Simco GMC, Inc. v. Volvo GM Heavy Truck Corp.*, 374 F.3d 701, 719 (8th Cir. 2004) (Hansen, J., dissenting in part and concurring in part) ("Volvo can successfully rebut any *Morton Salt* inference of injury to competition between Reeder and the 'favored' Volvo dealers because ***the evidence clearly establishes that none of the lost sales or profits*** was diverted from Reeder to those 'favored' dealers.") (emphasis added), *rev'd*, 546 U.S. 164 (2006) (agreeing with Judge Hansen's analysis of competitive injury). Defendants' illogical argument turns *Falls City* on its head.

Moreover, the results of the Matching Process *support* Plaintiffs' position that they did, in fact, lose specifically identifiable sales to Favored Purchasers as a result of price discrimination. *See Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 188 (1st Cir. 1996) ("A pair of sales at different prices makes out a *prima facie* case."). The purportedly small number of lost sales may create a question as to the extent of Plaintiffs' damages, but it does not

affirmatively demonstrate that Plaintiffs' losses were attributable to other causes. *Compare Boise Cascade Corp. v. FTC*, 837 F.2d 1127, 1144-45 (D.C. Cir. 1988) (rebuttal evidence that should have been considered—but which ultimately was found inadequate on remand—included (i) disfavored purchasers' increased sales and profits during the discriminatory pricing period; (ii) customers switching from favored to disfavored purchasers; and (iii) disfavored purchasers' uncertainty that price discrimination actually caused them to lose sales); *Allied Sales & Serv. Co. v. Global Indus. Techs., Inc.*, No. Civ. 97-0017, 2000 WL 726216, at *15 (S.D. Ala. May 1, 2000) ("tenuous evidence of lost sales," though relevant to damages, failed to rebut *Morton Salt* inference because that "inference arises absent any proof of lost sales to begin with").

Indeed, Defendants do not point to a single case where a *Morton Salt* inference was successfully rebutted, much less one where it was rebutted at the summary judgment stage through affirmative proof of specific lost sales. In *Boise Cascade*, noted above, the rebuttal evidence highlighted by the D.C. Circuit was far more substantial than what Defendants point to here, and even that ultimately was found insufficient. (*See* Br. 26-28, 39.) The only other cases Defendants cite (*see* Opp. 44-46) stand either for the unremarkable proposition that, as a general matter, inferences may be rebutted, *e.g.*, *Penn R. Co. v. Chamberlain*, 288 U.S. 333, 341 (1933), or that the *Morton Salt* inference "generally ***may not*** be overcome

by proof of no harm to competition," *see Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 658 (9th Cir. 1997) (emphasis added).

Particularly in light of the Supreme Court's explicit endorsement of the *Morton Salt* inference in *Volvo* (*see* Br. 18-20), there is simply no legal support for Defendants' position. *See, e.g., W. Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.*, No. 11-cv-1611, 2013 WL 4775894, at *8 (D. Colo. Sept. 5, 2013) (because court "is required to view the evidence and draw all reasonable inferences in the light most favorable to [plaintiff]," plaintiff demonstrated "facts entitling it to a *Morton Salt* inference of injury to competition (at least for purposes of summary judgment consideration)" by showing "both a significant price differential and a lengthy period in which such differential predominated").

Accordingly, based on the undisputed facts, Plaintiffs are entitled to an inference of competitive injury under *Morton Salt*.

### C. There Is No Requirement that a Robinson-Patman Plaintiff Show Substantial Lost Sales to Survive Summary Judgment

Even if the *Morton Salt* inference could be ignored, the District Court erred when it held that definitive proof of a substantial number of lost sales is required to establish an injury to competition under the Robinson-Patman Act. (Br. 33-42.)

The statute prohibits price discrimination where the effect "may be substantially to lessen competition." 15 U.S.C. § 13(a). Defendants urge the Court to ignore the words "may be" in the statutory text, (*see* Opp. 32 (arguing that

"price discrimination *must* affect substantially competition") (emphasis added)), and to hold that a Robinson-Patman plaintiff cannot, as a matter of law, show the possibility of a "substantial effect" on competition unless that plaintiff specifically identifies a substantial number of sales or customers that it lost to a favored purchaser. Those arguments are meritless.

Defendants are mistaken that *Volvo* supports their position. (Opp. 39-41.) The issue at the center of that case was whether, in the competitive bidding context, the plaintiff dealer Reeder could make a *prima facie* claim "absent a showing that the manufacturer discriminated between dealers contemporaneously competing to resell to the same retail customer." *Volvo*, 546 U.S. at 169. The Court ultimately found, on a full trial record, that Reeder could not establish competitive injury because "***if price discrimination between two purchasers existed at all***, it was not of such magnitude as to affect substantially competition between Reeder and the 'favored' Volvo dealer." *Id.* at 180 (emphasis added). In this appeal, price discrimination is not disputed and the existence of competition is being assumed. (*See* Opp. 2, 43 n.24.) Defendants misleadingly argue, however, that *Volvo* held that Reeder's evidence "did not show competitive injury ***because the loss of sales and profit*** 'was not of such magnitude as to affect *substantially* competition between [plaintiff] and the "favored" Volvo dealer.'" (Opp. 39 (quoting *Volvo*, 546 U.S. at 180) (emphasis added).) Defendants' blatant attempt

to reinvent a Supreme Court holding to fit their theory of the case should be rejected.[7]

Apart from mischaracterizing *Volvo*, Defendants cannot seriously dispute that the cases relied upon by the District Court do not hold that a specific showing of substantial lost sales is required to survive summary judgment on the issue of competitive injury. (*See* Br. 32-43.) Rather, Defendants simply suggest, without explanation, that when courts have required a reasonable possibility that price discrimination "affect substantially" competition, what they really meant to require was a definitive showing, at the summary judgment stage, of a substantial number of lost sales. (*See* Opp. 33-39.) That is not the law. *See, e.g.*, *Coastal Fuels*, 79 F.3d at 188 ("A pair of sales at different prices makes out a *prima facie* case."); *Precision Printing Co.*, 993 F. Supp. at 353 (holding that "testimony, in the form of a customer's affidavit, that at least one customer shifted business away from

[7] Defendants also argue *Volvo* requires a narrow construction of the Robinson-Patman Act and emphasize that the Act has been "extensively criticized." (Opp. 24-25.) To the extent *Volvo* urged a narrow construction, however, it was with respect to situations, unlike those at issue here, where "the allegedly favored purchasers are dealers with little resemblance to large independent department stores or chain operations, and the supplier's selective price discounting fosters competition among suppliers of different brands." *See Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 227 (3d Cir. 2008) (quoting *Volvo*, 546 U.S. at 181). Moreover, criticism notwithstanding, "[t]he determination whether to alter the scope of the Act must be made by Congress, not [the courts]." *Falls City*, 460 U.S. at 436.

[plaintiff] because it was no longer price-competitive" sufficed "to raise a genuine issue of material fact on the issue of competitive harm").[8]

Accordingly, even if this Court ignored the valid inference of competitive injury under *Morton Salt* (and it should not), Plaintiffs' evidence of harm to competition is sufficient to preclude summary judgment.

## V. PLAINTIFFS' CLAIMS FOR EQUITABLE RELIEF AND UNDER 2(d) AND 2(f) SHOULD SURVIVE SUMMARY JUDGMENT

Because Plaintiffs have established issues of fact with respect to competitive injury and antitrust injury, the District Court erred by dismissing Plaintiffs' claims for equitable relief and their claims under Sections 2(d) and 2(f) of the Robinson-Patman Act. (Br. 55-56.) Defendants make no independent arguments for

---

[8] Defendants' cases (Opp. 36-38) do not support their position. *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) ("For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 330 (1962) ("The usual tying contract . . . is inherently anticompetitive, [and] its use by an established company is likely 'substantially to lessen competition' although only a relatively small amount of commerce is affected."); *Hanson v. Pittsburgh Plate Glass Indus.*, 482 F.2d 220, 224 n.8 (5th Cir. 1973) (small number of sales that one competitor extended to another as a courtesy when an item was not in stock did not substantially affect competition); *Whitaker Cable Corp. v. FTC,* 239 F.2d 253, 256 (7th Cir. 1956) ("If the amount of the discrimination is inconsequential or if the size of the discriminator is such that it strains credulity to find the requisite adverse effect on competition, the Commission is powerless under the Act to prohibit such discriminations."). Moreover, as Judge Glasser has recognized, an injury to competition caused by illegal price discrimination need not necessarily manifest itself in the form of any diverted sales. (*See* SPA-64 n.43 ("[T]he favored purchaser has an advantage over its competitors who pay more for goods of like kind because the competitor can more easily lower its resale price, incur more business expenses, or make a greater profit to facilitate expansion.") (citing Earl W. Kinter and Joseph P. Bauer, Federal Antitrust Law, Vol. III, 295-96 (1983)).)

dismissing those claims. Moreover, with respect to the Section 2(d) claim, there is no requirement that a plaintiff prove competitive injury. *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 145 (2d Cir. 1998).

## CONCLUSION

For all the foregoing reasons, the District Court's order granting summary judgment to Defendants should be reversed.

Dated: New York, New York
April 29, 2014

Respectfully submitted,

/S/ Nicholas A. Gravante, Jr.

**DURETTECRUMP PLC**
Wyatt B. Durrette, Jr.
Kenneth D. McArthur
1111 E. Main St.
Twentieth Floor
Richmond, VA 23219
Telephone: (804) 775-6900
Facsimile: (804) 775-6911

**BOIES, SCHILLER & FLEXNER LLP**
Nicholas A. Gravante, Jr.
Steven I. Froot
575 Lexington Avenue
New York, N.Y. 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Michael I. Endler
Robert C. Tietjen
Benjamin D. Battles
30 South Pearl Street
Albany, N.Y. 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief was produced in Times New Roman (a proportionately spaced typeface), 14-point type, and contains 6,996 words (as calculated by the word count function in the Microsoft Word processing system).

Dated: New York, New York
April 29, 2014

Respectfully submitted,

/S/ Nicholas A. Gravante, Jr.

**DURETTECRUMP PLC**
Wyatt B. Durrette, Jr.
Kenneth D. McArthur
1111 E. Main St.
Twentieth Floor
Richmond, VA 23219
Telephone: (804) 775-6900
Facsimile: (804) 775-6911

**BOIES, SCHILLER & FLEXNER LLP**
Nicholas A. Gravante, Jr.
Steven I. Froot
575 Lexington Avenue
New York, N.Y. 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Michael I. Endler
Robert C. Tietjen
Benjamin D. Battles
30 South Pearl Street
Albany, N.Y. 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665

*Attorneys for Plaintiffs-Appellants*